**No. 24-____**

# In the United States Court of Appeals for the Sixth Circuit

**RECEIVED**
07/29/24
KELLY L. STEPHENS, Clerk

IN RE FIRSTENERGY CORP.,
*Petitioner.*

United States District Court for the
Southern District of Ohio (Nos. 20-cv-3785, 20-cv-4287)
(Hon. Algenon L. Marbley)

## PETITION FOR WRIT OF MANDAMUS

MORGAN L. RATNER
KATHLEEN O'MALLEY
SULLIVAN & CROMWELL LLP
1700 New York Ave. NW
Washington, DC 20006
(202) 956-7500

ROBERT J. GIUFFRA, JR.
SHARON L. NELLES
DAVID M.J. REIN
NICHOLAS F. MENILLO
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for FirstEnergy Corp.*

# TABLE OF CONTENTS

*Page*

**INTRODUCTION**...................................................................1

**STATEMENT OF FACTS**.......................................................6

    A.    HB6 and DOJ Criminal Investigation ..............................6

    B.    Other Government Investigations and Private Lawsuits ..............7

    C.    The Jones Day and Squire Internal Investigations.......................8

    D.    This Privilege Dispute ...................................................9

    E.    The Special Master's Orders ............................................12

    F.    The District Court's Orders...............................................16

**ARGUMENT** ........................................................................18

**I.**    **FIRSTENERGY HAS A CLEAR AND INDISPUTABLE RIGHT TO MANDAMUS**..........................................................20

    A.    Excluding The O'Neil Declaration Was Clear Legal Error ........20

    B.    Even Without The O'Neil Declaration, The District Court's Ruling Was Still Clear Legal Error................................................25

        1.    The district court applied the wrong test for attorney-client privilege..............................................26

        2.    The district court also applied the wrong test for work product .........................................................31

**II.**    **MANDAMUS IS THE ONLY ADEQUATE REMEDY** ....................35

**III.**    **MANDAMUS IS PARTICULARLY APPROPRIATE HERE** .........37

**CONCLUSION**......................................................................39

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Bittaker* v. *Woodford,*
  331 F.3d 715 (9th Cir. 2003)..................................................................35

*Bonds* v. *Cox,*
  20 F.3d 697 (6th Cir. 1994)...................................................................22

*Callahan* v. *Emory Healthcare, Inc.,*
  2019 WL 12405937 (N.D. Ga. Dec. 20, 2019)....................................21

*Carhartt, Inc.* v. *Innovative Textiles, Inc.,*
  333 F.R.D. 113 (E.D. Mich. 2019) .......................................................29

*Cheney* v. *United States Dist. Ct. for D.C.,*
  542 U.S. 367 (2004)...............................................................................18

*Chesher* v. *Allen,*
  122 Fed. Appx. 184 (6th Cir. 2005).........................................1, 18, 34

*In re County of Erie,*
  473 F.3d 413 (2d Cir. 2007) .................................................................28

*Decker* v. *Chubb Nat'l Ins. Co.,*
  2015 WL 5954584 (S.D. Ohio Oct. 14, 2015)....................................34

*Fletcher* v. *ABM Bldg. Value,*
  2017 WL 1536059 (S.D.N.Y. Apr. 18, 2017) .....................................28

*In re Fluor Intercontinental, Inc.,*
  803 Fed. Appx. 697 (4th Cir. 2020)......................................18, 36, 38

*FTC* v. *Boehringer Ingelheim Pharms., Inc.,*
  892 F.3d 1264 (D.C. Cir. 2018).............................................................29

*In re Grand Jury Subpoena Duces Tecum,*
  731 F.2d 1032 (2d Cir. 1984) ...........................................................4, 29

*In re Itron, Inc.*,
   883 F.3d 553 (5th Cir. 2018)................................................................18

*In re Kellogg Brown & Root, Inc.*,
   756 F.3d 754 (D.C. Cir. 2014).......................................................*passim*

*In re Kellogg Brown & Root, Inc.*,
   796 F.3d 137 (D.C. Cir. 2015)............................................................39

*In re King's Daughter Health System, Inc.*,
   31 F.4th 520 (6th Cir. 2022) .......................................................18, 20

*LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*,
   185 F.3d 61 (2d Cir. 1999) ..............................................................2, 21

*In re Lott*,
   424 F.3d 446 (6th Cir. 2005)................................................1, 18, 37, 38

*Miami Valley Fair Hous. Ctr. Inc.* v. *Metro Dev. LLC*,
   2017 WL 10980458 (S.D. Ohio May 16, 2017) ................................34

*Mohawk Indus., Inc.* v. *Carpenter*,
   558 U.S. 100 (2009)..........................................................................1, 34

*Montgomery* v. *Ruxton Health Care, IX, LLC*,
   2006 WL 3746145 (E.D. Va. Dec. 15, 2006)....................................21

*In re Perrigo Co.*,
   128 F.3d 430 (6th Cir. 1997)..........................................................1, 18

*In re Powerhouse Licensing, LLC*,
   441 F.3d 467 (6th Cir. 2006)............................................................37

*In re Pros. Direct Ins. Co.*,
   578 F.3d 432 (6th Cir. 2009)..............................................5, 32, 36

*In re Rospatch Sec. Litig.*,
   1991 WL 574963 (W.D. Mich. Mar. 14, 1991)................................30

*Ross* v. *City of Dublin*,
   2016 WL 7117389 (S.D. Ohio Dec. 7, 2016) ...................................14

*Sandra T.E.* v. *S. Berwyn Sch. Dist. 100*,
  600 F.3d 612 (7th Cir. 2010)........................................25, 26, 30, 32

*Tarochione* v. *Roberts Pipeline, Inc.*,
  62 F. Supp. 3d 821 (N.D. Ill. 2014).................................................23

*United States* v. *Gomez-Vigil*,
  929 F.2d 254 (6th Cir. 1991).........................................................23

*United States* v. *Rowe*,
  96 F.3d 1294 (9th Cir. 1996)....................................................26, 30

*United States* v. *Roxworthy*,
  457 F.3d 590 (6th Cir. 2006).........................................................31

*United States* v. *Straker*,
  596 F. Supp. 2d 80 (D.D.C. 2009)................................................23

*Upjohn Co.* v. *United States*,
  449 U.S. 383 (1981).............................................................*passim*

*Wilson* v. *Russo*,
  2022 WL 911271 (N.D. Ohio Mar. 29, 2022).................................34

## Statutes

18 U.S.C. § 1623(a).........................................................................23

28 U.S.C. § 1292(b)...................................................................17, 19

28 U.S.C. § 1746 .............................................................*passim*

Federal Rule of Evidence 104(a)......................................15, 16, 23, 24

## INTRODUCTION

After a federal criminal complaint implicated FirstEnergy in a political-corruption conspiracy, FirstEnergy and its Board of Directors did what prudent companies do when facing potential liability:  they hired outside law firms (Jones Day and Squire Patton Boggs) to conduct internal investigations and to advise on the company's response.  Under black-letter law, FirstEnergy and its Board had every reason to expect that the attorney-client privilege, work-product doctrine, or both, would protect the substance of those law-firm investigations.  *See Upjohn Co.* v. *United States*, 449 U.S. 383 (1981).  But that is not what happened below.  Instead, the district court ruled that neither attorney-client privilege nor work-product protected either investigation.

That extraordinary ruling justifies an extraordinary remedy.  This Court has repeatedly granted mandamus to correct erroneous privilege decisions.  *See, e.g.*, *In re Lott*, 424 F.3d 446, 456 (6th Cir. 2005); *Chesher* v. *Allen*, 122 Fed. Appx. 184, 187 (6th Cir. 2005); *In re Perrigo Co.*, 128 F.3d 430 (6th Cir. 1997).  The Supreme Court has made clear that mandamus is a critical "safety valve" to correct "a particularly injurious or novel privilege ruling."  *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 110-111 (2009).  The order here clearly meets that standard.

It is difficult to imagine a more "injurious" privilege ruling. The district court's order authorizes Plaintiffs to seek highly sensitive documents and information from Jones Day's and Squire's internal investigations, even though Jones Day represented FirstEnergy for years *in this securities action.*

The order is also "novel"—and strikingly so. During discovery, FirstEnergy withheld materials created in connection with the Jones Day and Squire investigations under the attorney-client privilege and work-product doctrine. After Plaintiffs moved to compel, FirstEnergy submitted a declaration by James O'Neil, a member of its Board, describing how those two law firms were retained to investigate matters raised by government investigations and private lawsuits. Out of nowhere, the special master *sua sponte* struck that declaration, citing the ultimate "gotcha"—that Mr. O'Neil had made his declaration "under penalty of perjury," but did not declare it "*as true* under penalty of perjury." The special master brushed aside that courts have repeatedly held that a declaration made "under penalty of perjury" substantially (and logically) complies with the requirement that it be declared as true. *See, e.g.*, *LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999); *see also infra*, p. 21 (citing other cases).

The special master then refused to allow FirstEnergy to correct what was at most a two-word oversight.  Instead, based solely on the inadvertent omission of the words "as true," the special master (affirmed by the district court) concluded that no evidence supported FirstEnergy's invocation of the attorney-client privilege or work-product protection.  FirstEnergy is not aware of any federal court decision that has so categorically eviscerated the attorney-client privilege and work-product protection, let alone on such a flimsy basis.

The district court's and special master's legal errors did not end with the O'Neil Declaration, and mandamus would be warranted even without its improper exclusion.  There was substantial other record evidence—including testimony from other FirstEnergy directors, a memorandum from FirstEnergy's auditor, and numerous public filings and statements—demonstrating that the Jones Day and Squire investigations were undertaken to provide legal advice in connection with pending government investigations and private litigations.  So even without the Declaration, the district court and special master should have found that both attorney-client privilege and work-product protection applied.  They ruled otherwise only by misapplying the relevant legal frameworks governing both doctrines.

*First*, in evaluating the attorney-client privilege, the district court and special master wrongly applied the *work-product* test.  The district court held that the attorney-client privilege turned on the "motivations behind the internal investigation[s]," and that FirstEnergy had failed to establish that the investigations were not "motivated primarily by business and human resources purposes."  R. 653 (Dist. Ct. Order) at 14246, 14262-14263.[1]  That was clear error.  Under the attorney-client privilege, the question is not the client's "motivation" or reason for seeking advice from a lawyer, but whether the client seeks *legal* advice rather than *business* advice.  Companies seek legal advice for business reasons every day, and such advice is plainly privileged.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984) ("[L]egal advice concerning the mechanics and consequences of alternative business strategies . . . is protected by the privilege.").

*Second*, on work product, as Plaintiffs themselves recognized, it is indisputable that "no internal investigations would have taken place but for the [DOJ] investigation" into FirstEnergy.  R. 529 (MTC Reply) at 11438.  But

---

[1] Pursuant to Sixth Circuit Rule 28(a)(1), citations to the record correspond to the PageID number of the referenced pages.

4

the special master, again affirmed by the district court, worked backwards, focusing on some of the company's *eventual* business "uses of the investigations" (such as terminating executives), rather than why those investigations were originally commenced—in response to government investigations and private litigation. R. 571 (SM Order) at 12384. That hindsight-based reasoning contravened the core principle that a "document prepared in anticipation of litigation" does not lose work-product protection simply because it "also serve[d] an ordinary business purpose" later on. *In re Pros. Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009).

These three independent errors—the unwarranted exclusion of the O'Neil Declaration and the use of legally erroneous frameworks for both the attorney-client-privilege and work-product doctrine—require this Court's immediate correction. The implications of the district court's order are extraordinary: no privilege or work product protection for two internal investigations conducted by outside counsel, hired in the immediate wake of enforcement proceedings and litigation. The harm to FirstEnergy is clear and irreparable: in both this case and other related cases, FirstEnergy will be required to turn over pages upon pages of documents from the internal investigations, including by counsel who represented the company in this

action.  And mandamus is the last possible line of defense:  the district court has denied interlocutory review.  *See* R. 673.

Unless corrected by this Court, the district court's unprecedented order will send shockwaves through law firms and corporate offices throughout the country.  Without predictability in the application of both the attorney-client privilege and the work-product doctrine, businesses in this Circuit will "be less likely to disclose facts to their attorneys and seek legal advice," and thus less able to evaluate misconduct allegations and respond appropriately.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759, 762-763 (D.C. Cir. 2014).  And an "uncertain privilege . . . is little better than no privilege at all."  *Upjohn*, 449 U.S. at 393.

## STATEMENT OF FACTS

### A.    HB6 and DOJ Criminal Investigation

FirstEnergy is an Ohio corporation that, through its affiliates, generates and distributes electricity to more than six million customers.  Starting in 2017, FirstEnergy and one of its subsidiaries paid millions of dollars for the benefit of former Ohio House Speaker Larry Householder in exchange for his promoting their legislative objectives.  R. 72 (Compl.) at 1565-1568 ¶¶ 64-70. In 2019, having again become Speaker, Householder secured passage of

legislation, known as House Bill 6 (HB6), that benefited FirstEnergy. *Id.* at 1567-1568 ¶¶ 71-74. On July 21, 2020, DOJ arrested Householder and unsealed a criminal complaint alleging that he and others had participated in an illegal bribery conspiracy related to HB6, which involved an unnamed energy company widely understood to be FirstEnergy. *Id.* at 1549 ¶ 8, 1596-1600 ¶¶ 143-49. That same day, DOJ issued subpoenas to FirstEnergy. *Id.* at 1597-1598 ¶ 144.

## B.   Other Government Investigations and Private Lawsuits

The Householder complaint and DOJ subpoenas triggered a wave of legal and regulatory actions against FirstEnergy. By July 22, seven class-action law firms had announced that they were investigating securities lawsuits against FirstEnergy. *See* R. 511-2 (Williams Decl. Exs.) at 11000-11017. Within weeks, eight complaints asserting derivative, securities, and RICO claims—including this putative securities class action[2]—were filed against FirstEnergy and certain directors and officers. *See* R. 510 (MTC Opp.) at 10902-10904 (citing dockets). Various state and federal regulators,

---

[2] The district court's class-certification decision is currently on appeal before this Court, following its grant of interlocutory appeal under Rule 23(f). *See* No. 23-3490. Argument was held on July 17 before Judges Boggs, Clay, and Gibbons.

including the Securities and Exchange Commission, the Ohio Attorney General, and the Public Utilities Commission of Ohio, also initiated investigations and proceedings against FirstEnergy. *See id.* at 10930-10932.

## C.    The Jones Day and Squire Internal Investigations

Both FirstEnergy and an independent review committee of its Board immediately retained separate outside counsel to conduct internal investigations. The Board Committee hired Squire to investigate DOJ's allegations. *See* R. 511-2 (Williams Decl. Exs.) at 10971, 10973; R. 489-3 (PwC Memo).[3] FirstEnergy retained Jones Day to conduct a separate investigation into those allegations, and to advise the company on its response to the DOJ subpoenas. R. 489-3 (PwC Memo); R. 259-5 (DPA) at 6002, 6012. The company also retained Jones Day to represent it in related actions, including this one. R. 510 (MTC Opp. App. A) at 10930-10932.

---

[3] This document, submitted by Plaintiffs *in camera* below, is a memorandum prepared by Pricewaterhouse Coopers (PwC), FirstEnergy's independent auditor. The memorandum states that the Board Committee retained Squire, and FirstEnergy retained Jones Day, because of the DOJ criminal investigation and subpoenas. Plaintiffs submitted the memorandum, and other exhibits filed with their motion to compel, *in camera* because the exhibits were designated confidential under the district court's protective order. R. 489-2 at 10500 n.1. Pursuant to 6th Cir. R. 25(h)(5), FirstEnergy will submit those exhibits to this Court under seal.

Because the investigations implicated issues subject to an independent auditor's review (such as FirstEnergy's internal controls), Squire was authorized to communicate confidentially with PwC about certain matters during its investigation. *See* R. 511-1 (O'Neil Decl.) at 10943 ¶ 30. FirstEnergy eventually terminated certain executives, including its CEO Charles Jones and Senior Vice President of External Affairs Michael Dowling, and separated other executives. R. 511-2 (Williams Decl. Exs.) at 10974. On July 22, 2021, FirstEnergy (represented by Jones Day) resolved the DOJ investigation by entering into a deferred prosecution agreement. *See* R. 259-5 (DPA) at 6000-6012.

## D.    This Privilege Dispute

During discovery in this action, Plaintiffs demanded complete access to materials created during the Jones Day and Squire investigations. After FirstEnergy objected, Plaintiffs moved to compel the company to produce "all previously withheld documents" "related" to both investigations. R. 489-1 (MTC) at 10465. Plaintiffs also demanded that FirstEnergy's witnesses be ordered to "answer all questions (past and future) related to the internal investigation[s]." *Id.* Jones and Dowling, who are also defendants in this action, also joined in the motion to compel—presumably hoping to use the

9

investigative materials to defend against their criminal prosecutions, now pending in Ohio state court. FirstEnergy opposed the motion based on the attorney-client privilege and work-product doctrine.

FirstEnergy submitted a declaration from James O'Neil, an independent FirstEnergy director who participated in the Board Committee's decision to hire Squire and who had personal knowledge of the company's hiring of Jones Day. Mr. O'Neil explained that "Squire was retained by [the Board Committee], and Jones Day was retained by FirstEnergy, to conduct internal investigations in response to the DOJ criminal investigation and the pending and anticipated litigation matters." *See* R. 511-1 (O'Neil Decl.) at 10942 ¶ 27. Mr. O'Neil stated that both firms "provided legal advice" to their respective clients. *Id.* He also reiterated what is obvious from the circumstances: "Were it not for the DOJ criminal investigation and pending litigation in late July 2020 . . . the internal investigations would not have been undertaken." *Id.* at 10942-10943 ¶ 29.

The O'Neil Declaration was far from the only record evidence supporting FirstEnergy's opposition to the motion to compel. The evidence cited by both parties also included:

- Docket citations for the many lawsuits filed against FirstEnergy related to HB6 in July and August of 2020;

- testimony from former FirstEnergy directors discussing their interactions with Jones Day and Squire;

- statements from FirstEnergy's DPA describing the Jones Day investigation and its "connection with [the firm's] representation";

- the PwC memo, which states that Squire was engaged "to perform an objective investigation. . . into allegations of illegal acts referenced in the [Householder] Complaint," and that Jones Day was engaged to "lead the[] response to the [DOJ] Subpoenas," and

- statements in FirstEnergy's public filings describing both investigations as directly "related to the government investigations" and "lawsuits against [the company] and certain current and former directors."

*See* R. 607-1 (Objections) at 13221-13224.

In moving to compel, Plaintiffs claimed that the Jones Day and Squire investigations were not entitled to privilege or work-product protection because the "primary purposes of" both investigations were to address three "pressing business purposes."    R. 489-1 (MTC) at 10475-10476.    *First*, FirstEnergy purportedly needed to "assuage PwC" regarding its internal controls, "so [it] could complete its required SEC filings."    *Id.* at 10476. *Second*, FirstEnergy and the Board had to "gather facts for a series of human

resources decisions." *Id.* at 10477. *Third*, FirstEnergy and the Board needed to "strike a deal with" DOJ to preserve the company's "access to outside capital." *Id.* at 10478. Plaintiffs did not submit any direct evidence to support their assertion that these supposed business purposes motivated the investigations; instead, they merely pointed to the various ways in which FirstEnergy *later* used the findings of the investigations.

### E.    The Special Master's Orders

1.    On November 29, 2023, the special master—Shawn Judge, a practicing lawyer at Gibbs Law Group[4]—granted Plaintiffs' motion and ordered FirstEnergy to "produce all previously withheld documents related to" both investigations. R. 571 (SM Order) at 12387.

The special master's decision turned entirely on two missing words in the O'Neil Declaration:  Mr. O'Neil had declared his statements "under penalty of perjury," but "never state[d] anywhere that its contents are declared **as true**." *Id.* at 12379. In the special master's view, this "deficiency render[ed] the document just a document and not a declaration" that complied

---

[4] https://www.classlawgroup.com/attorneys/shawn-judge.

with the requirements of 28 U.S.C. § 1746, placing it "outside the scope of what evidence a federal court can consider." *Id.*

That technical ruling came from left field. Plaintiffs did not raise any issue with the form of the O'Neil Declaration in their briefing. Indeed, in this litigation, Plaintiffs have submitted (and the district court has accepted) three declarations that were not even made "under penalty of perjury," which is undisputedly a requirement of Section 1746, as well as several other declarations that fail to comply with other Section 1746 requirements. *See* R. 649-2 (Notice of Supp. Auth.) at 14230-14232. Nor did the special master mention any issue with the O'Neil Declaration at oral argument.

In his ruling, the special master analyzed the implications of his exclusion of the O'Neil Declaration for the attorney-client privilege and work-product doctrine without distinguishing between the two. "Stated simply," he found, "FirstEnergy's argument falls apart without the O'Neil Declaration." R. 571 (SM Order) at 12385. Without the Declaration, the special master explained, FirstEnergy was merely "speculating about the why behind its actions." *Id.* at 12377. The special master thus considered Plaintiffs' supposed contrary "evidence," purportedly "ground[ing] the early investigation in the business necessity and human resources/public arena," to be

13

"uncontroverted," notwithstanding that "those same issues also logically overlap with anticipated litigation." *Id.* at 12384. The special master never identified what evidence he was relying on to conclude "that the investigation[s] would have occurred even in the absence of anticipated civil and criminal litigation," instead merely opting to cite Plaintiffs' brief. *Id.* at 12385. And the special master never addressed whether the investigations involved legal advice. Instead he categorically rejected FirstEnergy's attorney-client privilege claims under the work-product standard, holding that because the investigations were supposedly "prepared in the ordinary course of business," the "attorney-client privilege does not apply." *Id.* at 12385-86.

2. The next day, at an emergency status conference on the special master's ruling, FirstEnergy stated its intention to file an amended declaration adding the words "true and correct." *See* R. 587 (Nov. 30 Hr'g Tr.) at 12890-12891. It explained that the O'Neil Declaration's omission of that formulaic language had been an inadvertent scrivener's error. *Id.* at 12890. FirstEnergy pointed out that the district court had permitted such an amendment in a different case, *Ross* v. *City of Dublin*, 2016 WL 7117389 (S.D. Ohio Dec. 7, 2016). *Id.* at 12890-12891. And the company argued that Plaintiffs could not possibly be prejudiced by the technical correction, given that they

14

too had overlooked the issue. *Id.* The special master denied FirstEnergy's request, finding "no good cause." *Id.* at 12909-12910.[5]

3.    FirstEnergy sought reconsideration on two principal grounds. *See* R. 592-1. *First*, Section 1746 requires only substantial compliance, and submitting a declaration "under penalty of perjury," without the specific words "true and correct," is enough. *Id.* at 12976-12980. *Second*, under Federal Rule of Evidence 104(a), the rules of evidence (including the requirement that a declaration satisfy Section 1746) do not even apply to privilege determinations. *Id.* at 12980-12981. The special master denied reconsideration, rejecting the first argument and saying nothing about the second. *See* R. 636.

---

[5]    At one point, the special master purported to "clarif[y]" that "[d]iscovery of the attorneys' legal conclusions derived from [the] facts or thought processes to produce those facts is not discoverable." R. 587 (Nov. 30 Hr'g Tr.) at 12904-12905. The district court repeated that clarification, noting that "[t]he Special Master clearly stated that privileged or protected information is not discoverable." R. 653 (Dist. Ct. Order) at 14269. But those statements did not mitigate the harm since both rulings also expressly stated that neither investigation was "entitled to attorney-client privilege or work-product protections" in the first place, and that "FirstEnergy must produce all previously withheld documents related to the internal investigation[s]." R. 571 (SM Order) at 12387; R. 653 (Dist. Ct. Order) at 14274-14275.

**F.      The District Court's Orders**

1.      In overruling FirstEnergy's objections, the district court upheld the special master's ruling in its entirety.  R. 653 (Dist. Ct. Order).  The court agreed with the special master on the supposedly strict requirements of Section 1746, and rejected FirstEnergy's argument that the O'Neil Declaration should in any event be considered under Rule 104(a), stating that the Declaration did "not bear indicia of reliability."  *Id.* at 14253.  The court also affirmed the denial of permission to file an amended O'Neil Declaration, stating that its earlier decision permitting amendment in another case had been "simply an example of the Court using its discretion," and concluding— without explaining what made this case any different—that it need not similarly exercise its discretion here.  *Id.* at 14258.

The district court then upheld the special master's analysis of attorney-client privilege and work-product doctrine based on a record excluding the O'Neil Declaration.   On the attorney-client privilege, the court rejected FirstEnergy's argument that the special master had erred by applying the work-product test, which turns on the motivations behind conducting an internal investigation.   The court instead agreed with the special master's framework and conclusion that "FirstEnergy had not shown the internal

16

investigation was conducted because of litigation, and not because of [the later] employment decisions and business concerns" identified by Plaintiffs.  R. 653 (Dist. Ct. Order) at 14262-14268.  The court also criticized FirstEnergy for not preparing a privilege log and not submitting documents for *in camera* review. *Id.* at 14264-14265.  But the parties had previously agreed, in a court-ordered stipulation, that *no party* was required to log "[p]rivileged communications, documents, or work product exchanged" with "outside counsel . . . concerning the [HB6-related] litigations" against FirstEnergy because, of course, all those documents were presumptively privileged and/or work product.  R. 295 (Privilege Log Protocol) at 6625-6626).  And Plaintiffs sought an order that "FirstEnergy's internal investigation is not entitled to [any] attorney-client privilege or work-product protections in the first place," not that a subset of documents related to purported business concerns should be disclosed. R. 489-1 (Mot. to Compel) at 10489.

2.    FirstEnergy moved the district court to certify its order for interlocutory review pursuant to 28 U.S.C. § 1292(b), R. 661, but the district court denied the motion on July 12, 2024.  R. 673.

17

## ARGUMENT

Mandamus relief is warranted when (1) the "right to issuance of the writ is 'clear and indisputable'"; (2) "the party seeking issuance of the writ" has "no other adequate means to attain the relief he desires"; and (3) "the writ is appropriate under the circumstances." *Cheney* v. *United States Dist. Ct. for D.C.*, 542 U.S. 367, 380-381 (2004); *see In re King's Daughter Health Sys., Inc.*, 31 F.4th 520, 525-526 (6th Cir. 2022). That standard is often satisfied, and mandamus granted, when a litigant is ordered to disclose privileged communications, as the consequences of disclosure are harmful and irreversible. *See, e.g.*, *Lott*, 424 F.3d at 452; *Chesher*, 122 Fed. Appx. at 187; *Perrigo Co.*, 128 F.3d at 437 (6th Cir.); *Kellogg*, 756 F.3d at 754; *In re Fluor Intercontinental, Inc.*, 803 Fed. Appx. 697, 703 (4th Cir. 2020); *In re Itron, Inc.*, 883 F.3d 553, 567-569 (5th Cir. 2018).

The standard is clearly met here. The Jones Day and Squire investigations were conducted by outside counsel in the immediate wake of allegations of wrongdoing that had already spawned both government investigations and private lawsuits. Jones Day represented the company in dozens of those actions, including this one and the DOJ investigation that culminated in the DPA. It is hard to imagine a more "clear and indisputable"

case that at least *some* documents related to the law-firm investigations are protected from discovery by the attorney-client privilege, work-product doctrine, or both. Yet the district court and special master held that both the Jones Day and Squire investigations are unprotected. R. 571 (SM Order) at 12387. As a result, Plaintiffs are poised to gain access into FirstEnergy attorneys' factual and legal analysis of the events underlying their claims. That outcome is the result of what was, at most, the inadvertent omission of two formulaic words, compounded by the district court's and special master's clear misunderstandings of the governing frameworks for both privilege and work product.

At this point, because the district court sustained the special master's order and denied Section 1292 review, mandamus is the only remedy available to correct these errors before FirstEnergy is forced to disclose to Plaintiffs reams of documents protected by the attorney-client privilege and work product doctrine. This Court should grant that relief because the district court misapplied settled law in granting sweeping disclosure here, and because its unprecedented order has created uncertainty for the conduct of internal investigations throughout this Circuit and indeed the country.

## I.    FIRSTENERGY HAS A CLEAR AND INDISPUTABLE RIGHT TO MANDAMUS.

Under settled law, FirstEnergy has a "'clear and indisputable' right to the relief sought" on two independent grounds. *King's Daughter*, 31 F.4th at 526. *First*, the district court and special master erred in excluding the O'Neil Declaration, which establishes that the Jones Day and Squire investigations produced materials covered by the attorney-client privilege and work-product doctrines. *Second*, analyzed under the correct legal frameworks, the record evidence even without the O'Neil Declaration plainly establishes that the investigations generated materials protected by both privilege and work product. The district court and special master concluded otherwise only by badly misapplying the law on both privilege and work-product.

### A.    Excluding The O'Neil Declaration Was Clear Legal Error.

Under Section 1746, a party may support a factual claim with a declaration "in writing of [the declarant] which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form": "I declare . . . under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746. Mr. O'Neil's signed and dated

declaration states, "I, James F. O'Neil, III, hereby declare under penalty of perjury as follows." R. 511-1 (O'Neil Decl.) at 10938.

That declaration is "substantially" in the form required by the statute. That is plain common sense: "when a person swears to a statement under penalty of perjury, it is reasonable to infer that she believes the contents to be true and correct," even if the declarant does not literally "state that th[e] contents are 'true and correct.'" *Montgomery* v. *Ruxton Health Care, IX, LLC*, 2006 WL 3746145, at *3 (E.D. Va. Dec. 15, 2006). The only court of appeals to consider a declaration like Mr. O'Neil's—signed, dated, and made under penalty of perjury—thus concluded that it "substantially complie[d] with the[] statutory requirements." *LeBoeuf*, 185 F.3d at 65-66 (2d Cir.). Many other district-court decisions agree. *See, e.g.*, *Montgomery*, 2006 WL 3746145, at *3 ("[A]n unsworn declaration is not invalid under § 1746 simply because it lacks the words 'true and correct.'"); *Callahan* v. *Emory Healthcare, Inc.*, 2019 WL 12405937, at *3 (N.D. Ga. Dec. 20, 2019) (agreeing with "other courts addressing this issue [that] held that a declaration need not include the 'true and correct' language so long as the declarant states that the declaration is made 'under penalty of perjury'"); *see also* R. 607-1 (Objections) at 13187-13188 (citing cases); R. 649-2 (Notice of Supp. Auth.) at 14225-14226.

21

The district court, echoing the special master, erroneously rejected FirstEnergy's argument. It viewed the words "as true" as integral to Section 1746. The court mainly pointed to this Court's decision in *Bonds* v. *Cox*, 20 F.3d 697, 702 (6th Cir. 1994). *Bonds* quoted Section 1746, which again states that "declarations are permitted to be used as evidence only if 'subscribed . . . as true under penalty of perjury, *and dated*.'" *Id.* (emphasis in original). This Court then rejected the two declarations at issue there because "they *were undated*." *Id.* (emphasis added). That in no way resolves the question presented here. Unlike a declaration submitted under penalty of perjury, but without the words "true and correct," a declaration without a date does not have another proxy for the date. And a court cannot assess the reliability of a declaration where there is no indication of when it was made.

The district court also embraced the special master's speculation that the words "true and correct" are critical because, without them, a declarant could "state falsehoods while recognizing he or she is under penalty of perjury because the declarant has not declared the statement to be true." R. 653 (Dist. Ct. Order) at 14251. That is groundless. Witnesses cannot do the written equivalent of crossing their fingers behind their back and then lie to the court without consequence. Federal law explicitly provides that any person who

"knowingly makes *any false material declaration*" "under penalty of perjury" may be fined, imprisoned, or both. 18 U.S.C. § 1623(a) (emphasis added). That is what would happen, and rightfully so, to any witness who actually made a false statement under penalty of perjury because she had not separately promised that the statement would be true. *See, e.g.*, *United States* v. *Gomez-Vigil*, 929 F.2d 254, 257-258 (6th Cir. 1991) (sustaining perjury conviction for misstatement in declaration made "under the penalty of perjury").

By any measure, the district court clearly erred in holding that the O'Neil Declaration failed to comply with Section 1746, and therefore was not "evidence a federal court can consider." R. 571 (SM Order) at 12379. The court's decision to ignore the O'Neil Declaration because of its misreading of Section 1746 was doubly wrong. Under Federal Rule of Evidence 104(a), when deciding "any preliminary question about whether . . . a privilege exists . . . , the court *is not bound by evidence rules*." (emphasis added). So courts frequently consider declarations under Rule 104(a) even if they are unsworn, defective, or otherwise inadmissible. *See, e.g.*, *United States* v. *Straker*, 596 F. Supp. 2d 80, 84 n.4 (D.D.C. 2009) (under Rule 104(a), the court could

"consider the [unsworn] affidavit"); *Tarochione* v. *Roberts Pipeline, Inc.*, 62 F. Supp. 3d 821, 828 (N.D. Ill. 2014) (same).

The district court concluded that Rule 104(a) did not undermine the special master's reasoning because the O'Neil Declaration "does not bear indicia of reliability." R. 653 (Dist. Ct. Order) at 14253. But Mr. O'Neil was a member of FirstEnergy's Board while both the Jones Day and Squire investigations were conducted, and he served on the independent Board committee that retained Squire and supervised its investigation. His statement was signed, dated, and submitted under penalty of perjury. Given these undisputed circumstances, it is hard to imagine a *more* reliable document here. In support of its contrary view, the district court merely stated that "Mr. O'Neil is a defendant in this case, not a former coworker who is not a party to the action" (citing one Rule 104(a) case relied upon by FirstEnergy), or "a former attorney who unexpectedly failed to appear to testify" (citing another). R. 653 (Dist. Ct. Order) at 14253. But the court never explained why those differences matter, and they have never before been prerequisites in this context.

24

\*    \*    \*

In every respect, the special master treated this critical privilege dispute like a game of "gotcha," and the district court backed him up. At the very last minute, the special master erroneously excluded the O'Neil Declaration *sua sponte* on a flimsy technicality. He then refused to allow FirstEnergy to correct what was, at worst, a non-substantive clerical error (like those plaintiffs have repeatedly made in prior declarations without issue), cementing an admitted "technicality" as the "dispositive" ground for a major privilege decision. R. 571 (SM Order) at 12375. That is not how any dispute, let alone one implicating "the oldest of the privileges," *Upjohn*, 449 U.S. at 389, should be resolved.

### B.   Even Without The O'Neil Declaration, The District Court's Ruling Was Still Clear Legal Error.

Although the O'Neil Declaration itself substantiates FirstEnergy's claims of privilege and work-product protection, the other record evidence clearly and indisputably establishes both attorney-client privilege and work-product protection even without the Declaration. The district court and special master concluded otherwise only by misapplying the governing legal standards.

25

1.     **The district court applied the wrong test for attorney-client privilege.**

a.     It is black-letter law that confidential communications between a company and its counsel during the course of an internal investigation to "secure legal advice" are "covered by the attorney-client privilege." *Upjohn*, 449 U.S. at 394, 397; *Sandra T.E.* v. *S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 619 (7th Cir. 2010) ("[F]actual investigations performed by attorneys *as attorneys* fall comfortably within the protection of the attorney-client privilege."). That privilege extends not only to communications requesting or providing legal analysis, "but also the giving of information to the lawyer to enable him to give sound and informed advice." *Kellogg*, 756 F.3d at 757; *see Sandra T.E.*, 600 F.3d at 619 (citing cases).

These basic principles resolve this dispute. Beyond the O'Neil Declaration, it is undisputed that FirstEnergy and the Board Committee hired Jones Day and Squire to conduct investigations immediately after learning of alleged wrongdoing through a federal criminal complaint and receiving subpoenas from DOJ. It is also undisputed that Jones Day continued to represent the company in several of those matters, including this one and the DOJ investigation. Large public companies do not hire outside counsel to

provide such services unless they want legal advice. And *Upjohn* "make[s] clear that fact-finding which pertains to [such] legal advice" triggers the privilege. *United States* v. *Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996).

The substantial evidence here is consistent with common sense. According to one of FirstEnergy's directors, the "Squire lawyers" met with the Board to provide "legal updates" on their investigative findings, R. 550-2 (Johnson Dep.) at 11919. And Jones Day "conduct[ed] [its] investigation" and "examined carefully the relevant FirstEnergy Corp. records" "in connection with" serving as "counsel for FirstEnergy Corp." and responding to the DOJ investigation. R. 259-5 (DPA) at 6002, 6012. Both the Jones Day and Squire investigations thus plainly generated significant communications protected by the attorney-client privilege.

b.    The district court and special master, however, held that nothing those law firms did in connection with their investigations was protected by attorney-client privilege. They reached that unprecedented conclusion by wrongly conflating the tests for work-product and attorney-client privilege, and thus focusing on the communications' connection to *litigation* rather than *legal advice*. Indeed, the special master did not even distinguish in his analysis between attorney-client privilege and work-product protection. He instead

27

concluded that the Jones Day and Squire investigations did not generate *any* privileged materials because, in his view, the investigations were conducted "for non-litigation human resources/public relations purposes," not "in anticipation of litigation." R. 571 (SM Order) at 12385-12386. The district court agreed, explaining that the privilege question came down to the "motivations behind the investigations," and concluding that FirstEnergy had failed to establish that the investigations were not "motivated primarily by business and human resources purposes." R. 653 (Dist. Ct. Order) at 14246.

A company's "motivation" to conduct an internal investigation determines the scope of work-product protection, but not the attorney-client privilege. Instead, the application of the privilege turns on the nature of the advice at issue—*i.e.*, whether the communication reflects or facilitates "*legal* advice" as opposed to "*business* advice." *Kellogg*, 756 F.3d at 760 (emphases added). If *advice* is legal in nature—that is, if it "involves the interpretation and application of legal principles to [past or future] conduct," *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)—it does not matter whether the client had a business *purpose* for requesting it. Thus, even if FirstEnergy had hired outside law firms to determine whether there was cause "to terminate Jones and other high-level executives," as Plaintiffs suggest, R. 529 (MTC Reply) at

28

11440, those investigations would be privileged. The advice is still unquestionably legal; it just has HR consequences. *See, e.g.*, *Fletcher* v. *ABM Bldg. Value*, 2017 WL 1536059, at *3 & n.4 (S.D.N.Y. Apr. 18, 2017) (providing "legal analysis to the person ultimately deciding whether to fire an employee" is "precisely the type of legal advice that is protected by the attorney-client privilege").

If not corrected, the district court's flawed reasoning threatens to eviscerate the attorney-client privilege in the business setting. Companies frequently seek legal advice for a business "motive," whether an IPO, merger, or terminating an executive. But that is no basis to deny attorney-client privilege. *See, e.g.*, *Carhartt, Inc.* v. *Innovative Textiles, Inc.*, 333 F.R.D. 113, 116 (E.D. Mich. 2019) (holding that communications regarding product recall were privileged because lawyer's "advice and communications were predominantly legal" and the "mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege"); *FTC* v. *Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1268 (D.C. Cir. 2018) (privilege applied even though "decision whether and at what price to settle ultimately was a business decision"); *Grand Jury Subpoena*, 731 F.2d at 1038 (documents that "memorialize client confidences obtained in the

pursuit of legal advice concerning the mechanics and consequences of alternative business strategies [are] protected by the privilege"). Again, lawyers are not limited to providing legal advice related to *litigation*—lawyers can and do give legal advice on all facets of a company's operations.

c.    The district court also faulted FirstEnergy for not providing enough evidence to establish that the Jones Day and Squire lawyers were acting as "legal advisors," rather than "business or human resources advisors." R. 653 (Dist. Ct. Order) at 14263. That too was clearly wrong. Jones Day and Squire are not business consultants or human-resources experts—they are prominent law firms. And record evidence showed that those firms were retained as outside counsel in response to the initiation of multiple lawsuits and government investigations. Again, Jones Day was counsel to the company in many of those suits, *including this one*. The only rational conclusion is that those attorneys were acting as legal advisors. Clients "retain lawyers to perform investigative work"—and to represent them in court—"because they want the benefit of a lawyer's expertise and judgment." *Sandra T.E.*, 600 F.3d at 620.

In concluding otherwise, the district court cited one case involving a privilege dispute where an *in-house* lawyer "wore two hats": "legal counsel"

and "member of the board of directors." *In re Rospatch Sec. Litig.*, 1991 WL 574963, at *7 (W.D. Mich. Mar. 14, 1991). That case is worlds away from this one. Unlike in-house counsel, who sometimes function both as business and legal advisors, there is no real question about which hat outside counsel wear—especially where they are hired to both investigate and litigate the same subject. *See Rowe*, 96 F.3d at 1296 ("The hiring of outside counsel is, obviously, an indication that litigation is anticipated and, therefore, that legal services are required.").

### 2.    The district court also applied the wrong test for work product.

Unlike attorney-client privilege, whether materials created during an internal investigation are entitled to work-product protection *does* depend on whether the investigation was undertaken "because of a party's . . . anticipation of litigation, as contrasted with an ordinary business purpose." *United States* v. *Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006). Again, here, the chronology and record evidence apart from the O'Neil Declaration make abundantly clear that both the Jones Day and Squire investigations were undertaken because of *actual* (let alone anticipated) enforcement actions and litigation. *See supra*, pp. 7-12. Indeed, Plaintiffs acknowledged that

31

"[o]bviously no internal investigations would have taken place but for the Department of Justice investigation."  R. 529 (MTC Reply) at 11438.  Thus, both investigations resulted in materials protected by the work-product doctrine.  It was that simple.

Nevertheless, the district court and special master denied work-product protection after finding that Plaintiffs' supposed "evidence" showed that the internal investigations would have happened regardless of litigation, as it "ground[ed] the early investigation in the business necessity and human resources/public relations arena."  R. 571 (SM Order) at 12384; *see* R. 653 (Dist. Ct. Order) at 14266 (affirming).  That reflected yet another clear legal error:  treating FirstEnergy's *ex-post* business "uses of the investigation[s]" as if they were the *ex-ante* "driving force behind" the company and Board's initial decisions to hire outside counsel to investigate, even when "those same issues also logically overlap[ped] with anticipated litigation."  R. 571 (SM Order) at 12384-12385.

The district court's and special master's hindsight-based analysis cannot be squared with the settled principle that if "a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection." *Pros. Direct*, 578 F.3d at 439.  To

cite one example, in *Sandra T.E.*, the Seventh Circuit found that "[t]he chronology of events confirm[ed] that Sidley was hired to conduct" the "investigation [at issue] not merely in anticipation of likely litigation but in response to the actual filing of this lawsuit." 600 F.3d at 622. Even though "the Board had other motivations as well—it was responding to the public distress about the allegations, the possible complicity of the school principal, and the urgent need to implement prospective protective measures," the court emphasized that "this does not remove the investigation from the protection of the work-product doctrine." *Id.*

Here too, the "chronology of events" makes clear that both Jones Day and Squire were hired to investigate "in response to the actual" initiation of a government enforcement action and certainly impending private litigation. 600 F.3d at 622. Thus, even if FirstEnergy later used the investigations to inform certain business decisions, and even assuming that those later uses reflected "other motivations" for conducting the investigations in the first place, the investigations would still "qualify for work-product protection." *Id.*

Taken to its logical conclusion, the district court's and special master's reasoning would preclude application of work-product protection in most corporate investigations. Whenever a company is credibly accused of

33

misconduct, it will need counsel to investigate and advise, and if the allegations are true, the company will also need to address the business implications. If such actions are enough to vitiate work-product protection, then the protection will very rarely survive. Worse, corporate managers and outside counsel will have no way of knowing up front whether the protection will apply, the very problem the Supreme Court warned of in *Upjohn*. Recognizing as much, courts have repeatedly recognized the basic flaw in the district court's and special master's logic. *See, e.g.*, *Wilson* v. *Russo*, 2022 WL 911271, at \*4-7 (N.D. Ohio Mar. 29, 2022) (although report "may have resulted in personnel decisions and police policy changes," it was protected because it was prepared "in response to" an incident expected to result in litigation); *Decker* v. *Chubb Nat'l Ins. Co.*, 2015 WL 5954584, at \*6 (S.D. Ohio Oct. 14, 2015) (finding work-product protection because at "the time the[] documents were created, suit had already been filed by plaintiffs," even though "the[] documents also serve[d] another purpose—that of providing advice on the coverage decision"); *Miami Valley Fair Hous. Ctr. Inc.* v. *Metro Dev. LLC*, 2017 WL 10980458, at \*2 (S.D. Ohio May 16, 2017) (document "was prepared because of this litigation" where it was "created after [party] had learned about the complaint," notwithstanding its use in "due diligence").

34

## II.    MANDAMUS IS THE ONLY ADEQUATE REMEDY.

The district court's and special master's manifest errors warrant correction via mandamus because FirstEnergy has "no other adequate means . . . to attain the relief" it needs to protect critical attorney materials. *Chesher*, 122 Fed. Appx. at 187.  The Supreme Court has endorsed the use of mandamus in this exact sort of circumstance.  *See Mohawk*, 558 U.S. at 110-111.  Indeed, in *Mohawk*, the Court emphasized no fewer than three times that it was declining to create an automatic right to appeal all privilege disputes under the collateral-order doctrine because it expected that appellate courts would use the mandamus "safety valve" to "promptly correct[] serious errors." *Id.* at 111; *see id.* at 112 (noting that "mandamus" would "facilitate immediate review of some of the more consequential attorney-client privilege rulings"); *id.* at 103, 114.  Several years later, then-Judge Kavanaugh likewise explained in an opinion for the D.C. Circuit that the "no other adequate means" requirement "will often be met in cases where [the] petitioner claims that a district court erroneously ordered disclosure of attorney-client privileged documents." *Kellogg*, 756 F.3d at 760-761.

So too here.  *First*, appeal after final judgment would plainly be inadequate.  By its terms, the order at issue compels FirstEnergy to turn over

withheld materials and to answer deposition questions "related to" the investigation conducted by Jones Day, which represented FirstEnergy *in this case* for over two years. The order thus grants Plaintiffs access to defendants' lawyers' analyses and strategy directly applicable to this litigation. There is no way to un-ring that bell. *See Bittaker* v. *Woodford*, 331 F.3d 715, 717-718 (9th Cir. 2003) (recognizing that "significant strategic decisions" can "turn on [a privilege order's] validity").

In addition, the district court's ruling will have compounding effects. Shortly after that ruling, FirstEnergy received requests for the same documents in an ongoing regulatory matter, even though an adjudicator in that matter had previously determined that they were "*clearly* prepared in reasonable anticipation of litigation" and "protected from disclosure" by both privilege and work-product protection. R. 661-3 at 14399-14400 (emphasis added). Similar requests in other matters will likely follow. Thus, if this Court does not intervene now, privileged materials may well be disclosed in other proceedings, which even a post-trial reversal in this matter cannot cure.

*Second*, mandamus is the only avenue available to FirstEnergy to prevent disclosure. "[I]nterlocutory appeal is not available in attorney-client privilege cases (absent district court certification)," *Kellogg*, 756 F.3d at 761,

which FirstEnergy sought and was denied.  The only other theoretical option would be to disobey the district court's order to procure a criminal contempt citation, which can be appealed.  *See Fluor*, 803 Fed. Appx. at 699-700.  But even if this Court were prepared to require that serious penalty, the district court would have discretion to impose a civil contempt sanction instead, *id*. at 700, and "parties cannot appeal civil contempt orders."  *Pros. Direct*, 578 F.3d at 438.  Thus, contempt does not provide a "clear alternative means of relief." *Id.*  It is very likely mandamus or nothing.

## III.   MANDAMUS IS PARTICULARLY APPROPRIATE HERE.

Finally, this dispute calls out for issuance of the writ.  In making that determination, this Court considers, in addition to the factors described above, whether "the district court's order . . . manifests a persistent disregard of the federal rules," and whether the "order raises new and important problems." *Lott*, 424 F.3d at 449 (granting mandamus in privilege dispute).

Both additional factors are present here.  As explained above, the district court's order "manifests a persistent disregard of" a number of "federal rules," including the requirements for a declaration, the materials to be considered in privilege disputes, and the basic operation of both attorney-client privilege and work product.  *See Lott*, 424 F.3d at 449.  The order

37

likewise reflects an elevation of an easily remedied technicality over the substance of bedrock protections that make up the "necessary foundation for the adversarial system of justice." *Id.* at 450.

The order also creates "important problems" both for FirstEnergy in this case and for litigants in this circuit more generally. *See In re Powerhouse Licensing, LLC*, 441 F.3d 467, 471-472 (6th Cir. 2006) (explaining that this factor addresses "the relative importance of the issue[] raised to the wider legal landscape"). This is not some narrow and workaday privilege dispute. The order purports to compel FirstEnergy to turn over "all previously withheld" documents and to answer nearly all questions "related to" two separate investigations into matters at the heart of this sprawling class action, in which Plaintiffs seek billions in damages. R. 571 (SM Order) at 12387. Thus, the special master could not "imagine a more critical discovery issue than this one." R. 610 (Dec. 21 Hr'g Tr.) at 13320-13321.

The district court's order will have "far-reaching consequences" beyond FirstEnergy. *Fluor*, 803 Fed. Appx. at 703. Both the order's stark bottom-line conclusion and its reasoning come close to "abandon[ing] centuries"—or at least a half-century, since *Upjohn*—"of jurisprudence concerning the scope of the attorney-client privilege" and work-product protection, and

"endangering the full and frank communication" between companies investigating wrongdoing and their attorneys. *Lott*, 424 F.3d at 456. As this Court has reiterated, "an uncertain privilege—or one which purports to be certain, but rests in widely varying applications by the courts—is little better than no privilege" at all. *Id.* at 450. The order has no doubt already begun to "ring alarm bells in corporate general counsel offices throughout the country." *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 151 (D.C. Cir. 2015) (granting mandamus a second time). This Court can quiet that alarm only by granting the writ.

## CONCLUSION

For the foregoing reasons, the Court should grant a writ of mandamus directing the district court to deny Plaintiffs' motion to compel disclosure of the Jones Day and Squire investigation materials.

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.
ROBERT J. GIUFFRA, JR.
SHARON L. NELLES
DAVID M.J. REIN
NICHOLAS F. MENILLO
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

MORGAN L. RATNER
KATHLEEN O'MALLEY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for FirstEnergy Corp.*

JULY 29, 2024

## CERTIFICATE OF COMPLIANCE

This petition complies with Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,796 words.

This petition also complies with Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ Robert J. Giuffra, Jr.

ROBERT J. GIUFFRA, JR.

JULY 29, 2024

## CERTIFICATE OF SERVICE

I certify that on this 29th day of July, 2024, the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system.

I further certify that on this 29th day of July, 2024, a copy of the foregoing was served upon the district court via email and U.S. First Class Mail, and upon counsel for all parties in the district court via email.

/s/ Robert J. Giuffra, Jr.
ROBERT J. GIUFFRA, JR.

JULY 29, 2024

# ATTACHMENT A

**(R. 571, Order By Special Master
On Motion To Compel)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**IN RE FIRSTENERGY CORP.**
**SECURITIES LITIGATION,**

**This document relates to:**

**ALL ACTIONS.**

**Case No. 2:20-cv-3785**

**Chief Judge Algenon L. Marbley**

**Magistrate Judge Kimberly A. Jolson**

## ORDER BY SPECIAL MASTER
## ON MOTION TO COMPEL (ECF NO. 489)

This matter is before the undersigned for consideration of the June 30, 2023 Motion to Compel Discovery Regarding FirstEnergy's Internal Investigation.[1] (Motion, ECF No. 489.) For the reasons that follow, the undersigned **GRANTS** the motion.

## BACKGROUND

This case is a consolidated class action brought on behalf of all purchasers of securities in FirstEnergy Corp. ("FirstEnergy") between February 21, 2017 and July 21, 2020. (Amended Complaint, ECF No. 72 ¶ 1.) Class Plaintiffs seek relief under the Securities Act of 1933 and the Securities Exchange Act of 1934 against FirstEnergy, certain of its current and former employees, and "the investment banks which underwrote two FirstEnergy debt offerings during the Class Period." (*Id.*).

---

[1]     Movants are the "Class Plaintiffs" (Los Angeles County Employees Retirement Association and Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund) from Case No. 2:20-cv-03785, the "Direct Action Plaintiffs" from S.D. Ohio Case Nos. 2:21-cv-05839 and 2:22-cv-00865, and Defendants Michael J. Dowling and Charles E. Jones. (Mot., ECF No. 489 at PageID 10447.)

The crux of Plaintiffs' claims is that "FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history" to influence Ohio elections and secure a $1.3 billion bailout for two of its failing nuclear plants, as well as $700 million in subsidized revenues for the company, through passage of Ohio House Bill 6 ("HB6"). (*Id.* ¶¶ 3, 5.) The theory behind the claims is that when FirstEnergy's role in this scheme was brought to light, the price of its stock fell sharply, resulting in "billions of dollars of losses" for FirstEnergy investors. (*Id.* ¶ 9.)

Parallel to this litigation, the government has pursued criminal charges against several defendants alleged to have participated in this scheme, including Householder. *See United States v. Larry Householder, et al.*, No. 1:20-cr-00077-TSB (S.D. Ohio). On March 9, 2023, a jury found Householder and co-defendant Matthew Borges guilty on charges of conspiracy under the Racketeer Influenced and Corrupt Organizations Act. (*Id.* at ECF No. 240.) During this jury trial, the government highlighted Jones's and Dowling's purported relationships with Householder and involvement in the conspiracy. (Transcript, ECF No. 444-2) (trial transcript from March 7, 2023, including government's closing argument). And multiple representations before the Court suggest that FirstEnergy's cooperation with government investigations is ongoing. (ECF No. 457 at 2–3.)

Against this backdrop, multiple discovery disputes have arisen. Today's dispute is between Movants and FirstEnergy regarding the internal investigation (consisting of two phases conducted separately by two different law firms) into the company's degree of involvement in the Householder conspiracy. Movants sought documents and information related to the internal investigation, and FirstEnergy invoked the protections of the attorney-client privilege and work-product doctrine to shield material from discovery. The parties were unable to agree on a resolution of their dispute, which led to the filing of the motion to compel.

In the briefing on that motion, Movants summarize their argument as follows:

> At bottom, FirstEnergy's varied privilege and work-product assertions regarding its internal investigation fail because it cannot meet its burden of establishing that these protections apply and have not been waived. Rather than exclusively or primarily seeking legal advice or preparing for litigation, FirstEnergy conducted its internal investigation primarily for business purposes. Indeed, in light of the nature of the issues addressed in the investigation, FirstEnergy's statements concerning the investigation, and the Company's course of conduct, it is clear FirstEnergy would have conducted the investigation for business reasons regardless of actual or potential legal proceedings. For this and other reasons, information relating to or purportedly uncovered during the internal investigation is not protected by the attorney-client privilege or the work-product doctrine. Even if that information had been protected, FirstEnergy repeatedly waived any protections through its many deliberate disclosures and affirmative uses of information and conclusions from the investigation, including by freely revealing critical aspects of the internal investigation to third parties and the public.

(Motion, ECF No. 489-1 at PageID 10464-10465.) Movants seek an order directing FirstEnergy to produce all previously withheld documents related to the internal investigation, witnesses to answer all questions related to the internal investigation, and the withdraw by FirstEnergy of all asserted protections reflected in PricewaterhouseCoopers LLP's document productions.

FirstEnergy in turn argues that the attorney-client privilege and work-product doctrine preclude discovery into the internal investigation. The company summarizes its position as follows:

> To respond to the criminal subpoenas, develop its legal strategy, and defend against the newly filed and anticipated civil actions, an independent committee of FirstEnergy's Board of Directors and FirstEnergy itself each immediately retained their own outside counsel to conduct internal investigations. Over the course of many months, those outside counsel interviewed witnesses, reviewed numerous documents, developed their legal analyses, and presented their recommendations, strategy, and findings to their respective clients. Those activities are within the heartland of conduct protected by the attorney-client privilege and the work product doctrine.

(Memo. in Opp., ECF No. 510 at PageID 10898.) Thus asserting that the investigation is entitled to such protections because it was conducted for the purpose of obtaining legal advice in the face

3

of civil and criminal litigation and because the company has not waived its protections, FirstEnergy asks that the motion to compel be denied.

The motion has been fully briefed.  *See* Briefing, ECF Nos. 489 (motion/memorandum/supporting affidavit/exhibits), 510 (memorandum in opposition), 511 (supporting affidavit/exhibit), 529 (reply/supporting affidavit/exhibits by movants other than Jones and Dowling), and 530 (supplemental statement by movants Jones and Dowling).[2]  On September 28, 2023, the motion came on for an oral hearing before the undersigned.  Counsel for Movants and counsel for FirstEnergy presented oral argument.  At the conclusion of the hearing, the undersigned took the motion under advisement and requested limited supplemental briefing, which the entities involved provided (ECF Nos. 549, 550).  In subsequent discussions with the parties, including during a November 28, 2023 status conference, the undersigned issued a preliminary, non-binding decision that informed the parties that the motion to compel would be granted.  The instant Order memorializes the rationale for and finalizes the granting of the motion to compel.

## STANDARD INVOLVED

Pursuant to the Court's September 12, 2023 Order Appointing Special Master, the Special Master "shall have the authority to address pretrial matters, including but not limited to the following: . . . [e]stablish discovery and other schedules; direct and supervise the production of discovery including electronically stored information; review and attempt to resolve informally any discovery conflicts, including issues such as discoverability of particular information, privilege, confidentiality, and access to trade secrets and other records; and generally supervise

---

[2]     Defendants Jones and Dowling join Class Plaintiffs and Direct Action Plaintiffs as Movants in seeking the relief requested in the motion to compel, but do not join in the reply because they disagree with the characterization of the facts presented in the reply.  *See* Supp. Statement, ECF No. 530.

formal discovery and any informal exchanges of information." Order, ECF No. 541 at PageID 11684.

The Court has previously recognized that under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-cv-3785, 2022 WL 17075838, at *2, *4 (S.D. Ohio Nov. 18, 2022) (citing *Ball v. Kasich*, 2018 WL 6242230, at *3 (S.D. Ohio Nov. 29, 2018) (alteration in original)). Where, as here, privilege is at issue, the Sixth Circuit has explained that "[t]he burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).

## <u>DISCUSSION</u>

Resolution of the instant dispute turns on a nuanced technicality that proves dispositive in light of the applicable standards involved. It is therefore necessary to emphasize at the outset that as the party invoking the protections of attorney-client privilege and the work-product doctrine, FirstEnergy bears the burden of proof here.

The components of the attorney-client privilege are well settled:

 [T]he elements of the privilege are . . .

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) unless the protection is waived.

[*Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998)] (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)). The party asserting the privilege bears the burden of establishing the existence of the privilege. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).

*Cooey v. Strickland*, 269 F.R.D. 643, 648 (S.D. Ohio 2010).

Similarly, the contours of the work-product doctrine are long established:

> The work-product doctrine "protects from discovery documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative." *United States v. Roxworthy,* 457 F.3d 590, 593 (6th Cir. 2006). The burden of proving that an item is prepared in anticipation of litigation rests with the party asserting the privilege. *Id.* The Sixth Circuit adopted the "because of" test to determine whether this standard is met; that is, the asserting party must prove that the item was "prepared or obtained *because of* the prospect of litigation." *Id.* (quoting *United States v. Adlman (Adlman II),* 134 F.3d 1194, 1202 (2d Cir.1998)). Items that are "prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for non-litigation purposes," are not protected by the work-product doctrine. *Roxworthy,* 457 F.3d at 593. Thus, if the item would have been prepared in substantially the same manner, regardless of the anticipated litigation, the doctrine does not apply. *Id.* at 593–94.
>
> Furthermore, the "because of" test includes both a subjective inquiry and an objective inquiry into the reasonableness of the party's actions. A court considering the matter must consider "(1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *Id.* at 594.

*Cooey*, 269 F.R.D. at 647. *See also Futhey v. United Transp. Union Ins. Ass'n*, No. 1:14 CV 463, 2015 WL 2446169, at *2 (N.D. Ohio May 20, 2015) (explaining that the party relying on the work-product doctrine "bears the burden of showing that the investigation and report were created in anticipation of litigation and not just for business purposes").

The consequent question is thus "whether documents were 'prepared or obtained because of the prospect of litigation,' as opposed to those 'prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for non-litigation purposes[.]" *McNeil v. Mt. Carmel Health Sys.*, No. 2:20-cv-258, 2021 WL 5235103, at *4 (S.D. Ohio Nov. 10, 2021) (Jolson, M.J.). Again, "'if the item would have been prepared in substantially the same manner,

regardless of the anticipated litigation, the [work-product] doctrine does not apply." *Id.* (quoting *Cooey*, 269 F.R.D. at 647).

The undersigned must consider the evidence in the record against this backdrop of legal standards. Looking at FirstEnergy's proffered evidence leads to the nuanced technicality that proves dispositive in light of the applicable standards involved.

To support its argument that the investigation was motivated by and implemented because of concerns over anticipated civil and criminal litigation, FirstEnergy relies on the proffered declaration of a member of the company's Board of Directors, James F. O'Neil, III. *See* O'Neil Decl., ECF No. 511-1. At oral argument, FirstEnergy emphasized the importance of this document to the company's argument:

> And what we have done here is provide you with an affidavit from one of the outside directors who oversaw that Squire investigation. And he testifies why they did an investigation. He explains that it was because of the potential criminal liability and because of the onslaught of civil litigation. And so, you know, this is not just us speculating about that.

(9/28/23 Hrg. Tr. at 26:4-11.) By implication, however, the converse is also true: without the affidavit, FirstEnergy is speculating about the why behind its actions and is inviting the undersigned and the Court to do so as well.

Despite counsel's oral-argument characterization of the document at issue as an affidavit, the O'Neil Declaration is not an affidavit because it is not sworn and notarized; it is intended to be a declaration under 28 U.S.C. § 1746.

A timely submitted declaration that meets the requirements of the statute is sufficient for consideration under the Court's Local Civil Rules. S.D. Ohio Civil Rule 7.2(e) "provides that evidence in support or opposition to a motion shall be presented in the form of 'affidavits, declarations pursuant to 28 U.S.C. § 1746, admissions, verified interrogatory answers, and other

documentary exhibits." *Enigwe*, 2008 WL 11352583, at *1. The problem for FirstEnergy is that the O'Neil Declaration fails to constitute a 28 U.S.C. § 1746 declaration.

That statute provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".
>
> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746.

Despite this statutory language, the O'Neil Declarations contains the following introductory line:

> I, James F. O'Neil, III, hereby declare under penalty of perjury as follows:

(O'Neil Decl., ECF No. 511-1 at PageID 10938.) Thirty numbered paragraphs of factual allegations follow before the declaration ends with the following:

Executed on July 26, 2023.

/s/ _____
James F. O'Neil, III

8

(*Id.* at PageID 10943.)  Note that although the declaration provides it is "under of penalty of perjury," bears the execution date, and is signed, the declaration never states anywhere that its contents are declared ***as true***.

This deficiency renders the document just a document and not a declaration constituting evidence that a factfinder and a federal court can credit under 28 U.S.C. § 1746.  The omission is damning to the purpose and utility of the document.  It places the document outside the scope of what evidence a federal court can consider and specifically outside the scope of Local Civil Rule 7.2(e).

Although the Sixth Circuit has not expressly opined on this exact issue, language from the court of appeals suggests it would deem the O'Neil Declaration deficient.  For example, in *Bonds v. Cox*, 20 F.3d 697 (6th Cir. 1994), the court of appeals addressed whether multiple unsworn affidavits met the standard of declarations under 28 U.S.C. § 1746.  The appellate court held:

> Unsworn declarations are permitted to be used as evidence only if "subscribed ... as true under penalty of perjury, *and dated* [.]" 28 U.S.C. § 1746 (emphasis added). Although [the] additional affidavits were subscribed under penalty of perjury, they were undated. Given the explicit language of the statute, they must therefore be excluded from consideration.

*Id.* at 702.  Thus, the Sixth Circuit identified four core elements to a declaration under  28 U.S.C. § 1746: (1) it must be signed, (2) it must declare its contents to be true, (2) it must acknowledge that it is under penalty of perjury, and (4) it must be dated.  The failure to meet the fourth component caused the document to not qualify as worthy of consideration in *Bonds*.  Applying the same analysis here, the failure to meet the second component excludes the O'Neil Declaration from consideration.

*Bonds*' progeny within the Circuit supports rejecting the O'Neil Declaration. *See, e.g.,* *Sfakianos v. Shelby Cty. Gov't.*, No. 08-02172, 2010 WL 11493114, at *10 (W.D.Tenn. Dec. 30, 2010) (citing *Bonds* in rejecting consideration of "technically deficient" unsworn affidavit).

Persuasive authority from within this District weighs against the O'Neil Declaration. *See, e.g., Enigwe v. Diversity City Media*, No. 2:07-CV-250, 2008 WL 11352583, at * (S.D. Ohio June 2, 2008) (Graham, J.) ("Plaintiff's purported declaration fails because it is not made in the form of an affidavit of facts separate from the motion and is also not signed and dated.").

Multiple Circuits would similarly reject the O'Neil Declaration. The Second Circuit, for example, has explained as follows:

> Parsing the declaration provided in [28 U.S.C. § 1746] reveals its substantive elements: the declarant must (1) "declare (or certify, verify, or state)," (2) "under penalty of perjury," (3) that the matter sworn to is "true and correct." *Id.* The substitution of "subject to punishment" for "under penalty of perjury" is a substantial departure from the substance of the declaration provided in § 1746, and thus, does not comply with the statute.

*In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). Thus, the Second Circuit stated that "[w]e hold that 28 U.S.C. § 1746 requires that a certification of the truth of a matter be expressly made under penalty of perjury. Any other result would be contrary to the plain language of the statute and the objective sought to be advanced by it." *Id.* at 489.

Other Circuits agree. *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022) ("In short, § 1746 has these statutory requirements for an unsworn statement to substitute for a sworn affidavit: The declarant must (1) date and sign the document, and (2) subscribe its content as 'true,' (3) under 'penalty of perjury,' (4) in substantially the above-quoted pattern language."); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("Kline's affidavit is not in substantial conformity with either formula because, as drafted, it allows the affiant to circumvent

the penalties for perjury in signing onto intentional falsehoods.  Kline never declared her statement

to be true and correct; therefore, her affidavit must be disregarded as summary judgment proof.").

Similarly, numerous district courts nationwide have issued cases weighing against the

O'Neil Declaration.  Some of these cases expressly rejected a document as a sufficient declaration

because it failed to include 28 U.S.C. § 1746's "true" requirement.  *See, e.g., In re Muscatell*, 106

B.R. 307, 309 (M.D.Fla. 1989) (disregarding unsworn declaration made under the penalty of

perjury because declarant never declared his statement to be true and correct).

Still other district court cases reject a document for failing to meet the other requirements

of 28 U.S.C. § 1746.  These cases support today's reasoning by analogy.  *See, e.g., Grand Fabrics

Int'l Ltd. v. Melrose Textile, Inc.*, No. CV 18-00748 DSF (AFMx), 2018 WL 6118439, at *7

(C.D.Ca. May 9, 2018) (striking declaration because it did not identify where declarant was located

at time of signing and because it was undated); *Wheeler v. Baxter Healthcare Corp.*, No.

4:11CV00263 JLH, 2011 WL 5402446, at *2 (E.D.Ark. Nov. 8, 2011) (citing *Bonds* in excluding

declaration from consideration due to lack of signature and dating).

A minority of courts reviewed might accept the O'Neil Declaration.  *See, e.g., Callahan v.

Emory Healthcare, Inc.*, No. 1:18-CV-4856-WMR-JSA, 2019 WL 12405937, at *2-3 (N.D.Ga.

Dec. 20, 2019) (finding the absence of "true and correct" language was not fatal to a declaration);

*LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (same).

Such cases failed to credit sufficiently the nuance of 28 U.S.C. § 1746 and risk distorting

"substantially the following form" into a game of horseshoes compliance so as to render the

statutory requirements meaningless.

The undersigned finds these cases less persuasive.  They often read out the "true"

requirement of 28 U.S.C. § 1746, deeming it subsumed or inherent in the "under penalty of perjury"

requirement.  This is a strained and conflation that appears to be born more from pragmatism than adherence to the statute and settled canons of construction.  28 U.S.C. § 1746 does not present an example where words (*i.e.*, "true") should be rejected as surplusage because they appear to have been inadvertently inserted or are repugnant to the rest of the statute.  *See Chicksaw Nation v. United States*, 534 U.S. 84, 94, 122 S. Ct. 528, 535 (2001).  Instead, the statute presents an example where the canon of statutory interpretation requiring a court to give effect to each word, if possible, applies.  *Id.* at 84, 122 S. Ct. at 535.

This is because the "true" verification and the "under penalty of perjury" verification convey two related but distinct concepts: a declarant can state falsehoods while recognizing he or she is under penalty of perjury because the declarant has not declared the statement to be true—but when the declarant declares a statement to be true while concurrently recognizing the consequence—by declaring him or herself to be under penalty of perjury—the recognition of the consequences of lying takes on real meaning as risk attaches.  The Sixth Circuit has explained that "[c]ourts avoid constructions of statues that would render Congress's chosen words superfluous.  Instead, courts 'must give effect, if possible, to every clause and word of a statute.'"  *United States v. Wilkes*, 78 F.4th 272, 280 (6th Cir. 2023) (quoting *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, (2000)).  Interpreting 28 U.S.C. § 1746 so that "true" and "under penalty of perjury" are two requirements with their own meanings honors that precedent.

Thus construed, 28 U.S.C. § 1746 is clear: its requirements are mandated, while the wording of those requirements can be effectuated in multiple ways—so long as the requirements ***are*** expressed.  In other words, each ingredient can be expressed in different ways, but the recipe for a sufficient declaration remains fixed and includes that a declarant expressly state that he or

12

she is alleging the contents of the declaration *to be true* while acknowledging he or she risks the legal consequences of committing perjury.

The requirements for a proper declaration under 28 U.S.C. § 1746 are neither onerous nor complicated, and both sides have repeatedly demonstrated they are capable of compliance. In contrast to the deficient O'Neil Declaration, multiple other declarations filed in connection with the internal investigation dispute contain variations of the required content.

For example, in her memorandum in opposition declaration submitted on behalf of FirstEnergy, attorney Hilary Williams states that she "declare[s] under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on July 26, 2023." (Williams Decl., ECF No. 511 at PageID 10935.) In a second declaration submitted with FirstEnergy's post-oral argument supplemental briefing, Williams similarly ends her declaration with the statement that she "declare[s] under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on October 5, 2023." (Williams Suppl. Decl., ECF No. 550-1 at PageID 11911.)

Plaintiffs in turn have submitted three declarations by attorney Jason Forge, all of which similarly contain a form of the required content. *See* Forge Decl., ECF No. 489-2 at PageID 10501 ("I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 30, 2023, at San Diego, California."); Forge Reply Decl., ECF No. 529-1 at PageID 11454 ("I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 9, 2023, at San Diego, California."); Forge Suppl. Decl., ECF No. 549-1 at PageID 11837 ("I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 5, 2023 at San Diego, California.").

Because O'Neil's declaration fails to constitute a declaration under 28 U.S.C. § 1746 and therefore fails to fall within permissible timely evidence under Local Civil Rule 7.2(e), the undersigned must necessarily exclude it from the record evidence. Accordingly, the undersigned cannot credit all the factual representations set forth in FirstEnergy's briefing that rely solely on the O'Neil Declaration. This leaves FirstEnergy bereft of sufficient persuasive support for meeting its burden of proving that the internal investigation is protected from discovery.

This leaves uncontroverted Movants' evidence contextualizing the phase of the investigation conducted by Squire Patton Boggs. *See, e.g.,* Reply, ECF No. 529 at PageID 11437-11438. Plaintiffs present an analytic chain that firmly and predominantly grounds the early investigation in the business necessity and human resources/public relations arena, even if those same issues also logically overlap with anticipated litigation. *See id.* at PageID 11440. Thus, Plaintiffs' assessment of the investigation rings true: "FirstEnergy has failed to carry its burden to demonstrate it would not have commissioned substantially similar investigations to determine which employees were involved in a massive criminal corruption scheme but for the possibility of litigation." (Reply, ECF No. 529 at PageID 11441.)

The FirstEnergy investigation and many of the uses of the investigation results thus adhere to that seen in *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96 (S.D.N.Y. 2007). The record evidence presented by Plaintiffs in their briefing (and not always Defendant Jones and Dowling) supports that the internal investigation was conducted for audit/SEC filing purposes and for human resources decisions/public relations benefit, even if those decisions and the facts involved in both purposes also would likely inform litigation preparation. To conclude otherwise and credit FirstEnergy's insufficiently supported litigation-preparation argument would be to engage in impermissible speculation and elevate guesswork over crediting evidence. It would assume the

validity of the representations of the O'Neil Declaration without any piece of actual evidence making or suggesting those representations.

Although FirstEnergy abstractly invokes "common sense" as supporting the premise that the internal investigation was executed in anticipation of litigation, no reasonable interpretation of the evidence permits the conclusion that the investigation was not just for business purposes or equally for business purposes. Crediting that the documents sought "were prepared because of these non-litigation purposes" leads to the conclusion that "[w]hile those same non-litigation purposes may have important legal implications for Defendants, they remain implications, and not the driving force behind the preparation of each requested document." *McNeil*, 2021 WL 5235103, at *5 (internal quotations marks omitted).

Stated simply: FirstEnergy's argument falls apart without the O'Neil Declaration. The company's job here was to present persuasive evidence establishing that the investigation's purpose made it protected, and the lack of sufficient persuasive evidence left the company's factual allegations almost totally unsupported—and therefore unconvincing. In contrast, Movants presented evidence of a business purposes and human resources purposes that lead to the conclusion that the investigation would have occurred even in the absence of anticipated civil and criminal litigation.

The evidence in the record suggests that the investigation was at least prepared in the ordinary course of business pursuant to SEC public requirements unrelated to litigation and for non-litigation human resources/public relations purposes. And to a lesser extent, the evidence suggests that the investigation would have been prepared in substantially the same manner, regardless of the anticipated litigation.

Three conclusions and two observations flow from this analytic chain.

First, the undersigned must conclude that the attorney-client privilege does not apply to render the discovery sought unreachable.

Second, the undersigned also cannot conclude that the work-product doctrine attaches to the discovery sought.

Third, because neither attorney-client privilege nor the work-product doctrine renders the discovery sought privileged matter under Rule 26(b)(1), Movants may obtain discovery of this nonprivileged matter as sought in the motion to compel.

This leads to the first observation, which is that the foregoing three conclusions moot the need to opine here on Movants' alternative argument that, if the investigation was once protected, FirstEnergy waived such protection. The relevant waiver arguments by both sides are left unaddressed at this time.

The second observation is that both sides—even FirstEnergy, despite counsel's belated oral argument characterization of the investigations as two investigations (9/28/23 Hrg Tr. at 24: 5-6, 25:6-7, 17-18, 46:6)—have repeatedly bundled the two law firms' investigations into one investigation composed of phases, and no one requested any sort of in camera review of any of the material sought or review of portions of the individual selections of the material sought. Instead, both sides have appeared to adopt an all-or-nothing approach in which everything is discoverable or nothing is. Despite this arguably unusual approach, the undersigned examined the internal investigation as both one, multiple-phases investigation and two distinct investigations. The undersigned has little doubt that the Squire phase of the investigation (roughly to August 2020) readily falls outside the realm of protected material. The second investigation or second phase of the investigation, conducted by Jones Day, presents a closer call for the undersigned, but the inescapable hole left by striking the O'Neil Declaration still proves dispositive. Under either

16

analysis, there is a dearth of evidence without the O'Neil Declaration to support that either phase or either investigation was not predominantly for a business purpose and/or human resources/public relations purposes. Ultimately, the undersigned has credited the parties' essentially "all or nothing approach," and today's order aligns with that perhaps atypical approach.

## **CONCLUSION**

For the foregoing reasons, the Special Master **GRANTS** the motion to compel (ECF No. 489) and **ORDERS** as follows:

(1) FirstEnergy's internal investigation is not entitled to attorney-client privilege or work-product protections.

(2) FirstEnergy must produce all previously withheld documents related to the internal investigation.

(3) Witnesses must answer all fact-related questions (past and future) related to the internal investigation (*i.e.*, FirstEnergy cannot shield ***facts*** from disclosure just because a witness learned those facts from the investigation). The parties should meet and confer on which depositions, if any, must necessarily be reopened; if the parties cannot agree, they should promptly contact the Special Master. Movants' suggestion that any reopened deposition be limited to two hours is well taken, and FirstEnergy shall bear the reopened deposition costs. If the parties cannot agree on costs, they should promptly contact the Special Master.

(4) Movants **cannot** take the depositions of any of the attorney-investigators at this time. The necessity and propriety of such unlikely action will be determined, if warranted, upon renewed request only after Movants have had a chance to conduct depositions in which non-attorney-investigators can testify to the facts as permitted above.

(5) FirstEnergy must withdraw all asserted protections that are reflected in the PricewaterhouseCoopers LLP document productions.

(6) Costs of the Special Master's work on the motion to compel are to be born equally by the parties.

All entities are reminded that "the Special Master's discovery orders are effective immediately upon being entered and remain in effect unless and until a party obtains a stay from the Court or the Court sustains an objection." (Order, ECF No. 570 at PageID 12370.) Note that

the Court's September 12, 2023 Order Appointing Special Master provides in relevant part that "[p]ursuant to Rule 53(f)(2), any party may file an objection to the Special Master's orders, reports or recommendations within 21 days of the date it is electronically filed.  All such objections shall be directed to Chief Judge Marbley and Magistrate Judge Jolson simultaneously.  Failure to meet these deadlines results in permanent waiver of any objection to the Special Master's orders, reports, or recommendations."  (Order, ECF No. 541 at PageID 11687.)

**IT IS SO ORDERED.**

_/s/ Shawn K. Judge_____
SHAWN K. JUDGE (0069493)
SPECIAL MASTER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 29, 2023, the foregoing was filed with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Shawn K. Judge*
Shawn K. Judge (0069493)

# ATTACHMENT B

**(R. 587, Transcript of Emergency Hearing
Before Special Master Shawn Judge (Nov. 30, 2023))**

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF OHIO

 3                        EASTERN DIVISION

 4

 5     IN RE:  FIRSTENERGY CORP.          CIVIL ACTION NO.

 6            SECURITIES LITIGATION        2:20-cv-3785

 7     THIS DOCUMENT RELATES TO:

 8     ALL ACTIONS.

 9

10            -------------------------------------------

11                         CONFIDENTIAL

12                 UNDER THE PROTECTIVE ORDER

13            -------------------------------------------

14

15                 EMERGENCY HEARING HELD BEFORE

16                 SPECIAL MASTER SHAWN JUDGE

17                 Thursday, November 30, 2023

18                        11:46 A.M.

19          Taken remotely via Zoom videoconference

20

21

22

23

24     JOB NO.: 6338462

25     REPORTED BY: MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423
```

Page 1

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE CLASS PLAINTIFFS:

 4                   ROBBINS GELLER RUDMAN & DOWD, LLP

 5                   BY: JASON FORGE, ESQ.

 6                   BY: KEVIN S. SCIARANI, ESQ.

                     BY: FRANCIS KARAM, ESQ.

 7                   BY: CHRISTOPHER GILROY, ESQ.

                     655 West Broadway

 8                   San Diego, California 92101

                     jforge@rgrdlaw.com

 9                   kscariani@rgrdlaw.com

10                   fkaram@rgrdlaw.com

11                   cgilroy@rgrdlaw.com

                     -and-

12                   MURRAY MURPHY MOUL & BASIL, LLP

13                   BY: JOSEPH MURRAY, ESQ.

14                   1114 Dublin Road

15                   Columbus, Ohio 43215

16                   murray@mmmb.com

17

18    FOR THE DIRECT-ACTION PLAINTIFFS:

19                   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

20                   BY: MICHAEL MIARMI, ESQ.

21                   250 Hudson Street, 8th Floor

                     New York, New York 10013

22                   mmiarmi@lchb.com

23

24

25
```

Page 2

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)
 2
 3    For Defendants Steven Strah; K. Jon Taylor; Jason J.
      Lisowski; George M. Smart; Paul T. Addison; Michael J.
 4    Anderson; Steven J. Demetriou; Julia L. Johnson; Donald
      T. Misheff; Thomas N. Mitchell; James F. O'Neil III;
 5    Christopher D. Pappas; Sandra Pianalto; Luis A. Reyes;
 6    Jerry Sue Thornton and Leslie M. Turner;
 7                    JONES DAY
                      BY: GEOFFREY J. RITTS, ESQ.
 8                    901 Lakeside Avenue
                      Cleveland, Ohio 44114
 9                    gjritts@jonesday.com
                      -and-
10                    BY: MARJORIE P. DUFFY, ESQ.
                      325 John H. McConnell Boulevard,
11                    Suite 600
                      Columbus, Ohio 43215
12                    mpduffy@jonesday.com
13
14                    WARREN TERZIAN, LLP
                      BY: THOMAS D. WARREN, ESQ.
15                    30799 Pinetree Road, Suite 345
                      Pepper Pike, Ohio 44124
16
17    FOR DEFENDANT FIRST ENERGY:
18                    SULLIVAN & CROMWELL, LLP
                      BY: DAVID M.J. REIN, ESQ.
19                        SHARON L. NELLES, ESQ.
                          ROBERT J. GIUFFRA, ESQ.
20                    125 Broad Street
                      New York, New York 10004
21                    reind@sullcrom.com
                      nelless@sullcrom.com
22                    guiffra@sullcrom.com
23
24
25

                                           Page  3
```

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)
 2    FOR DEFENDANT CHARLES E. JONES:
 3                    BAKER & HOSTETLER
                      BY: CAROLE S. RENDON, ESQ.
 4                        RACHAEL L. ISRAEL, ESQ.
                          BETH NEWTON, ESQ.
 5                        DANIEL R. WARREN, ESQ.
                      Key Tower Suite 2000
 6                    127 Public Square
                      Cleveland, Ohio 44114
 7                    crendon@bakerlaw.com
                      risrael@bakerlaw.com
 8                    bnewton@bakerlaw.com
                      dwarren@bakerlaw.com
 9
10    FOR DEFENDANT DONALD SCHNEIDER:
11                    ORRICK HERRINGTON & SUTCLIFFE, LLP
                      BY: BREE MURPHY, ESQ.
12                    1152 15th Street NW
                      Columbia Center
13                    Washington, D.C. 20005
14                    bmurphy@orrick.com
15                    -and-
16                    SANTEN & HUGHES
                      BY: BRIAN P. O'CONNOR, ESQ.
17                    600 Vine Street, Suite 700
                      Cincinnati, Ohio 45202
18                    bpo@santenthughes.com
19
20    FOR DEFENDANT MICHAEL DOWLING:
21                    TUCKER ELLIS, LLP
                      BY: JOHN F. MCCAFFREY, ESQ.
22                        JOHN A. FAVRET, ESQ.
                      950 Main Avenue, Suite 1100
23                    Cleveland, Ohio 44113
                      john.mccafrey@tuckerellis.com
24                    john.favret@tuckerellis.com
25
```

Page 4

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)
 2    FOR DEFENDANT LEILA VESPOLI:
 3                    ARNOLD & PORTER
                      BY: AARON F. MINER, ESQ.
 4                    250 West 55th Street
                      New York, New York 10019
 5                    aaron.miner@arnoldporter.com
 6
 7    FOR DEFENDANT JOHN JUDGE:
 8                    VORYS SATER SEYMOUR & PEASE, LLP
                      BY: EMILY TAFT, ESQ.
 9                    301 East 4th Street
                      Cincinnati, Ohio 45202
10                    ejtaft@vorys.com
11                   -and-
12                    VORYS SATER SEYMOUR & PEASE, LLP
                      BY: ANDREW P. GURAN, ESQ.
13                    50 South Main Street, Suite 1200
                      Akron, Ohio 44308
14                    aguran@vorys.com
15
16    FOR DEFENDANT JAMES PEARSON:
17                    BALLARD SPAHR, LLP
                      BY: TIMOTHY D. KATSIFF, ESQ.
18                    1735 Market Street,  51st Floor
                      Philadelphia, Pennsylvania 19103
19                    katsifft@ballardspahr.com
20
21    FOR DEFENDANT DENNIS CHACK:
22                    MORGAN, LEWIS & BOCKIUS, LLP
                      BY: KAREN POHLMANN, ESQ.
23                    1701 Market Street
                      Philadelphia, Pennsylvania 19103
24                    karen.pohlmann@morganlewis.com
25
```

                                            Page 5

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)
 2    FOR THE UNDERWRITER DEFENDANTS:
 3                    DAVIS POLK & WARDWELL, LLP
                      BY: JOSHUA SHINBROT, ESQ.
 4                        ERIC M. KIM, ESQ.
                      450 Lexington Avenue
 5                    New York, New York 10017
                      joshua.shinbrot@davispolk.com
 6                    eric.kim@davispolk.com
                      -and-
 7                    PORTER WRIGHT MORRIS & ARTHUR, LLP
                      BY: DAVID S. BLOOMFIELD, JR., ESQ.
 8                    41 South High Street, Suite 2900
                      Columbus, Ohio 43215
 9                    dbloomfield@porterwright.com
10
11    FOR DEFENDAT ROBERT REFFNER:
12                    MCDERMOTT WILL & EMERY, LLP
                      BY: PAUL HELMS, ESQ.
13                        SAMANTHA L. FENTON, ESQ.
                      444 West Lake Street, Suite 4000
14                    Chicago, Illinois 60606
                      phelms@mwe.com
15                    sfenton@mwe.com
16                    -and-
17                    BROWSE MCDOWELL
                      BY: JOHN C. FAIRWEATHER, ESQ.
18                    388 South Main Street, Suite 500
                      Akron, Ohio 44311
19                    jfairweather@brouse.com
20
21    FOR ENERGY HARBOR:
22                    ZEIGER, TIGGES & LITTLE, LLP
                      BY: STUART G. PARSELL, ESQ.
23                    41 South High Street
                      3500 Huntington Center
24                    Columbus, Ohio 43215
25                    parsell@litohio.com
```

                                        Page 6

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1              Thursday, November 30, 2023

 2                   A.M. SESSION

 3                     --OoO--

 4

 5        SPECIAL MASTER JUDGE:  Let's go on the record.

 6    Miss Sabado, if you could, we are on the record.

 7              It's 11:46 on November 30th, 2023 and we're

 8    here in the matter of the -- by request of the parties in

 9    the In Re FirstEnergy litigation.  The parties have

10    requested an emergency status conference related to the

11    order put on by the Special Master in the preceding day

12    that granted the motion to compel ECF number 489 which

13    permitted inquiry during discovery into the internal

14    investigation and struck the O'Neil declaration.

15              We've had informal discussions off the record

16    that have proven less than fruitful on a potential

17    compromise and the parties have come today to request a

18    form of relief.  Because their substantive arguments are

19    being conveyed and there are some elusive answers that

20    need to be put on the record in addition to clarification

21    of the order, we are now on the record.

22              I would like each side to state concisely

23    their position, not the monologues that we just heard but

24    a tighter version.  I will let you build your record and

25    then I will have some preliminary comments.  Because the
```

Page 7

 1  primary component requesting the stay and the motion for

 2  a stay is FirstEnergy, FirstEnergy counsel if you would

 3  identify yourself for purposes of the record and state to

 4  me concisely your position and what you're asking.

 5      MR. GIUFFRA:  Yes, your Honor.  Robert Giuffra for

 6  FirstEnergy.

 7          We're asking the Court to stay the order so

 8  that we can seek additional review by, at a minimum, the

 9  magistrate and the -- and the chief judge.  We believe --

10  we've filed a brief.  The brief is now on the docket.  We

11  believe that you should have the opportunity to read that

12  brief before entering your order on the stay.  On Tuesday

13  when we met, you recognized that because of the

14  importance of the issues in this -- on this question of

15  whether there should be an -- an invasion of the

16  attorney-client privilege and work product protection

17  governing the internal investigation conducted in advance

18  of these litigations, that there should be a stay and we

19  believe that FirstEnergy meets all the requirements for a

20  stay.

21          First, we believe that the settled law is --

22  and this is all laid out in our brief -- that disclosure

23  of privileged materials will cause irreparable harm.  The

24  irreparable harm will be even more serious in this case

25  because the documents include the analyses of the

CONFIDENTIAL UNDER PROTECTIVE ORDER

 1   attorneys' four matters directly at issue in this case,

 2   including by attorneys in this case.  The harm will be

 3   certain and immediate because movants collectively have

 4   scheduled five upcoming depositions by yearend.  All of

 5   those witnesses have knowledge of the investigations

 6   solely from -- from counsel.  Absent a stay, it's clear

 7   that the movants will seek to elicit testimony that

 8   relates to privileged material.  We need the stay in

 9   order to forestall -- forestall that result.

10           We also satisfy the requirement for

11   likelihood of success on the merits.  We believe that our

12   appeal will raise -- and we filed the objections

13   yesterday -- raise serious questions.  The motion to

14   compel order depends entirely on the inadvertent omission

15   from the O'Neil declaration.  It was obviously

16   inadvertent because the right language was included in

17   the attorney declaration.  Movants themselves never

18   raised any issue with respect to the declaration and

19   Chief Judge Marbley, under similar circumstances, has

20   allowed a party to cure such an omission in the case

21   called Ross versus Dublin, Ohio.  It's a case from 2016,

22   2016 Westlaw, 7117389.

23           And in that case, the declaration omitted the

24   date and the true and correct language and he permitted

25   the amendment to cure what he called quote "technical

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    deficiencies."  Moreover, as your order recognized, the

2    law goes both ways on whether there even was a

3    deficiency.  In fact, the published Second Circuit

4    decision cited in your order held that quote "under

5    penalty of perjury" without "true" was substantial

6    compliance.  So we think those issues raise a serious

7    question for appeal and therefore, warrant a stay.

8            There wouldn't be any sort of an injury to

9    the other parties.  The case order in this case always

10   contemplated that because of the importance of the issues

11   surrounding the privilege protecting the -- the

12   FirstEnergy internal investigations, that the schedule

13   would -- would be amended to allow for the final

14   resolution of any motion to compel order, including all

15   appeals and that order is the June 5, 2023 order

16   scheduling order at paragraph two, ECF 474.  And as I

17   think we've noted, FirstEnergy is -- intends to file a

18   motion today to stay all proceedings in light of the 23F

19   petition that was granted by the Sixth Circuit and

20   finally, the public interest will be served by having a

21   correct application of the privilege and the substantive

22   issues that raise -- that are raised here have broader,

23   you know, implications going into protections for

24   internal investigations that haven't been reached in your

25   order which turned again on the technical deficiency you

Page 10

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    saw in the -- in the declaration.

2              And we think this all needs to be heard by --

3    by a minimum by -- by the magistrate Chief Judge Marbley.

4    Obviously, to the extent we seek review by the Sixth

5    Circuit of an adverse ruling, that would be subject to

6    the standards governing 1292 and also mandamus but I

7    think the issues here are sufficiently serious and

8    important that we would have a -- we would have a

9    reasonable shot at getting such review.

10             We've considered the proposal for the

11   compromise that the other side would like.  The problem

12   is all of the orders we've talked about have talked

13   about, you know, the -- the -- having this issue be

14   determined and the schedule moving, pending any appellate

15   proceedings.  So therefore, there's a need for delay.

16   There's been a -- the claim has been made always "all

17   it's about is facts," not so in our opinion.  What the

18   other side wants is to get facts that were learned by

19   witnesses that were only from attorneys and where the

20   attorney-client privilege is intertwined in the

21   communication of those facts and that's bedrock

22   attorney-client privileged materials.

23             And to the -- since your Honor has the --

24   since you haven't, Special Master, because of the nature

25   of your order which, again, turned on the technical

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    deficiency in the declaration, haven't even addressed the
 2    -- the merits of the issue other than the fact that
 3    you -- you ruled that we hadn't put forward anything to
 4    explain what the purpose was of the investigation because
 5    of the omission in the declaration.  You know, we'd like
 6    the opportunity to cure that issue and then -- and then
 7    if you want to address the issue then and then we can
 8    take an appeal.  But at a minimum, given the irreparable
 9    injury that would be suffered here and the likelihood of
10    success, based on the current order, a stay should be
11    issued.
12               That's all we're asking go for and we would
13    urge you not to issue the stay -- we would urge you not
14    to issue an order until you have an opportunity to at
15    least read our brief which we think elucidates all the
16    reasons why a stay is warranted here.  Thank you.
17         SPECIAL MASTER JUDGE:  Let me ask you this before I
18    ask Mr. Forge to respond.  Is there any substantive
19    difference between the motion that you have styled as a
20    motion to me for a stay and a motion that you would
21    present to Magistrate Judge Jolson and Chief Judge
22    Marbley for a stay?
23         MR. GIUFFRA:  We filed a motion with the Court.  If
24    you were to deny that motion, then it would go to -- to
25    them and then they would -- they would rule on that
```

Page 12

```
1    motion.  I think we will also supplement the record to
2    include the declaration with the omitted language in it
3    and so that would be the issue that would be dealt with
4    by -- presumably, you could deal with it or they could
5    deal with it.  I'm trying to be practical here and I
6    think in light of and -- I -- I assume you haven't had a
7    chance to read Chief Judge Marbley's order, you know,
8    letting a party deal -- cure an issue like this.
9              SPECIAL MASTER JUDGE:  I've read the Ross case.
10             MR. GIUFFRA:  Okay.
11             SPECIAL MASTER JUDGE:  My question to you is, the
12   motion that you filed ECF number 574, you directed it to
13   me.  If you had directed it to the Court, would it say
14   anything substantively different?
15             MR. GIUFFRA:  It would depend on what you were to
16   rule today.  If you, for example, were going to rule
17   today, we might update that motion and -- and change it
18   and add additional grounds for our objections, including
19   we'd obviously raise a -- we'd obviously elevate the stay
20   issue to Chief Judge Marbley because we think this is
21   a -- you know, we think the discovery should be stayed
22   pending a court's resolution and, if necessary, appellate
23   resolution of the important issues that have been raised
24   here.
25             SPECIAL MASTER JUDGE:  So I'm not sure I understand
```

Page 13

CONFIDENTIAL UNDER PROTECTIVE ORDER

1     the question -- or the answer.  Let me ask a question

2     this way.  What argument for a stay would you have put in

3     a motion directed to Chief Judge Marbley and Magistrate

4     Judge Jolson that is not in the motion for a stay you

5     filed directed to me?

6              MR. GIUFFRA:  As of right now, nothing would be

7     different and the motion is filed with the Court.

8     Whether you're the right person to deal with it or

9     whether Chief Judge Marbley is the right person to deal

10    with it, you know, I don't know the answer to that

11    question.  We think in the first instance presumably

12    you're dealing with it.  We made the app -- you know,

13    we're here today.  The plaintiffs made the emergency

14    motion to you.

15              For you to deny the stay, we would obviously

16    supplement our papers with anything you said that would

17    be on the record and that the other side said that would

18    be on the record and we'd add that to our papers seeking

19    a stay from -- from -- from Chief Judge Marbley.  But as

20    of --

21              SPECIAL MASTER JUDGE:  Okay.  Thank you.

22              MR. GIUFFRA:  Okay.

23              SPECIAL MASTER JUDGE:  Anything further before we

24    let Mr. Forge have his turn?

25              MR. GIUFFRA:  No.

                                                    Page 14

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1              SPECIAL MASTER JUDGE:  Thank you.

 2              Mr. Forge, if you'd identify yourself for the

 3     record as I assume you're speaking for all of the

 4     movement -- movants but I don't want to foreclose the

 5     possibility that Defendants Jones and Dowling may -- they

 6     separated themselves from you on the reply brief.  I -- I

 7     don't know if you're speaking for them as well in this

 8     regard or that they want to speak.  So please give the

 9     scope of who you're talking for and then your argument.

10              MR. FORGE:  Thank you, Mr. Judge.

11              Jason Forge on behalf of plaintiffs and all

12     movants.  I would invite counsel for Mr. Jones or

13     Mr. Dowling to -- to jump in if there's any daylight

14     between my arguments and their position but I believe the

15     record reflects that the only area where we've diverged

16     is our description of the facts for, you know, fairly

17     obvious reasons but not the facts of the litigation

18     itself in terms of procedural history and what has

19     occurred at the depositions.  So I think -- I think my

20     argument will stay clear of any characterizations that

21     would require correction or exception by them.

22              SPECIAL MASTER JUDGE:  Appreciate that.

23              MR. FORGE:  Okay.  So with that, I want to -- I

24     want to try to be concise because that's what you asked

25     us to do and so I'll be very specific as far as what we
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1   are asking and why.  We want this litigation to proceed.

2   We want the discovery to proceed.  We have dozens of

3   depositions on schedule.  We want to keep them on

4   schedule.  In order to do that, all we want is the

5   following:  In your -- in the special master's order ECF

6   571, provision number 3 states that "witnesses must

7   answer all fact related questions, past and future,

8   related to the internal investigation," and then

9   parenthetically, "I.e. FirstEnergy cannot shield facts

10  from disclosure just because a witness learned those

11  facts from the investigation."

12          That is the only part of the order we're

13  asking you to ensure remains in effect while their

14  objection is pending because that is the only part of the

15  order that we -- that is essential to us moving forward

16  with these depositions and making productive use of our

17  time.  The only other ask that I have for you today is to

18  at least temporarily modify the deposition protocol to

19  enable the parties to reserve time out of their allocated

20  nine hours for each side.  So reserve however much time

21  they want for a -- a resumed deposition after the

22  objections are resolved without -- without any

23  limitations on the subject matter of those resumed

24  depositions, but maintaining the nine hour per side cap

25  on those depositions to ensure that no witness is

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    subjected to more than the 18 hours of deposition

2    testimony that's currently provided under the existing

3    deposition protocol.  That's my only request.  That's the

4    movants' only request for today.

5            I'm happy to answer any questions beyond

6    that.  I can certainly address each of the points that

7    Mr. Giuffra made regarding his argument for a stay.  I

8    think the most important point, as I emphasized when we

9    were off the record, is that FirstEnergy has not

10   identified the existence of a single fact related to the

11   internal investigation that they have not already shared

12   with the government, their adversary, with us, us being

13   plaintiffs and even movants, their adversaries in this

14   case.  Not a single fact.  Not one.  So there is nothing

15   to protect other than what Mr. Giuffra has described as

16   questions about "what did a lawyer tell you."

17           I will make the commitment that we will not

18   ask those questions.  We will not ask any witness to

19   divulge, "What did lawyer X tell you on this date?"  We

20   are going to stick to that first sentence of paragraph 3

21   of your conclusion.  Facts and only facts and not ask a

22   witness to disclose an actual communication with a

23   lawyer.  So because there are no facts they have not

24   already disclosed, there is nothing to protect regarding

25   the facts.  It is just the actual contents of a

Page 17

CONFIDENTIAL UNDER PROTECTIVE ORDER

1   communication and we're not going to get into that.  So
2   there's no issue here regarding harm -- any harm
3   whatsoever, let alone irreparable harm.
4           On the irreparable harm front, I will quote
5   the Supreme Court in Mohawk Industries versus Carpenter.
6   "Post judgment appeals generally suffice to protect the
7   rights of litigants and ensure the vitality of the
8   attorney-client privilege."  That's at page 109 of 50 --
9   558 U.S. 100.  As the Southern District of Ohio Court
10  held in William Powell Company versus National Indemnity
11  Company -- and this is a -- a -- a Westlaw citation --
12  "erroneous privilege rulings usually can be remedied the
13  same way as other erroneous evidentiary rulings" and then
14  it goes on to continue to quote the Supreme Court.  Quote
15  "by vacating adverse judgment and remanding for a new
16  trial in which the protected material and its fruits are
17  excluded from evidence."So it is not irreparable harm
18  even if there's actual new information, but again, we're
19  not talking about any new information being divulged by
20  letting us go forward under that first sentence of
21  paragraph 3.
22          Regarding the O'Neil declaration, this is far
23  more than a technical shortcoming.  As a member of
24  FirstEnergy's board of directors, Mr. O'Neil is bound by
25  the FirstEnergy Corp board of directors code of ethics

Page 18

1  and business conduct.  That is in the record in this case
2  as Deposition Exhibit 359.  That code of ethics and
3  business conduct provides in part "directors shall
4  communicate any suspected violations of laws, rules,
5  regulations of this code promptly to the chairman of the
6  board, chief executive office, chief ethics officer or
7  chair of the corporate governance committee.  Violations
8  will be investigated by the board or by a person or
9  persons designated by the board and appropriate action
10  will be taken in the event of any violations of the
11  code."
12          This is an obligation in addition to their
13  inherent fiduciary obligations that the board members
14  have and their inherent statutory duty of care that they
15  owe to all investors and to the company.  If -- and --
16  and none of that is contingent upon the threat of
17  criminal or civil liability.  If Mr. O'Neil wants to
18  submit a valid declaration or affidavit in which he
19  disclaims his willingness to abide by this obligation and
20  fulfill his fiduciary obligations, he is perfectly free
21  to do so.  But Mr. O'Neil may not do so in a evidentiary
22  sufficient way as to the other ten members of
23  FirstEnergy's board.  Therefore, he has never had and
24  does not have personal knowledge as to quote "what
25  FirstEnergy would have done but for the possibility of

Page 19

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    criminal or civil liability." He simply is not a

2    competent witness to provide testimony along those lines.

3              So it is not simply a technical infirmity.

4    He cannot truthfully say what the other board members

5    would have done and therefore, he cannot truthfully say

6    what FirstEnergy would have done but for the threat of

7    criminal and civil liability. Mr. Giuffra has made

8    multiple references to ECF 574 and the language about

9    adding additional time at the end of the class period --

10   I'm sorry, at the end of fact discovery for resolution of

11   privilege issues.

12             I actually wrote that language. Mr. Giuffra

13   was not involved in the discussions concerning that

14   language. And I can assure you that there is nothing in

15   ECF 474 or in any of the preceding scheduling orders

16   modifications that I also wrote that say anything about

17   staying proceedings. So to the extent he's trying to

18   imply that Magistrate Judge Jolson has previously said

19   that proceedings would be stayed pending any litigation

20   over these issues, he is simply wrong as the orders

21   themselves will demonstrate, I can assure you.

22             With that, I'm happy to answer any questions,

23   Mr. Judge, but I -- I want to keep things concise. I

24   might have strayed from that a little bit but the essence

25   of what you wanted to know is what we want you to do and

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    I hopefully have conveyed that.

2        SPECIAL MASTER JUDGE:  You have and I appreciate

3    that.  I have just one question and I apologize if it

4    puts you in an awkward position because you may not have

5    known that the case would be cited today.  The Ross

6    versus City of Dublin case decided by Chief Judge Marbley

7    that FirstEnergy has cited a number of times, are you

8    familiar with the case and are you able to speak to it at

9    this point?

10        MR. FORGE:  No, I apologize.  I'm not.  I can

11    familiarize myself if we take a five minute break and I

12    can speak to it if you want to take a recess.

13        SPECIAL MASTER JUDGE:  We are going to take a five

14    minute break -- or more than a five minute break but

15    during that break if you want to look at it, I don't

16    think I'm going to question you about it.  I just wanted

17    to know if you had a take on it before our break.

18        MR. GIUFFRA:  Could I be heard just one minute just

19    to make sure the record is clear on just a few things?

20    Number 1, on all the arguments that have been made about

21    whether Mr. O'Neil was a competent witness to testify

22    about what the purpose of the internal investigation was,

23    that's never been briefed before you.  We have not had an

24    opportunity to respond and Mr. Forge has not cited any

25    cases for his theory that he has expounded here today.

Page 21

CONFIDENTIAL UNDER PROTECTIVE ORDER

1      Second, as to ECF 474, it stands for what it

2  says and, obviously, you can read the order.  It's not

3  about the drafting history or intent.

4      The last point, I looked back on our motion.

5  The motion for the stay of the order was directed to you

6  and, obviously, you know if you -- I -- I again urge you

7  to read our brief, have the other side put in an

8  opposition before issuing an order on an issue that we

9  think is an important one because we think you ought to

10  get the benefit of all the briefing that was done

11  overnight before issuing your -- your ruling.  Thank you.

12      SPECIAL MASTER JUDGE:  Thank you.  It's

13  12:09 currently.  I ask that everyone be patient with me.

14  We will take a break until 12:25, at which point we will

15  reconvene.  You can stay on the Zoom.  You can put

16  yourself off camera if you would like.  At 12:25, I will

17  rejoin you with a decision of the requests made of me

18  today and on the pending motion.  At this point, we're

19  off the record.

20      (Whereupon a recess was held from 12:09

21      p.m. to 12:32 p.m.)

22      SPECIAL MASTER JUDGE:  All right.  Let's go on the

23  record.  We are back on the record.  It's 12:32 p.m.  I

24  thank everyone for their patience.  I took a few minutes

25  longer than the anticipated 12:25.  We are resuming the

Page 22

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    record on the hearing on the pending motion to compel.

2          During this time, I completed reading of the

3    motion and its memorandum in support documents number 573

4    ECF -- 573 and 574 and I'm prepared to make a ruling.

5          As a preliminary comment, prior to the

6    argument discussions with counsel, there was some

7    confusion over the order that I put on on motion to

8    compel ECF number 489 and the scope of that decision.  As

9    I clarified for the parties and as I promised that I

10    would formalize on the record, in that decision on ECF

11    page 571, page I.D. number 12387 in the conclusion, I

12    order in the numbered paragraph number 3 that "witnesses

13    must answer all fact related questions, past and future,

14    related to the internal investigation" and noted in a

15    parenthetical that "FirstEnergy cannot shield" --

16    italicized, bold faced -- "facts from disclosure just

17    because a witness learned those facts from the

18    investigation."

19          Given the framing of the issues by the

20    parties in the oral argument and in the briefing, I had

21    intended and apparently did not succeed in conveying to

22    the parties that discovery of the facts is permissible.

23    Discovery of the attorneys at this point is not.

24    Discovery of the attorneys' legal conclusions derived

25    from those facts or thought processes to produce those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    facts is not discoverable.  But the fact that a witness
2    learned of a factual allegation or representation or
3    statement of fact from an investigator or as a result of
4    the investigation is fair game for discovery under my
5    order.  With that clarification, the order stands.
6              Turning to the motion for a stay in front of
7    me today.  There's a threshold issue of whether that
8    motion which is directed to me can be ruled upon by me.
9    In the recent decision order put on by Magistrate Judge
10   Jolson on November 20th, 2023 -- this is ECF number 570
11   at page I.D. 12370 -- the Magistrate Judge wrote in the
12   final sentence, "Therefore, the Court clarifies that
13   pursuant to its order appointing the special master, the
14   special master's discovery orders are effective
15   immediately upon being entered and remain in effect
16   unless and until a party obtains a stay from the Court or
17   the court sustains an objection."
18             The issue in my mind suggested by that
19   language is whether I have the authority to stay one of
20   my own decisions or whether that sentence reserves the
21   stay from the Court -- the stayability for the Court.  So
22   the last thing I want to do is overreach in my authority
23   and cloak myself in a judicial robe and absorb -- usurp
24   the Court's authority here.  I'm going to go out on a
25   limb and say I have the ability to stay my own orders and

Page 24

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    if I'm wrong in that regard, Chief Judge Marbley and

2    Magistrate Judge Jolson, I'm sure will correct me, my

3    erroneous reading here.  So I think I am empowered to

4    rule on the motion for a stay in front of me, 573, 574.

5            Motion's denied for the following reasons --

6    and I note that this is an oral decision pursuant to my

7    order of appointment filed by the Court.  This is ECF

8    number 541 at page I.D. 11687.  I'm empowered to file a

9    formal written decision, or alternatively, I can issue

10   any formal order on the record before a court reporter

11   and this constitutes such an order.  I do this in lieu of

12   a written opinion and to enable the parties to file a

13   more expedited appeal, the parties to the judges, and get

14   this before them simply by obtaining a transcript -- an

15   expedited transcript as opposed to waiting for me to

16   memorialize that in a written order.

17           The reason the motion is denied:  I do not

18   think that the order on the internal investigation in

19   which I struck sua sponte the O'Neil declaration is

20   incorrect in any regard.  It is a flawed document that

21   does not qualify under 20 USC 1746 as a declaration.  As

22   a consequence of that, as I explained in that order,

23   FirstEnergy was left without any evidence or much

24   evidence at all explaining why it had done what it had

25   done in an attempt to justify and meet its burden of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL UNDER PROTECTIVE ORDER

1   proof.  In contrast, the movants had presented me with

2   ample evidence, even though it was not their burden, that

3   this was a business and human resources related decision.

4           The parties have discussed and FirstEnergy

5   directed me to the Ross versus City of Dublin case.  I

6   did not cite that in my decision because I thought it

7   would open up the exact can of worms today where

8   somebody's asking to supplement but I think the Ross

9   decision by Chief Judge Marbley supports, not only denial

10  of the stay but the order striking the O'Neil

11  declaration.  In Ross, you had an unsworn and undated

12  declaration.  The Court said at 2016 Westlaw 7117389 at

13  page 8 in this 2016 decision that "Ross' unsworn and

14  undated declaration, however, was defective for failing

15  to comply with 28 USC 1746."

16          There's no gray area in that statement.  It's

17  a substantively defective declaration and therefore not

18  worthy of consideration.  That is the exact conclusion

19  that I reached in my decision and I cited ample case law

20  from within and outside the jurisdiction.  I recognize

21  that some jurisdictions, the Second Circuit and

22  otherwise, might disagree.  I find those, however

23  expressed in my decision, to be the minority of cases and

24  the more poorly reasoned cases.

25          The reason I think Ross also supports the

Page 26

```
 1   motion for the denial of the stay request is Chief Judge
 2   Marbley and I agree on the conclusion of law involved
 3   that would be subject to de novo review in an objection.
 4   That is whether the omission of one of the statutory
 5   requirements under Section 1746 renders a declaration
 6   defective.  We agree in that conclusion of law.  In Ross,
 7   as FirstEnergy pointed out, Chief Judge Marbley allowed
 8   the offending party to file an amended or supplemental
 9   replacement declaration to correct what was deemed a
10   technical deficiency.
11           This is a procedural question.  No party has
12   suggested to me that Ross stands for and my re-reading of
13   Ross a moment ago does not indicate any basis that a
14   party is entitled to amend.  There's a difference between
15   a permissive you can file an amendment with this Court
16   versus you're entitled to file an amendment with leave of
17   Court.  This is a procedural question subject to a use of
18   discretion.  I think that on objection, Chief Judge
19   Marbley would uphold any denial of amendment.  In other
20   words, I view FirstEnergy as not having a right to
21   correct its error in this regard.
22           It's a substantive error.  There is no
23   procedural entitlement, however, to correct that.  I
24   would think that it is discretionary within the purview
25   of the Court and by delegated authority within the
```

Page 27

1    purview of the Special Master.  I don't have a motion in

2    front of me to file an amended declaration.  In Ross,

3    there was a pending motion that was filed that was

4    concurrently pending before the Court before the related

5    summary judgment was decided.  So in other words, you had

6    a declaration that was supporting a motion that had not

7    been decided and there was a motion to amend the

8    declaration.

9            That's not the scenario we had here.  Here,

10   there was a declaration filed to support the motion to

11   compel briefing.  There was a decision reached in that

12   and only then did FirstEnergy come forward and say, "We

13   would like to correct the deficiency."  So I think Ross

14   is distinguishable.  Ross doesn't create an entitlement

15   here.  The local rules call for a motion when you want

16   the Court to act and therefore, when you want to delegate

17   an authority of the Special Master to be imposed, you

18   have to file a motion.  There is no motion here.

19           I'm going to construe the argument today as

20   presenting me with an oral motion to amend which is

21   denied.  There was no good cause presented to me for the

22   error other than it was simply not done correctly and no

23   one brought it to the Court's attention, no one brought

24   it to my attention until after an adverse decision was

25   filed.  I understand there is the authority to correct

                                                      Page 28

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    it.  There is no entitlement to do so and we need not do

2    so.  The oral motion is denied.

3            This leaves me also with the argument by

4    FirstEnergy that Magistrate Judge Jolson in a prior

5    ordered acknowledged that the case schedule may need to

6    be amended if there was disclosure of the internal

7    investigation documents and otherwise.  I read that

8    order, however, and I know Mr. Forge indicated he wrote

9    the order so I'm assuming that was the proposed order

10   that was submitted.  But I read that language and

11   Magistrate Judge Jolson's apparent intent surrounding

12   that language as recognizing a possible need and not a

13   substantive decision.

14           I recognize also that even if my decision

15   regarding the internal investigation's upheld, there's a

16   lot to get done and a lot to be turned over and a lot of

17   depositions scheduled that may get screwed up.  So we may

18   need to push the case schedule around a little bit.

19   However, I do not read Magistrate Judge Olson -- Jolson's

20   prior comments as presenting a decision that if this

21   material is deemed discoverable, as it has been deemed

22   discoverable for FirstEnergy's failure to meet its

23   burden, then a case schedule modification is absolutely

24   necessary and that a stay is the result.

25           There's no law in the case to be applied here

                                                        Page 29

CONFIDENTIAL UNDER PROTECTIVE ORDER

1    because I don't think she opined on and decided the issue

2    as FirstEnergy reads it.  I also do not think that the

3    fact that there is an objection pending necessitates a

4    stay.  FirstEnergy can expedite the filing of its

5    objection.  The plaintiff or movants -- movant plaintiffs

6    and the opt out plaintiffs and the defendants' Jones and

7    Dowling can expedite their response.  We can get this

8    moving along and the issue of whether I'm correct on the

9    O'Neil declaration and the effect of striking that

10   document can be resolved before we get too heavily into

11   the deposition schedule.

12           So the motion for a stay is denied.  That can

13   be appealed to the Court or FirstEnergy, you're free to

14   file of course a motion directed directly to the Court.

15   You now have two avenues to get the issues in front of

16   the Court.  You had represented to me that you did not

17   view any substantive difference in what kind of motion

18   you would have filed to me versus to Chief Judge Marbley

19   and Magistrate Judge Jolson.  The more expedited view

20   would be I think to just get this copy -- a copy of the

21   this transcript and object to today's oral decision and

22   get the issues in front of them as promptly and quickly

23   as possible.

24           The Court is aware of today's status

25   conference.  The Court is aware that there is a motion to

Page 30

CONFIDENTIAL UNDER PROTECTIVE ORDER

1  stay coming in this area.  The Court is also aware that

2  there is a motion to stay the entire case in light of the

3  26F appeal.  The parties should expedite their briefing

4  as much as possible so as not to delay.  Don't take your

5  full 21 days.  Don't take the full response date

6  involved.

7          Is there any questions as to the scope of my

8  decision today?

9      MR. GIUFFRA:  My one question was are we -- what

10 are we doing about the document issue and the issue with

11 respect to reserving time for depositions?  That was what

12 we had been talking about prior to.

13     SPECIAL MASTER JUDGE:  That's where I was going

14 next.  I think for the document issue, if I understood

15 Mr. Forge correctly, he was voluntarily saying that that

16 part of my order -- that he was agreeing that it could be

17 held or it could be -- I don't want to use the word

18 stayed but they were not going to seek enforcement of

19 that part during the period while the objection was

20 pending.

21          Is that correct, Mr. Forge?

22     MR. FORGE:  That -- that's what we said, as long as

23 we're able to reserve time, yes.

24     SPECIAL MASTER JUDGE:  Yeah.  And the reserving of

25 time, I have no problem with as requested.  I think it's

Page 31

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1    a good idea.  Unless and until the Court stays the
2    depositions, I think it's a pragmatic approach that
3    resolves the issue, reserve the time.
4            Counsel for FirstEnergy, does that amply
5    clarify the points?
6        MR. GIUFFRA:  I think I understand your position.
7    Thank you.
8        SPECIAL MASTER JUDGE:  Great.  Thank you.
9            Mr. Forge, anything further from you?
10       MR. FORGE:  Just one -- one question that relates
11   to this issue and it's a little bit broader.  It goes
12   beyond it.  When we looked at the order appointing the
13   special master, it requires the objections to be filed
14   within 21 days but neither the order itself nor the local
15   rule contains any provisions for response to the
16   objection, unlike in a situation where it's a magistrate
17   order.  When there's a Magistrate Judge order being
18   appealed, there's a 14-day to appeal it and 14-day for
19   response.  There's no provision for responses set forth
20   in the order or in the local rule.
21           We addressed this a little bit in a -- in a
22   notice that we filed concerning the Randazzo SFAO issue.
23   I don't know if you have any insight, Mr. Special Master,
24   regarding that if the Court -- certainly if the Court
25   is -- is allowing and absolutely if the Court is
```

Page 32

1  expecting a response, we would expedite our response.  I

2  just don't want to elbow our way into doing something

3  that the Court is not expecting or wanting.

4      SPECIAL MASTER JUDGE:  Yeah, I appreciate that

5  point.  I have discussed it with the Court.  The Court

6  will be putting on an order clarifying this.  I can

7  represent to the parties a response will be permitted.

8  The exact time limit you have for filing a response to

9  objections, I'm not sure what that's going to be yet.

10  That's above my pay grade and they haven't told me.

11      My thought is, at least with regard to this

12  issue, ruin somebody's evening, ruin somebody's weekend

13  and get it in as soon as possible.  The sooner you get it

14  in, I know Magistrate Judge Jolson and Chief Judge

15  Marbley, given the importance of the issues here and

16  given the nature of screwing up the schedule will be

17  jumping right on it.  And in the meantime, there'll be an

18  order coming out that will clarify for you what your

19  traditional response is here.  But here, expedite your

20  response and you'll have time to file a response.

21      I can also say that there will be no reply

22  brief permitted without leave of Court to the

23  objections -- to the response to the objections.  So it's

24  going to mirror very much the Magistrate Judge objection

25  process that's in the Court's general order for

Page 33

CONFIDENTIAL UNDER PROTECTIVE ORDER

1   magistrate judges.

2        MR. FORGE:  Thank you.  We will -- we will heed

3   that -- those words and -- and expedite our response and

4   we'll get working on that now before it's filed.

5        SPECIAL MASTER JUDGE:  If the Court disagrees with

6   what I just said, I will disavow that portion of the

7   transcript readily and say I don't know why they did it.

8             Anything else from either counsel?

9        MR. FORGE:  Nothing -- not from plaintiffs, thank

10  you.

11       MR. GIUFFRA:  Nothing.

12       SPECIAL MASTER JUDGE:  All right.  Thank you.

13  We're off the record.

14

15            (Whereupon the proceedings were

16             concluded at 12:51 p.m.)

17

18

19                     -o0o-

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL UNDER PROTECTIVE ORDER

1

2       I, MICHELLE MEDEL SABADO, RPR, CRR, CSR NO. 7423, IN

3   AND FOR THE STATE OF CALIFORNIA, HEREBY CERTIFY:

4       THAT SAID PROCEEDINGS WERE TAKEN DOWN BY ME IN

5   SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND

6   THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION, AND

7   THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT OF

8   SAID PROCEEDINGS;

9       I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

10  EVENT OF THE ACTION.

11      WITNESS MY HAND THIS 30TH DAY OF NOVEMBER, 2023.

12

13

14

15

16          *Michelle M. Sabado*

17          MICHELLE MEDEL SABADO

18          RPR, CRR, CSR NO. 7423

19

20

21

22

23

24

25

Page 35

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[& - action]**

| & | | 4 | |
|---|---|---|---|
| **&** 2:4,12,19 | **18** 17:1 | | **6338462** 1:24 |
| 3:18 4:3,11,16 | **19103** 5:18,23 | **4000** 6:13 | **655** 2:7 |
| 5:3,8,12,22 6:3 | **2** | **41** 6:8,23 | **7** |
| 6:7,12,22 | **20** 25:21 | **43215** 2:15 | **700** 4:17 |
| **1** | **2000** 4:5 | 3:11 6:8,24 | **7117389** 9:22 |
| **1** 21:20 | **20005** 4:13 | **44113** 4:23 | 26:12 |
| **100** 18:9 | **2016** 9:21,22 | **44114** 3:8 4:6 | **7423** 1:25 35:2 |
| **10004** 3:20 | 26:12,13 | **44124** 3:15 | 35:18 |
| **10013** 2:21 | **2023** 1:17 7:1,7 | **44308** 5:13 | **8** |
| **10017** 6:5 | 10:15 24:10 | **44311** 6:18 | **8** 26:13 |
| **10019** 5:4 | 35:11 | **444** 6:13 | **8th** 2:21 |
| **109** 18:8 | **20th** 24:10 | **450** 6:4 | **9** |
| **1100** 4:22 | **21** 31:5 32:14 | **45202** 4:17 5:9 | **901** 3:8 |
| **1114** 2:14 | **23f** 10:18 | **474** 10:16 | **92101** 2:8 |
| **1152** 4:12 | **250** 2:21 5:4 | 20:15 22:1 | **950** 4:22 |
| **11687** 25:8 | **26263** 35:16 | **489** 7:12 23:8 | **a** |
| **11:46** 1:18 7:7 | **26f** 31:3 | **4th** 5:9 | **a.m.** 1:18 7:2 |
| **1200** 5:13 | **28** 26:15 | **5** | **aaron** 5:3 |
| **12370** 24:11 | **2900** 6:8 | **5** 10:15 | **aaron.miner** |
| **12387** 23:11 | **2:20** 1:6 | **50** 5:13 18:8 | 5:5 |
| **125** 3:20 | **3** | **500** 6:18 | **abide** 19:19 |
| **127** 4:6 | **3** 16:6 17:20 | **51st** 5:18 | **ability** 24:25 |
| **1292** 11:6 | 18:21 23:12 | **541** 25:8 | **able** 21:8 31:23 |
| **12:25** 22:14,16 | **30** 1:17 7:1 | **558** 18:9 | **above** 33:10 |
| 22:25 | **301** 5:9 | **55th** 5:4 | **absent** 9:6 |
| **12:32** 22:21,23 | **30799** 3:15 | **570** 24:10 | **absolutely** |
| **12:51** 34:16 | **30th** 7:7 35:11 | **571** 16:6 23:11 | 29:23 32:25 |
| **14** 32:18,18 | **325** 3:10 | **573** 23:3,4 25:4 | **absorb** 24:23 |
| **15th** 4:12 | **345** 3:15 | **574** 13:12 20:8 | **acknowledged** |
| **1701** 5:23 | **3500** 6:23 | 23:4 25:4 | 29:5 |
| **1735** 5:18 | **359** 19:2 | **6** | **act** 28:16 |
| **1746** 25:21 | **3785** 1:6 | **600** 3:11 4:17 | **action** 1:5 2:18 |
| 26:15 27:5 | **388** 6:18 | **60606** 6:14 | 19:9 35:10 |

Page 1

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[actions - behalf]**

| | | | |
|---|---|---|---|
| **actions** 1:8 | **allowing** 32:25 | **appearances** | **assume** 13:6 |
| **actual** 17:22,25 | **alternatively** | 2:1 3:1 4:1 5:1 | 15:3 |
| 18:18 | 25:9 | 6:1 | **assuming** 29:9 |
| **actually** 20:12 | **amend** 27:14 | **appellate** 11:14 | **assure** 20:14,21 |
| **add** 13:18 | 28:7,20 | 13:22 | **attempt** 25:25 |
| 14:18 | **amended** 10:13 | **application** | **attention** 28:23 |
| **adding** 20:9 | 27:8 28:2 29:6 | 10:21 | 28:24 |
| **addison** 3:3 | **amendment** | **applied** 29:25 | **attorney** 8:16 |
| **addition** 7:20 | 9:25 27:15,16 | **appointing** | 9:17 11:20,22 |
| 19:12 | 27:19 | 24:13 32:12 | 18:8 |
| **additional** 8:8 | **ample** 26:2,19 | **appointment** | **attorneys** 9:1,2 |
| 13:18 20:9 | **amply** 32:4 | 25:7 | 11:19 23:23,24 |
| **address** 12:7 | **analyses** 8:25 | **appreciate** | **authority** 24:19 |
| 17:6 | **anderson** 3:4 | 15:22 21:2 | 24:22,24 27:25 |
| **addressed** 12:1 | **andrew** 5:12 | 33:4 | 28:17,25 |
| 32:21 | **answer** 14:1,10 | **approach** 32:2 | **avenue** 3:8 4:22 |
| **advance** 8:17 | 16:7 17:5 | **appropriate** | 6:4 |
| **adversaries** | 20:22 23:13 | 19:9 | **avenues** 30:15 |
| 17:13 | **answers** 7:19 | **area** 15:15 | **aware** 30:24,25 |
| **adversary** | **anticipated** | 26:16 31:1 | 31:1 |
| 17:12 | 22:25 | **argument** 14:2 | **awkward** 21:4 |
| **adverse** 11:5 | **apologize** 21:3 | 15:9,20 17:7 | **b** |
| 18:15 28:24 | 21:10 | 23:6,20 28:19 | |
| **affidavit** 19:18 | **app** 14:12 | 29:3 | **back** 22:4,23 |
| **ago** 27:13 | **apparent** 29:11 | **arguments** | **baker** 4:3 |
| **agree** 27:2,6 | **apparently** | 7:18 15:14 | **bakerlaw.com** |
| **agreeing** 31:16 | 23:21 | 21:20 | 4:7,7,8,8 |
| **aguran** 5:14 | **appeal** 9:12 | **arnold** 5:3 | **ballard** 5:17 |
| **akron** 5:13 | 10:7 12:8 | **arnoldporter....** | **ballardspahr....** |
| 6:18 | 25:13 31:3 | 5:5 | 5:19 |
| **allegation** 24:2 | 32:18 | **arthur** 6:7 | **based** 12:10 |
| **allocated** 16:19 | **appealed** 30:13 | **asked** 15:24 | **basil** 2:12 |
| **allow** 10:13 | 32:18 | **asking** 8:4,7 | **basis** 27:13 |
| **allowed** 9:20 | **appeals** 10:15 | 12:12 16:1,13 | **bedrock** 11:21 |
| 27:7 | 18:6 | 26:8 | **behalf** 15:11 |

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[believe - comments]**

**believe** 8:9,11 8:19,21 9:11 15:14
**benefit** 22:10
**bernstein** 2:19
**beth** 4:4
**beyond** 17:5 32:12
**bit** 20:24 29:18 32:11,21
**bloomfield** 6:7
**bmurphy** 4:14
**bnewton** 4:8
**board** 18:24,25 19:6,8,9,13,23 20:4
**bockius** 5:22
**bold** 23:16
**boulevard** 3:10
**bound** 18:24
**bpo** 4:18
**break** 21:11,14 21:14,15,17 22:14
**bree** 4:11
**brian** 4:16
**brief** 8:10,10 8:12,22 12:15 15:6 22:7 33:22
**briefed** 21:23
**briefing** 22:10 23:20 28:11 31:3

**broad** 3:20
**broader** 10:22 32:11
**broadway** 2:7
**brought** 28:23 28:23
**brouse.com** 6:19
**browse** 6:17
**build** 7:24
**burden** 25:25 26:2 29:23
**business** 19:1,3 26:3

**c**

**c** 6:17
**cabraser** 2:19
**california** 2:8 35:3
**call** 28:15
**called** 9:21,25
**camera** 22:16
**cap** 16:24
**care** 19:14
**carole** 4:3
**carpenter** 18:5
**case** 8:24 9:1,2 9:20,21,23 10:9,9 13:9 17:14 19:1 21:5,6,8 26:5 26:19 29:5,18 29:23,25 31:2
**cases** 21:25 26:23,24

**cause** 8:23 28:21
**center** 4:12 6:23
**certain** 9:3
**certainly** 17:6 32:24
**certify** 35:3,9
**cgilroy** 2:11
**chack** 5:21
**chair** 19:7
**chairman** 19:5
**chance** 13:7
**change** 13:17
**characterizati...** 15:20
**charles** 4:2
**chicago** 6:14
**chief** 8:9 9:19 11:3 12:21 13:7,20 14:3,9 14:19 19:6,6 21:6 25:1 26:9 27:1,7,18 30:18 33:14
**christopher** 2:7 3:5
**cincinnati** 4:17 5:9
**circuit** 10:3,19 11:5 26:21
**circumstances** 9:19
**citation** 18:11

**cite** 26:6
**cited** 10:4 21:5 21:7,24 26:19
**city** 21:6 26:5
**civil** 1:5 19:17 20:1,7
**claim** 11:16
**clarification** 7:20 24:5
**clarified** 23:9
**clarifies** 24:12
**clarify** 32:5 33:18
**clarifying** 33:6
**class** 2:3 20:9
**clear** 9:6 15:20 21:19
**cleveland** 3:8 4:6,23
**client** 8:16 11:20,22 18:8
**cloak** 24:23
**code** 18:25 19:2 19:5,11
**collectively** 9:3
**columbia** 4:12
**columbus** 2:15 3:11 6:8,24
**come** 7:17 28:12
**coming** 31:1 33:18
**comment** 23:5
**comments** 7:25 29:20

Page 3

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[commitment - dealt]**

| | | | |
|---|---|---|---|
| **commitment** 17:17 | **conclusions** 23:24 | **copy** 30:20,20 | **criminal** 19:17 20:1,7 |
| **committee** 19:7 | **concurrently** 28:4 | **corp** 1:5 18:25 | **cromwell** 3:18 |
| **communicate** 19:4 | **conduct** 19:1,3 | **corporate** 19:7 | **crr** 1:25 35:2 35:18 |
| **communication** 11:21 17:22 18:1 | **conducted** 8:17 | **correct** 9:24 10:21 25:2 27:9,21,23 28:13,25 30:8 31:21 35:7 | **csr** 1:25 35:2 35:18 |
| **company** 18:10 18:11 19:15 | **conference** 7:10 30:25 | | **cure** 9:20,25 12:6 13:8 |
| **compel** 7:12 9:14 10:14 23:1,8 28:11 | **confidential** 1:11 | **correction** 15:21 | **current** 12:10 |
| **competent** 20:2 21:21 | **confusion** 23:7 | **correctly** 28:22 31:15 | **currently** 17:2 22:13 |
| **complete** 35:7 | **consequence** 25:22 | **counsel** 2:1 3:1 4:1 5:1 6:1 8:2 9:6 15:12 23:6 32:4 34:8 | **cv** 1:6 |
| **completed** 23:2 | **consideration** 26:18 | | **d** |
| **compliance** 10:6 | **considered** 11:10 | **course** 30:14 | **d** 3:5,14 5:17 |
| **comply** 26:15 | **constitutes** 25:11 | **court** 1:1 8:7 12:23 13:13 14:7 18:5,9,14 24:12,16,17,21 24:21 25:7,10 26:12 27:15,17 27:25 28:4,16 30:13,14,16,24 30:25 31:1 32:1,24,24,25 33:3,5,5,22 34:5 | **d.c.** 4:13 |
| **component** 8:1 | **construe** 28:19 | | **daniel** 4:5 |
| **compromise** 7:17 11:11 | **contains** 32:15 | | **date** 9:24 17:19 31:5 |
| **concerning** 20:13 32:22 | **contemplated** 10:10 | | **david** 3:18 6:7 |
| **concise** 15:24 20:23 | **contents** 17:25 | | **davis** 6:3 |
| **concisely** 7:22 8:4 | **contingent** 19:16 | | **davispolk.com** 6:5,6 |
| **concluded** 34:16 | **continue** 18:14 | **court's** 13:22 24:24 28:23 33:25 | **day** 3:7 7:11 32:18,18 35:11 |
| **conclusion** 17:21 23:11 26:18 27:2,6 | **continued** 3:1 4:1 5:1 6:1 | **create** 28:14 | **daylight** 15:13 |
| | **contrast** 26:1 | **crendon** 4:7 | **days** 31:5 32:14 |
| | **conveyed** 7:19 21:1 | | **dbloomfield** 6:9 |
| | **conveying** 23:21 | | **de** 27:3 |
| | | | **deal** 13:4,5,8 14:8,9 |
| | | | **dealing** 14:12 |
| | | | **dealt** 13:3 |

Page 4

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[decided - dwarren]**

| | | | |
|---|---|---|---|
| **decided** 21:6 28:5,7 30:1 | **delay** 11:15 31:4 | **diego** 2:8 | **discussed** 26:4 33:5 |
| **decision** 10:4 22:17 23:8,10 24:9 25:6,9 26:3,6,9,13,19 26:23 28:11,24 29:13,14,20 30:21 31:8 | **delegate** 28:16 | **difference** 12:19 27:14 30:17 | **discussions** 7:15 20:13 23:6 |
| | **delegated** 27:25 | **different** 13:14 14:7 | **distinguishable** 28:14 |
| | **demetriou** 3:4 | **direct** 2:18 | **district** 1:1,2 18:9 |
| | **demonstrate** 20:21 | **directed** 13:12 13:13 14:3,5 22:5 24:8 26:5 30:14 | **diverged** 15:15 |
| **decisions** 24:20 | **denial** 26:9 27:1,19 | | **division** 1:3 |
| **declaration** 7:14 9:15,17 9:18,23 11:1 12:1,5 13:2 18:22 19:18 25:19,21 26:11 26:12,14,17 27:5,9 28:2,6,8 28:10 30:9 | **denied** 25:5,17 28:21 29:2 30:12 | **direction** 35:6 | **divulge** 17:19 |
| | | **directly** 9:1 30:14 | **divulged** 18:19 |
| | **dennis** 5:21 | | **docket** 8:10 |
| | **deny** 12:24 14:15 | **directors** 18:24 18:25 19:3 | **document** 1:7 25:20 30:10 31:10,14 |
| | **depend** 13:15 | **disagree** 26:22 | |
| | **depends** 9:14 | **disagrees** 34:5 | **documents** 8:25 23:3 29:7 |
| **deemed** 27:9 29:21,21 | **deposition** 16:18,21 17:1 17:3 19:2 30:11 | **disavow** 34:6 | **doing** 31:10 33:2 |
| | | **disclaims** 19:19 | |
| **defective** 26:14 26:17 27:6 | | **disclose** 17:22 | **donald** 3:4 4:10 |
| | **depositions** 9:4 15:19 16:3,16 16:24,25 29:17 31:11 32:2 | **disclosed** 17:24 | **dowd** 2:4 |
| **defendant** 3:17 4:2,10,20 5:2,7 5:16,21 | | **disclosure** 8:22 16:10 23:16 29:6 | **dowling** 4:20 15:5,13 30:7 |
| | | | **dozens** 16:2 |
| | **derived** 23:24 | **discoverable** 24:1 29:21,22 | **drafting** 22:3 |
| **defendants** 3:3 6:2 15:5 30:6 | **described** 17:15 | **discovery** 7:13 13:21 16:2 20:10 23:22,23 23:24 24:4,14 | **dublin** 2:14 9:21 21:6 26:5 |
| **defendat** 6:11 | **description** 15:16 | | **duffy** 3:10 |
| **deficiencies** 10:1 | **designated** 19:9 | **discretion** 27:18 | **duty** 19:14 |
| **deficiency** 10:3 10:25 12:1 27:10 28:13 | **determined** 11:14 | **discretionary** 27:24 | **dwarren** 4:8 |

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[e - filed]**

| e | enforcement | evidence 18:17 | f |
|---|---|---|---|
| **e** 4:2 | 31:18 | 25:23,24 26:2 | **f** 3:4 4:21 5:3 |
| **east** 5:9 | **ensure** 16:13 | **evidentiary** | **faced** 23:16 |
| **eastern** 1:3 | 16:25 18:7 | 18:13 19:21 | **fact** 10:3 12:2 |
| **ecf** 7:12 10:16 | **entered** 24:15 | **exact** 26:7,18 | 16:7 17:10,14 |
| 13:12 16:5 | **entering** 8:12 | 33:8 | 20:10 23:13 |
| 20:8,15 22:1 | **entire** 31:2 | **example** 13:16 | 24:1,3 30:3 |
| 23:4,8,10 | **entirely** 9:14 | **exception** | **facts** 11:17,18 |
| 24:10 25:7 | **entitled** 27:14 | 15:21 | 11:21 15:16,17 |
| **effect** 16:13 | 27:16 | **excluded** 18:17 | 16:9,11 17:21 |
| 24:15 30:9 | **entitlement** | **executive** 19:6 | 17:21,23,25 |
| **effective** 24:14 | 27:23 28:14 | **exhibit** 19:2 | 23:16,17,22,25 |
| **either** 34:8 | 29:1 | **existence** 17:10 | 24:1 |
| **ejtaft** 5:10 | **eric** 6:4 | **existing** 17:2 | **factual** 24:2 |
| **elbow** 33:2 | **eric.kim** 6:6 | **expecting** 33:1 | **failing** 26:14 |
| **elevate** 13:19 | **erroneous** | 33:3 | **failure** 29:22 |
| **elicit** 9:7 | 18:12,13 25:3 | **expedite** 30:4,7 | **fair** 24:4 |
| **ellis** 4:21 | **error** 27:21,22 | 31:3 33:1,19 | **fairly** 15:16 |
| **elucidates** | 28:22 | 34:3 | **fairweather** |
| 12:15 | **esq** 2:5,6,6,7,13 | **expedited** | 6:17 |
| **elusive** 7:19 | 2:20 3:7,10,14 | 25:13,15 30:19 | **familiar** 21:8 |
| **emergency** | 3:18,19,19 4:3 | **explain** 12:4 | **familiarize** |
| 1:15 7:10 | 4:4,4,5,11,16 | **explained** | 21:11 |
| 14:13 | 4:21,22 5:3,8 | 25:22 | **far** 15:25 18:22 |
| **emery** 6:12 | 5:12,17,22 6:3 | **explaining** | **favret** 4:22 |
| **emily** 5:8 | 6:4,7,12,13,17 | 25:24 | **fenton** 6:13 |
| **emphasized** | 6:22 | **expounded** | **fiduciary** 19:13 |
| 17:8 | **essence** 20:24 | 21:25 | 19:20 |
| **empowered** | **essential** 16:15 | **expressed** | **file** 10:17 25:8 |
| 25:3,8 | **ethics** 18:25 | 26:23 | 25:12 27:8,15 |
| **enable** 16:19 | 19:2,6 | **extent** 11:4 | 27:16 28:2,18 |
| 25:12 | **evening** 33:12 | 20:17 | 30:14 33:20 |
| **energy** 3:17 | **event** 19:10 | | **filed** 8:10 9:12 |
| 6:21 | 35:10 | | 12:23 13:12 |
| | | | 14:5,7 25:7 |

Page 6

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[filed - honor]**

| | | | |
|---|---|---|---|
| 28:3,10,25 | 15:11,23 21:10 | **geoffrey** 3:7 | **grade** 33:10 |
| 30:18 32:13,22 | 21:24 29:8 | **george** 3:3 | **granted** 7:12 |
| 34:4 | 31:15,21,22 | **getting** 11:9 | 10:19 |
| **filing** 30:4 33:8 | 32:9,10 34:2,9 | **gilroy** 2:7 | **gray** 26:16 |
| **final** 10:13 | **form** 7:18 | **giuffra** 3:19 8:5 | **great** 32:8 |
| 24:12 | **formal** 25:9,10 | 8:5 12:23 | **grounds** 13:18 |
| **finally** 10:20 | **formalize** | 13:10,15 14:6 | **guiffra** 3:22 |
| **find** 26:22 | 23:10 | 14:22,25 17:7 | **guran** 5:12 |
| **first** 3:17 8:21 | **forth** 32:19 | 17:15 20:7,12 | **h** |
| 14:11 17:20 | **forward** 12:3 | 21:18 31:9 | **h** 3:10 |
| 18:20 | 16:15 18:20 | 32:6 34:11 | **hand** 35:11 |
| **firstenergy** 1:5 | 28:12 | **give** 15:8 | **happy** 17:5 |
| 7:9 8:2,2,6,19 | **four** 9:1 | **given** 12:8 | 20:22 |
| 10:12,17 16:9 | **framing** 23:19 | 23:19 33:15,16 | **harbor** 6:21 |
| 17:9 18:25 | **francis** 2:6 | **gjritts** 3:9 | **harm** 8:23,24 |
| 19:25 20:6 | **free** 19:20 | **go** 7:5 12:12,24 | 9:2 18:2,2,3,4 |
| 21:7 23:15 | 30:13 | 18:20 22:22 | 18:17 |
| 25:23 26:4 | **front** 18:4 24:6 | 24:24 | **heard** 7:23 11:2 |
| 27:7,20 28:12 | 25:4 28:2 | **goes** 10:2 18:14 | 21:18 |
| 29:4 30:2,4,13 | 30:15,22 | 32:11 | **hearing** 1:15 |
| 32:4 | **fruitful** 7:16 | **going** 10:23 | 23:1 |
| **firstenergy's** | **fruits** 18:16 | 13:16 17:20 | **heavily** 30:10 |
| 18:24 19:23 | **fulfill** 19:20 | 18:1 21:13,16 | **heed** 34:2 |
| 29:22 | **full** 31:5,5 | 24:24 28:19 | **heimann** 2:19 |
| **five** 9:4 21:11 | **further** 14:23 | 31:13,18 33:9 | **held** 1:15 10:4 |
| 21:13,14 | 32:9 35:9 | 33:24 | 18:10 22:20 |
| **fkaram** 2:10 | **future** 16:7 | **good** 28:21 | 31:17 |
| **flawed** 25:20 | 23:13 | 32:1 | **helms** 6:12 |
| **floor** 2:21 5:18 | **g** | **governance** | **herrington** |
| **following** 16:5 | **g** 6:22 | 19:7 | 4:11 |
| 25:5 | **game** 24:4 | **governing** 8:17 | **high** 6:8,23 |
| **foreclose** 15:4 | **geller** 2:4 | 11:6 | **history** 15:18 |
| **forestall** 9:9,9 | **general** 33:25 | **government** | 22:3 |
| **forge** 2:5 12:18 | **generally** 18:6 | 17:12 | **honor** 8:5 |
| 14:24 15:2,10 | | | 11:23 |

Page 7

**[hopefully - jones]**

| | | | |
|---|---|---|---|
| **hopefully** 21:1 | **inadvertent** | **intertwined** | **issued** 12:11 |
| **hostetler** 4:3 | 9:14,16 | 11:20 | **issues** 8:14 10:6 |
| **hour** 16:24 | **include** 8:25 | **invasion** 8:15 | 10:10,22 11:7 |
| **hours** 16:20 | 13:2 | **investigated** | 13:23 20:11,20 |
| 17:1 | **included** 9:16 | 19:8 | 23:19 30:15,22 |
| **hudson** 2:21 | **including** 9:2 | **investigation** | 33:15 |
| **hughes** 4:16 | 10:14 13:18 | 7:14 8:17 12:4 | **issuing** 22:8,11 |
| **human** 26:3 | **incorrect** 25:20 | 16:8,11 17:11 | **italicized** 23:16 |
| **huntington** | **indemnity** | 21:22 23:14,18 | |
| 6:23 | 18:10 | 24:4 25:18 | **j** |
| | **indicate** 27:13 | 29:7 | **j** 3:3,3,4,7,19 |
| **i** | **indicated** 29:8 | **investigation's** | **james** 3:4 5:16 |
| **i.d.** 23:11 24:11 | **industries** 18:5 | 29:15 | **jason** 2:5 3:3 |
| 25:8 | **infirmity** 20:3 | **investigations** | 15:11 |
| **i.e.** 16:9 | **informal** 7:15 | 9:5 10:12,24 | **jerry** 3:6 |
| **idea** 32:1 | **information** | **investigator** | **jfairweather** |
| **identified** | 18:18,19 | 24:3 | 6:19 |
| 17:10 | **inherent** 19:13 | **investors** 19:15 | **jforge** 2:8 |
| **identify** 8:3 | 19:14 | **invite** 15:12 | **job** 1:24 |
| 15:2 | **injury** 10:8 | **involved** 20:13 | **john** 3:10 4:21 |
| **iii** 3:4 | 12:9 | 27:2 31:6 | 4:22 5:7 6:17 |
| **illinois** 6:14 | **inquiry** 7:13 | **irreparable** | **john.favret** |
| **immediate** 9:3 | **insight** 32:23 | 8:23,24 12:8 | 4:24 |
| **immediately** | **instance** 14:11 | 18:3,4,17 | **john.mccafrey** |
| 24:15 | **intended** 23:21 | **israel** 4:4 | 4:23 |
| **implications** | **intends** 10:17 | **issue** 9:1,18 | **johnson** 3:4 |
| 10:23 | **intent** 22:3 | 11:13 12:2,6,7 | **jolson** 12:21 |
| **imply** 20:18 | 29:11 | 12:13,14 13:3 | 14:4 20:18 |
| **importance** | **interest** 10:20 | 13:8,20 18:2 | 24:10 25:2 |
| 8:14 10:10 | **interested** 35:9 | 22:8 24:7,18 | 29:4 30:19 |
| 33:15 | **internal** 7:13 | 25:9 30:1,8 | 33:14 |
| **important** 11:8 | 8:17 10:12,24 | 31:10,10,14 | **jolson's** 29:11 |
| 13:23 17:8 | 16:8 17:11 | 32:3,11,22 | 29:19 |
| 22:9 | 21:22 23:14 | 33:12 | **jon** 3:3 |
| **imposed** 28:17 | 25:18 29:6,15 | | **jones** 3:7 4:2 |
| | | | 15:5,12 30:6 |

Page 8

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[jonesday.com - made]**

| | | | |
|---|---|---|---|
| **jonesday.com** 3:9,12 | **jurisdictions** 26:21 | **lakeside** 3:8 | **limb** 24:25 |
| **joseph** 2:13 | **justify** 25:25 | **language** 9:16 | **limit** 33:8 |
| **joshua** 6:3 | **k** | 9:24 13:2 20:8 | **limitations** 16:23 |
| **joshua.shinbrot** 6:5 | **k** 3:3 | 20:12,14 24:19 29:10,12 | **lines** 20:2 |
| **jr** 6:7 | **karam** 2:6 | **law** 8:21 10:2 | **lisowski** 3:3 |
| **judge** 1:16 5:7 | **karen** 5:22 | 26:19 27:2,6 | **litigants** 18:7 |
| 7:5 8:9 9:19 | **karen.pohlma...** | 29:25 | **litigation** 1:6 |
| 11:3 12:17,21 | 5:24 | **laws** 19:4 | 7:9 15:17 16:1 |
| 12:21 13:7,9 | **katsiff** 5:17 | **lawyer** 17:16 | 20:19 |
| 13:11,20,25 | **katsifft** 5:19 | 17:19,23 | **litigations** 8:18 |
| 14:3,4,9,19,21 | **keep** 16:3 20:23 | **lchb.com** 2:22 | **litohio.com** 6:25 |
| 14:23 15:1,10 | **kevin** 2:6 | **learned** 11:18 | **little** 6:22 20:24 |
| 15:22 20:18,23 | **key** 4:5 | 16:10 23:17 | 29:18 32:11,21 |
| 21:2,6,13 | **kim** 6:4 | 24:2 | **llp** 2:4,12,19 |
| 22:12,22 24:9 | **kind** 30:17 | **leave** 27:16 | 3:14,18 4:11 |
| 24:11 25:1,2 | **know** 10:23 | 33:22 | 4:21 5:8,12,17 |
| 26:9 27:1,7,18 | 11:13 12:5 | **leaves** 29:3 | 5:22 6:3,7,12 |
| 29:4,11,19 | 13:7,21 14:10 | **left** 25:23 | 6:22 |
| 30:18,19 31:13 | 14:10,12 15:7 | **legal** 23:24 | **local** 28:15 |
| 31:24 32:8,17 | 15:16 20:25 | **leila** 5:2 | 32:14,20 |
| 33:4,14,14,24 | 21:17 22:6 | **leslie** 3:6 | **long** 31:22 |
| 34:5,12 | 29:8 32:23 | **letting** 13:8 | **longer** 22:25 |
| **judges** 25:13 | 33:14 34:7 | 18:20 | **look** 21:15 |
| 34:1 | **knowledge** 9:5 | **lewis** 5:22 | **looked** 22:4 |
| **judgment** 18:6 | 19:24 | **lexington** 6:4 | 32:12 |
| 18:15 28:5 | **known** 21:5 | **liability** 19:17 | **lot** 29:16,16,16 |
| **judicial** 24:23 | **kscariani** 2:9 | 20:1,7 | **luis** 3:5 |
| **julia** 3:4 | **l** | **lieff** 2:19 | **m** |
| **jump** 15:13 | **l** 3:4,19 4:4 | **lieu** 25:11 | **m** 3:3,6 6:4 |
| **jumping** 33:17 | 6:13 | **light** 10:18 13:6 | **m.j.** 3:18 |
| **june** 10:15 | **laid** 8:22 | 31:2 | **made** 11:16 |
| **jurisdiction** 26:20 | **lake** 6:13 | **likelihood** 9:11 12:9 | 14:12,13 17:7 20:7 21:20 |

**[made - necessitates]**

| | | | |
|---|---|---|---|
| 22:17 | 32:13,23 33:4 | **michelle** 1:25 | 22:18 23:1,3,7 |
| **magistrate** 8:9 | 34:5,12 | 35:2,17 | 24:6,8 25:4,17 |
| 11:3 12:21 | **master's** 16:5 | **mind** 24:18 | 27:1 28:1,3,6,7 |
| 14:3 20:18 | 24:14 | **miner** 5:3 | 28:10,15,18,18 |
| 24:9,11 25:2 | **material** 9:8 | **minimum** 8:8 | 28:20 29:2 |
| 29:4,11,19 | 18:16 29:21 | 11:3 12:8 | 30:12,14,17,25 |
| 30:19 32:16,17 | **materials** 8:23 | **minority** 26:23 | 31:2 |
| 33:14,24 34:1 | 11:22 | **minute** 21:11 | **motion's** 25:5 |
| **main** 4:22 5:13 | **matter** 7:8 | 21:14,14,18 | **moul** 2:12 |
| 6:18 | 16:23 | **minutes** 22:24 | **movant** 30:5 |
| **maintaining** | **matters** 9:1 | **mirror** 33:24 | **movants** 9:3,7 |
| 16:24 | **mccaffrey** 4:21 | **misheff** 3:4 | 9:17 15:4,12 |
| **make** 17:17 | **mcconnell** 3:10 | **mitchell** 3:4 | 17:4,13 26:1 |
| 21:19 23:4 | **mcdermott** | **mmiarmi** 2:22 | 30:5 |
| **making** 16:16 | 6:12 | **mmmb.com** | **movement** 15:4 |
| **mandamus** | **mcdowell** 6:17 | 2:16 | **moving** 11:14 |
| 11:6 | **medel** 1:25 | **modification** | 16:15 30:8 |
| **marbley** 9:19 | 35:2,17 | 29:23 | **mpduffy** 3:12 |
| 11:3 12:22 | **meet** 25:25 | **modifications** | **multiple** 20:8 |
| 13:20 14:3,9 | 29:22 | 20:16 | **murphy** 2:12 |
| 14:19 21:6 | **meets** 8:19 | **modify** 16:18 | 4:11 |
| 25:1 26:9 27:2 | **member** 18:23 | **mohawk** 18:5 | **murray** 2:12,13 |
| 27:7,19 30:18 | **members** 19:13 | **moment** 27:13 | 2:16 |
| 33:15 | 19:22 20:4 | **monologues** | **mwe.com** 6:14 |
| **marbley's** 13:7 | **memorandum** | 7:23 | 6:15 |
| **marjorie** 3:10 | 23:3 | **morgan** 5:22 | |
| **market** 5:18,23 | **memorialize** | **morganlewis....** | **n** |
| **master** 1:16 7:5 | 25:16 | 5:24 | **n** 3:4 |
| 7:11 11:24 | **merits** 9:11 | **morris** 6:7 | **named** 35:5 |
| 12:17 13:9,11 | 12:2 | **motion** 7:12 8:1 | **national** 18:10 |
| 13:25 14:21,23 | **met** 8:13 | 9:13 10:14,18 | **nature** 11:24 |
| 15:1,22 21:2 | **miarmi** 2:20 | 12:19,20,20,23 | 33:16 |
| 21:13 22:12,22 | **michael** 2:20 | 12:24 13:1,12 | **necessary** |
| 24:13 28:1,17 | 3:3 4:20 | 13:17 14:3,4,7 | 13:22 29:24 |
| 31:13,24 32:8 | | 14:14 22:4,5 | **necessitates** |
| | | | 30:3 |

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[need - part]**

| | | | |
|---|---|---|---|
| **need** 7:20 9:8 11:15 29:1,5 29:12,18 | 19:17,21 21:21 25:19 26:10 30:9 | **olson** 29:19 | **orders** 11:12 20:15,20 24:14 24:25 |
| **needs** 11:2 | **o0o** 7:3 34:19 | **omission** 9:14 9:20 12:5 27:4 | **orrick** 4:11 |
| **neither** 32:14 | **object** 30:21 | **omitted** 9:23 13:2 | **orrick.com** 4:14 |
| **nelles** 3:19 | **objection** 16:14 24:17 27:3,18 30:3,5 31:19 32:16 33:24 | **open** 26:7 | **ought** 22:9 |
| **nelless** 3:21 | | **opined** 30:1 | **outside** 26:20 |
| **never** 9:17 19:23 21:23 | | **opinion** 11:17 25:12 | **overnight** 22:11 |
| **new** 2:21,21 3:20,20 5:4,4 6:5,5 18:15,18 18:19 | **objections** 9:12 13:18 16:22 32:13 33:9,23 33:23 | **opportunity** 8:11 12:6,14 21:24 | **overreach** 24:22 |
| | | **opposed** 25:15 | **owe** 19:15 |
| | | **opposition** 22:8 | **own** 24:20,25 |
| **newton** 4:4 | **obligation** 19:12,19 | **opt** 30:6 | **p** |
| **nine** 16:20,24 | **obligations** 19:13,20 | **oral** 23:20 25:6 28:20 29:2 30:21 | **p** 3:10 4:16 5:12 |
| **note** 25:6 | | | |
| **noted** 10:17 23:14 | **obtaining** 25:14 | **order** 1:12 7:11 7:21 8:7,12 9:9 9:14 10:1,4,9 10:14,15,15,16 10:25 11:25 12:10,14 13:7 16:4,5,12,15 22:2,5,8 23:7 23:12 24:5,5,9 24:13 25:7,10 25:11,16,18,22 26:10 29:8,9,9 31:16 32:12,14 32:17,17,20 33:6,18,25 | **p.m.** 22:21,21 22:23 34:16 |
| **notice** 32:22 | **obtains** 24:16 | | **page** 18:8 23:11,11 24:11 25:8 26:13 |
| **november** 1:17 7:1,7 24:10 35:11 | **obvious** 15:17 | | **papers** 14:16 14:18 |
| | **obviously** 9:15 11:4 13:19,19 14:15 22:2,6 | | **pappas** 3:5 |
| **novo** 27:3 | | | **paragraph** 10:16 17:20 18:21 23:12 |
| **number** 7:12 13:12 16:6 21:7,20 23:3,8 23:11,12 24:10 25:8 | **occurred** 15:19 | | **parenthetical** 23:15 |
| | **offending** 27:8 | | **parenthetically** 16:9 |
| | **office** 19:6 | | |
| **numbered** 23:12 | **officer** 19:6 | | **parsell** 6:22,25 |
| | **ohio** 1:2 2:15 3:8,11,15 4:6 4:17,23 5:9,13 6:8,18,24 9:21 18:9 | | **part** 16:12,14 19:3 31:16,19 |
| **nw** 4:12 | | | |
| **o** | | | |
| **o'connor** 4:16 | | **ordered** 29:5 | |
| **o'neil** 3:4 7:14 9:15 18:22,24 | **okay** 13:10 14:21,22 15:23 | | |

Page 11

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[parties - provide]**

parties  7:8,9,17
    10:9 16:19
    23:9,20,22
    25:12,13 26:4
    31:3 33:7
party  9:20 13:8
    24:16 27:8,11
    27:14
past  16:7 23:13
patience  22:24
patient  22:13
paul  3:3 6:12
pay  33:10
pearson  5:16
pease  5:8,12
penalty  10:5
pending  11:14
    13:22 16:14
    20:19 22:18
    23:1 28:3,4
    30:3 31:20
pennsylvania
    5:18,23
pepper  3:15
perfectly  19:20
period  20:9
    31:19
perjury  10:5
permissible
    23:22
permissive
    27:15
permitted  7:13
    9:24 33:7,22

person  14:8,9
    19:8
personal  19:24
persons  19:9
petition  10:19
phelms  6:14
philadelphia
    5:18,23
pianalto  3:5
pike  3:15
pinetree  3:15
place  35:5
plaintiff  30:5
plaintiffs  2:3
    2:18 14:13
    15:11 17:13
    30:5,6 34:9
please  15:8
pohlmann  5:22
point  17:8 21:9
    22:4,14,18
    23:23 33:5
pointed  27:7
points  17:6
    32:5
polk  6:3
poorly  26:24
porter  5:3 6:7
porterwright....
    6:9
portion  34:6
position  7:23
    8:4 15:14 21:4
    32:6

possibility  15:5
    19:25
possible  29:12
    30:23 31:4
    33:13
post  18:6
potential  7:16
powell  18:10
practical  13:5
pragmatic  32:2
preceding  7:11
    20:15
preliminary
    7:25 23:5
prepared  23:4
present  12:21
presented  26:1
    28:21
presenting
    28:20 29:20
presumably
    13:4 14:11
previously
    20:18
primary  8:1
prior  23:5 29:4
    29:20 31:12
privilege  8:16
    10:11,21 11:20
    18:8,12 20:11
privileged  8:23
    9:8 11:22
problem  11:11
    31:25

procedural
    15:18 27:11,17
    27:23
proceed  16:1,2
proceedings
    10:18 11:15
    20:17,19 34:15
    35:4,8
process  33:25
processes  23:25
produce  23:25
product  8:16
productive
    16:16
promised  23:9
promptly  19:5
    30:22
proof  26:1
proposal  11:10
proposed  29:9
protect  17:15
    17:24 18:6
protected
    18:16
protecting
    10:11
protection  8:16
protections
    10:23
protective  1:12
protocol  16:18
    17:3
proven  7:16
provide  20:2

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[provided - reserve]**

provided  17:2
provides  19:3
provision  16:6
  32:19
provisions
  32:15
public  4:6
  10:20
published  10:3
purpose  12:4
  21:22
purposes  8:3
pursuant  24:13
  25:6
purview  27:24
  28:1
push  29:18
put  7:11,20
  12:3 14:2 22:7
  22:15 23:7
  24:9
puts  21:4
putting  33:6

**q**

qualify  25:21
question  8:14
  10:7 13:11
  14:1,1,11 21:3
  21:16 27:11,17
  31:9 32:10
questions  9:13
  16:7 17:5,16
  17:18 20:22
  23:13 31:7

quickly  30:22
quote  9:25 10:4
  18:4,14,14
  19:24

**r**

r  4:5
rachael  4:4
raise  9:12,13
  10:6,22 13:19
raised  9:18
  10:22 13:23
randazzo  32:22
reached  10:24
  26:19 28:11
read  8:11 12:15
  13:7,9 22:2,7
  29:7,10,19
readily  34:7
reading  23:2
  25:3 27:12
reads  30:2
reason  25:17
  26:25
reasonable
  11:9
reasoned  26:24
reasons  12:16
  15:17 25:5
recent  24:9
recess  21:12
  22:20
recognize
  26:20 29:14
recognized
  8:13 10:1

recognizing
  29:12
reconvene
  22:15
record  7:5,6,15
  7:20,21,24 8:3
  13:1 14:17,18
  15:3,15 17:9
  19:1 21:19
  22:19,23,23
  23:1,10 25:10
  34:13
reduced  35:6
references  20:8
reffner  6:11
reflects  15:15
regard  15:8
  25:1,20 27:21
  33:11
regarding  17:7
  17:24 18:2,22
  29:15 32:24
regulations
  19:5
rein  3:18
reind  3:21
rejoin  22:17
related  7:10
  16:7,8 17:10
  23:13,14 26:3
  28:4
relates  1:7 9:8
  32:10
relief  7:18

remain  24:15
remains  16:13
remanding
  18:15
remedied  18:12
remotely  1:19
renders  27:5
rendon  4:3
replacement
  27:9
reply  15:6
  33:21
reported  1:25
reporter  25:10
represent  33:7
representation
  24:2
represented
  30:16
request  7:8,17
  17:3,4 27:1
requested  7:10
  31:25
requesting  8:1
requests  22:17
require  15:21
requirement
  9:10
requirements
  8:19 27:5
requires  32:13
reserve  16:19
  16:20 31:23
  32:3

Page 13

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[reserves - soon]**

| | | | |
|---|---|---|---|
| **reserves** 24:20 | **rights** 18:7 | **santen** 4:16 | **served** 10:20 |
| **reserving** 31:11 | **risrael** 4:7 | **santenthughe...** | **session** 7:2 |
| 31:24 | **ritts** 3:7 | 4:18 | **set** 32:19 |
| **resolution** | **road** 2:14 3:15 | **sater** 5:8,12 | **settled** 8:21 |
| 10:14 13:22,23 | **robbins** 2:4 | **satisfy** 9:10 | **seymour** 5:8,12 |
| 20:10 | **robe** 24:23 | **saw** 11:1 | **sfao** 32:22 |
| **resolved** 16:22 | **robert** 3:19 | **saying** 31:15 | **sfenton** 6:15 |
| 30:10 | 6:11 8:5 | **says** 22:2 | **shared** 17:11 |
| **resolves** 32:3 | **ross** 9:21 13:9 | **scenario** 28:9 | **sharon** 3:19 |
| **resources** 26:3 | 21:5 26:5,8,11 | **schedule** 10:12 | **shawn** 1:16 |
| **respect** 9:18 | 26:13,25 27:6 | 11:14 16:3,4 | **shield** 16:9 |
| 31:11 | 27:12,13 28:2 | 29:5,18,23 | 23:15 |
| **respond** 12:18 | 28:13,14 | 30:11 33:16 | **shinbrot** 6:3 |
| 21:24 | **rpr** 1:25 35:2 | **scheduled** 9:4 | **shortcoming** |
| **response** 30:7 | 35:18 | 29:17 | 18:23 |
| 31:5 32:15,19 | **rudman** 2:4 | **scheduling** | **shorthand** 35:5 |
| 33:1,1,7,8,19 | **ruin** 33:12,12 | 10:16 20:15 | **shot** 11:9 |
| 33:20,20,23 | **rule** 12:25 | **schneider** 4:10 | **side** 7:22 11:11 |
| 34:3 | 13:16,16 25:4 | **sciarani** 2:6 | 11:18 14:17 |
| **responses** | 32:15,20 | **scope** 15:9 23:8 | 16:20,24 22:7 |
| 32:19 | **ruled** 12:3 24:8 | 31:7 | **signature** 35:16 |
| **result** 9:9 24:3 | **rules** 19:4 | **screwed** 29:17 | **similar** 9:19 |
| 29:24 | 28:15 | **screwing** 33:16 | **simply** 20:1,3 |
| **resumed** 16:21 | **ruling** 11:5 | **second** 10:3 | 20:20 25:14 |
| 16:23 | 22:11 23:4 | 22:1 26:21 | 28:22 |
| **resuming** 22:25 | **rulings** 18:12 | **section** 27:5 | **single** 17:10,14 |
| **review** 8:8 11:4 | 18:13 | **securities** 1:6 | **situation** 32:16 |
| 11:9 27:3 | **s** | **seek** 8:8 9:7 | **sixth** 10:19 |
| **reyes** 3:5 | | 11:4 31:18 | 11:4 |
| **rgrdlaw.com** | **s** 2:6 4:3 6:7 | **seeking** 14:18 | **smart** 3:3 |
| 2:8,9,10,11 | **sabado** 1:25 | **sentence** 17:20 | **solely** 9:6 |
| **right** 9:16 14:6 | 7:6 35:2,17 | 18:20 24:12,20 | **somebody's** |
| 14:8,9 22:22 | **samantha** 6:13 | **separated** 15:6 | 26:8 33:12,12 |
| 27:20 33:17 | **san** 2:8 | **serious** 8:24 | **soon** 33:13 |
| 34:12 | **sandra** 3:5 | 9:13 10:6 11:7 | |

Page 14

CONFIDENTIAL UNDER PROTECTIVE ORDER

**[sooner - technical]**

| | | | |
|---|---|---|---|
| **sooner** 33:13 | **statutory** 19:14 | **sua** 25:19 | 26:8 |
| **sorry** 20:10 | 27:4 | **subject** 11:5 | **supplemental** |
| **sort** 10:8 | **stay** 8:1,2,7,12 | 16:23 27:3,17 | 27:8 |
| **south** 5:13 6:8 | 8:18,20 9:6,8 | **subjected** 17:1 | **support** 23:3 |
| 6:18,23 | 10:7,18 12:10 | **submit** 19:18 | 28:10 |
| **southern** 1:2 | 12:13,16,20,22 | **submitted** | **supporting** |
| 18:9 | 13:19 14:2,4 | 29:10 | 28:6 |
| **spahr** 5:17 | 14:15,19 15:20 | **substantial** | **supports** 26:9 |
| **speak** 15:8 21:8 | 17:7 22:5,15 | 10:5 | 26:25 |
| 21:12 | 24:6,16,19,21 | **substantive** | **supreme** 18:5 |
| **speaking** 15:3,7 | 24:25 25:4 | 7:18 10:21 | 18:14 |
| **special** 1:16 7:5 | 26:10 27:1 | 12:18 27:22 | **sure** 13:25 |
| 7:11 11:24 | 29:24 30:4,12 | 29:13 30:17 | 21:19 25:2 |
| 12:17 13:9,11 | 31:1,2 | **substantively** | 33:9 |
| 13:25 14:21,23 | **stayability** | 13:14 26:17 | **surrounding** |
| 15:1,22 16:5 | 24:21 | **succeed** 23:21 | 10:11 29:11 |
| 21:2,13 22:12 | **stayed** 13:21 | **success** 9:11 | **suspected** 19:4 |
| 22:22 24:13,14 | 20:19 31:18 | 12:10 | **sustains** 24:17 |
| 28:1,17 31:13 | **staying** 20:17 | **sue** 3:6 | **sutcliffe** 4:11 |
| 31:24 32:8,13 | **stays** 32:1 | **suffered** 12:9 | |
| 32:23 33:4 | **steven** 3:3,4 | **suffice** 18:6 | **t** |
| 34:5,12 | **stick** 17:20 | **sufficient** 19:22 | |
| **specific** 15:25 | **strah** 3:3 | **sufficiently** | **t** 3:3,4 |
| **sponte** 25:19 | **strayed** 20:24 | 11:7 | **taft** 5:8 |
| **square** 4:6 | **street** 2:21 3:20 | **suggested** | **take** 12:8 21:11 |
| **standards** 11:6 | 4:12,17 5:4,9 | 24:18 27:12 | 21:12,13,17 |
| **stands** 22:1 | 5:13,18,23 6:8 | **suite** 3:11,15 | 22:14 31:4,5 |
| 24:5 27:12 | 6:13,18,23 | 4:5,17,22 5:13 | **taken** 1:19 |
| **state** 7:22 8:3 | **striking** 26:10 | 6:8,13,18 | 19:10 35:4 |
| 35:3 | 30:9 | **sullcrom.com** | **talked** 11:12,12 |
| **statement** 24:3 | **struck** 7:14 | 3:21,21,22 | **talking** 15:9 |
| 26:16 | 25:19 | **sullivan** 3:18 | 18:19 31:12 |
| **states** 1:1 16:6 | **stuart** 6:22 | **summary** 28:5 | **taylor** 3:3 |
| **status** 7:10 | **styled** 12:19 | **supplement** | **technical** 9:25 |
| 30:24 | | 13:1 14:16 | 10:25 11:25 |
| | | | 18:23 20:3 |
| | | | 27:10 |

Page 15

**[tell - vorys.com]**

| | | | |
|---|---|---|---|
| **tell** 17:16,19 | **threshold** 24:7 | **try** 15:24 | **upcoming** 9:4 |
| **temporarily** 16:18 | **thursday** 1:17 7:1 | **trying** 13:5 20:17 | **update** 13:17 |
| **ten** 19:22 | **tigges** 6:22 | **tucker** 4:21 | **upheld** 29:15 |
| **terms** 15:18 | **tighter** 7:24 | **tuckerellis.com** 4:23,24 | **uphold** 27:19 |
| **terzian** 3:14 | **time** 16:17,19 16:20 20:9 23:2 31:11,23 31:25 32:3 33:8,20 35:5 | **tuesday** 8:12 | **urge** 12:13,13 22:6 |
| **testify** 21:21 | | **turn** 14:24 | **usc** 25:21 26:15 |
| **testimony** 9:7 17:2 20:2 | | **turned** 10:25 11:25 29:16 | **use** 16:16 27:17 31:17 |
| **thank** 12:16 14:21 15:1,10 22:11,12,24 32:7,8 34:2,9 34:12 | **times** 21:7 | **turner** 3:6 | **usually** 18:12 |
| | **timothy** 5:17 | **turning** 24:6 | **usurp** 24:23 |
| | **today** 7:17 10:18 13:16,17 14:13 16:17 17:4 21:5,25 22:18 24:7 26:7 28:19 31:8 | **two** 10:16 30:15 | **v** |
| **theory** 21:25 | | **typewriting** 35:6 | **vacating** 18:15 |
| **thing** 24:22 | | | **valid** 19:18 |
| **things** 20:23 21:19 | | **u** | **version** 7:24 |
| **think** 10:6,17 11:2,7 12:15 13:1,6,20,21 14:11 15:19,19 17:8 21:16 22:9,9 25:3,18 26:8,25 27:18 27:24 28:13 30:1,2,20 31:14,25 32:2 32:6 | **today's** 30:21 30:24 | **u.s.** 18:9 | **versus** 9:21 18:5,10 21:6 26:5 27:16 30:18 |
| | **told** 33:10 | **undated** 26:11 26:14 | **vespoli** 5:2 |
| | **took** 22:24 | **under** 1:12 9:19 10:4 17:2 18:20 24:4 25:21 27:5 35:6 | **videoconfere...** 1:19 |
| | **tower** 4:5 | | **view** 27:20 30:17,19 |
| | **traditional** 33:19 | | **vine** 4:17 |
| | **transcript** 25:14,15 30:21 34:7 35:7 | **understand** 13:25 28:25 32:6 | **violations** 19:4 19:7,10 |
| | **trial** 18:16 | **understood** 31:14 | **vitality** 18:7 |
| **thomas** 3:4,14 | **true** 9:24 10:5 35:7 | **underwriter** 6:2 | **voluntarily** 31:15 |
| **thornton** 3:6 | | **united** 1:1 | **vorys** 5:8,12 |
| **thought** 23:25 26:6 33:11 | **truthfully** 20:4 20:5 | **unsworn** 26:11 26:13 | **vorys.com** 5:10 5:14 |
| **threat** 19:16 20:6 | | | |

**[waiting - zoom]**

| w |
|---|
| **waiting** 25:15 |
| **want** 12:7 15:4 |
| 15:8,23,24 |
| 16:1,2,3,4,21 |
| 20:23,25 21:12 |
| 21:15 24:22 |
| 28:15,16 31:17 |
| 33:2 |
| **wanted** 20:25 |
| 21:16 |
| **wanting** 33:3 |
| **wants** 11:18 |
| 19:17 |
| **wardwell** 6:3 |
| **warrant** 10:7 |
| **warranted** |
| 12:16 |
| **warren** 3:14,14 |
| 4:5 |
| **washington** |
| 4:13 |
| **way** 14:2 18:13 |
| 19:22 33:2 |
| **ways** 10:2 |
| **we've** 7:15 8:10 |
| 10:17 11:10,12 |
| 15:15 |
| **weekend** 33:12 |
| **west** 2:7 5:4 |
| 6:13 |
| **westlaw** 9:22 |
| 18:11 26:12 |
| **whatsoever** |
| 18:3 |

| william 18:10 |
|---|
| **willingness** |
| 19:19 |
| **witness** 16:10 |
| 16:25 17:18,22 |
| 20:2 21:21 |
| 23:17 24:1 |
| 35:11 |
| **witnesses** 9:5 |
| 11:19 16:6 |
| 23:12 |
| **word** 31:17 |
| **words** 27:20 |
| 28:5 34:3 |
| **work** 8:16 |
| **working** 34:4 |
| **worms** 26:7 |
| **worthy** 26:18 |
| **wright** 6:7 |
| **written** 25:9,12 |
| 25:16 |
| **wrong** 20:20 |
| 25:1 |
| **wrote** 20:12,16 |
| 24:11 29:8 |

| x |
|---|
| **x** 17:19 |

| y |
|---|
| **yeah** 31:24 |
| 33:4 |
| **yearend** 9:4 |
| **yesterday** 9:13 |
| **york** 2:21,21 |
| 3:20,20 5:4,4 |

| 6:5,5 |
|---|

| z |
|---|
| **zeiger** 6:22 |
| **zoom** 1:19 |
| 22:15 |

Page 17

# ATTACHMENT · ·

(R. · · · , · · · · · · · · · · · · · · · · · · · · · · · · · · · · Order · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ) · · · · · · · · · · · · · · · · · · · · ·

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION, | Case No. 2:20-cv-03785-ALM-KAJ |
| This document relates to: | Chief Judge Algenon L. Marbley |
| ALL ACTIONS. | Magistrate Judge Kimberly A. Jolson |

## <u>ORDER & OPINION</u>

This matter is before this Court on Defendant FirstEnergy Corp.'s ("FirstEnergy") Notice of Objections to the Special Master's Orders Dated November 29, 2023, and November 30, 2023 (Doc. 607); FirstEnergy's and Individual Defendants' Objections to the Special Master's Report and Recommendation on FirstEnergy's Motion to Stay (Docs. 643, 644); FirstEnergy's Objections to the Order by the Special Master Denying Motion for Reconsideration (Doc. 645); and FirstEnergy's Objections to the Special Master's Order Denying Leave to File a Reply (Doc. 640). For the following reasons, the Objections and the request for oral argument on the Objections are **OVERRULED.**

## I.      Background

This Court has previously summarized the facts giving rise to this action.  (*See* Docs. 175, 219, 461).  Relevant here, Plaintiffs allege that "FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history," and once FirstEnergy's role was revealed, "the price of FirstEnergy stock plummeted."  (Doc. 72 at ¶ 3, 9).  On July 21, 2020, Former Ohio House Speaker Larry Householder was arrested for his part in the scheme.  (*Id.* at ¶ 8).  After his arrest, FirstEnergy conducted internal investigations.  (Doc. 607-1 at 13; Doc. 571 at 2).  One investigation, conducted by Squire Patton Boggs ("Squire"), began on July 28, 2020.  (*See* Doc. 529

at 6; *see also* Doc. 489-1 at 12).  Another investigation by Jones Day also began within days of Larry Householder's arrest.  (Doc. 510 at 18; Doc. 607-1 at 22).  Yet, as noted by the Special Master, the parties often treated the two investigations as one in their briefing on this Motion.  (Doc. 571 at 16).

Movants, consisting of Plaintiffs and Defendants Michael J. Dowling and Charles E. Jones, moved to compel documents and information related to the internal investigations.  (*See* Doc. 489).  Movants argued that these investigations were motivated primarily by business and human resources purposes, and Defendant FirstEnergy could not meet its burden of establishing that the materials sought were privileged or protected by work-product doctrine.  (Doc. 489 at 2).  FirstEnergy responded that the investigations were protected, because they were conducted for the purpose of obtaining legal advice and to "defend against the newly filed and anticipated civil actions" and criminal charges.  (Doc. 510 at 10).

In support of its arguments, FirstEnergy presented a declaration from Defendant James O'Neil ("the O'Neil Declaration").  (Doc. 511-1 at 1–7).  O'Neil serves on FirstEnergy's Board of Directors and has held that position since January 17, 2017.  (*Id.* at 2).  His declaration asserted that "the investigations were conducted because FirstEnergy was facing sudden and extraordinary legal risk from government investigations and litigation."  (Doc. 510 at 12).  Other than this declaration, First Energy offered little evidence of the motivations behind the investigations, other than general references to lawsuits against the company and its cooperation with government entities.  (*See* Doc. 510 at 21–26; *see also* Doc. 607-1 at 64–67).

The parties fully briefed the Motion.  (*See* Docs. 489, 510, 511, 529, 530).  Then, the Court appointed Shawn K. Judge as Special Master and referred the Motion to him.  (Doc. 541); Fed. R. Civ. P. 53.  The parties participated in oral argument in front of the Special Master and completed limited supplemental briefing.  (*See* Docs. 549, 550, 612).  During a November 28, 2023, status

conference, the Special Master issued a preliminary decision, which he then memorialized in a written order dated November 29, 2023.  (Doc. 571).  Before this order, neither the parties nor the Special Master raised any deficiency with the O'Neil Declaration.

The Special Master's November 29 Order granted the Motion (Doc. 489) and found that the internal investigations were not privileged or protected by work-product doctrine.  In doing so, the Special Master pointed out a fatal flaw in the O'Neil Declaration: it failed to fulfill the requirements of 28 U.S.C. § 1746.  (Doc. 571 at 8).  The Special Master explained that "although the declaration provides it is 'under of penalty of perjury,' bears the execution date, and is signed, the declaration never states anywhere that its contents are declared *as true*."  (*Id.* at 9 (emphasis in original)).  Accordingly, the Special Master said the O'Neil Declaration was "just a document" and not evidence that could be considered under precedent and the local rules.  (*Id.*; *see also id.* at 9–13 (citing cases in support)).  After considering the dearth of evidence otherwise submitted by FirstEnergy, the Special Master found that FirstEnergy failed to meet its burden.  (*Id.* at 14–17).  As such, the Special Master granted the motion to compel and "left unaddressed" the parties' waiver of privilege arguments.  (Doc. 571 at 16).

Defendant then filed a motion requesting a stay "pending final judicial resolution of FirstEnergy's objections" to the Special Master's decision.  (Docs. 573, 574).  FirstEnergy also argued that the Special Master should have allowed them to file an amended version of the O'Neil Declaration, citing *Ross v. City of Dublin*, No. 2:14-cv-2724, 2016 WL 7117389 (S.D. Ohio Dec. 7, 2016).  (Doc. 574 at 7–8).  Yet FirstEnergy never filed a separate motion seeking leave to amend the declaration.  On November 30, 2023, after oral argument, the Special Master issued another order denying FirstEnergy's "oral motion for leave to belatedly supplement [the O'Neil Declaration] to the extent that FirstEnergy's argument can be construed as making such a motion."  (Doc. 575 at 2).

FirstEnergy subsequently filed its objections to the Special Master's order granting the motion to compel and his order denying the amendment. (Doc. 607). Movants responded, (Doc. 614, 615), and FirstEnergy's objections are now ripe for review.

## II. Standard of Review

Under the Court's Order of Appointment and Rule 53, the Court reviews *de novo* all of the Special Master's findings of fact and conclusions of law and will set aside a ruling on a procedural matter only for an abuse of discretion. (Doc. 541 at 6–7); Fed. R. Civ. P. 53(f)(3)–(5). "This is similar to the scope of review of a district court's discovery orders by the circuit court." *Ravin Crossbows, LLC v. Hunter's Mfg. Co.*, No. 5:18-cv-1729, 2020 WL 7706257, at *2 (N.D. Ohio Dec. 29, 2020) (citing *Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999)). The scope of permissible discovery, the issue at hand, is a procedural matter that the Court reviews for abuse of discretion. *See Ciccio v. SmileDirectClub, LLC*, 2022 WL 2182301, at *1 (M.D. Tenn. June 16, 2022) ("Because a special master's ruling on the scope of permissible discovery is considered a procedural matter . . . the Court reviews for abuse of discretion."). Courts in this circuit and other circuits have reviewed a special master's various discovery orders for abuse of discretion. *See, e.g.*, *Emergency Pro. Servs., Inc. v. Aetna Health, Inc.*, No. 1:19-cv-1224, 2023 WL 1987307, at *2 (N.D. Ohio Feb. 14, 2023) (order allowing discovery on five categories of information); *Ravin Crossbows, LLC*, 2020 WL 7706257, at *2 (order requiring specific information be exchanged for mediation); *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2014 WL 5654318, at *1 (D. Minn. Jan. 28, 2014) (order compelling production of documents).

"An abuse of discretion occurs where the reviewing court has a definite and firm conviction that a clear error of judgment has occurred." *Liberty Ford Lincoln Mercury, Inc. v. Ford Motor Co.*, No. 1:21-cv-02085, 2023 WL 4991718, at *2 (N.D. Ohio Aug. 4, 2023) (citation omitted).

Furthermore, "[a] ruling that is arbitrary, unjustifiable, or clearly unreasonable constitutes an abuse of discretion." *Id.* "In practice, this standard results in upholding a decision that falls within a broad range of permissible choices even where the reviewing court might not reach the same result." *Id.*

But there is another wrinkle. Parts of FirstEnergy's objections concern attorney-client privilege. Because "[t]he question of whether the attorney client privilege applies is a mixed question of law and fact," the Sixth Circuit primarily guides that such decisions are "subject to *de novo* review." *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 293–94 (6th Cir. 2002). Yet this guidance has not always been consistent, and the Sixth Circuit has, at times, reviewed privilege issues under a more deferential standard. *See Stone Surgical LLC v. Stryker Corp.*, 858 F.3d 383, 391–92 (6th Cir. 2017) (reviewing a court's decision to exclude emails due to attorney-client privilege as an evidentiary matter subject to abuse of discretion); *Chesher v. Allen*, 122 F. App'x 184, 187–88 (6th Cir. 2005) (remanding for consideration under a "clearly erroneous" standard, where a district court reviewed an issue involving the crime-fraud exception to attorney-client privilege *de novo*).

Therefore, erring on the side of caution, the Court reviews the Special Master's determinations regarding attorney-client privilege *de novo* and reviews procedural matters for abuse of discretion.

### III.   FirstEnergy's Objections

FirstEnergy submitted numerous objections to the Special Master's orders. The Court addresses each in turn.

### A.  The Exclusion of the O'Neil Declaration

The company first argues that the Special Master erred in concluding that the O'Neil Declaration did not comply with 28 U.S.C. § 1746. In doing so, FirstEnergy asserts that the declaration met the Sixth Circuit's "substantial compliance" standard for 28 U.S.C. § 1746. (Doc.

607-1 at 29–34).  Alternatively, FirstEnergy argues that even if the O'Neil Declaration did not comply with Section 1746, Federal Rule of Evidence 104(a) allows courts to consider affidavits "that bear indicia of reliability even if unsworn, defective, or otherwise inadmissible," and the Special Master erred in not doing so.  (Doc. 607-1 at 34–35).

### 1.  Requirements of 28 U.S.C. § 1746

Evidentiary issues, such as the decision to strike an unsworn declaration, are reviewed for abuse of discretion.  *See Counts v. Kraton Polymers, U.S. LLC*, 260 F. App'x 825, 829 (6th Cir. 2008) (reviewing the district court's decision to strike undated, unsworn declarations under 28 U.S.C. § 1746 for abuse of discretion).  Therefore, FirstEnergy's footnote arguing for *de novo* review is unpersuasive since the Sixth Circuit has said otherwise.  (Doc. 607 at 29 n.6 (citing cases where courts review procedural matters *de novo*)); *Counts*, 260 F. App'x at 829 (reviewing the district court for abuse of discretion, even where the party argued that Sixth Circuit precedent did not require strict compliance with 28 U.S.C. § 1746).  But nonetheless, under either standard, the outcome would be the same, and FirstEnergy's objection is not well-taken.

At issue is the language of 28 U.S.C. § 1746.  While the statute allows a declaration's language "substantially" to follow a set form, the Special Master found that Section 1746 explicitly requires a declarant to state that the information contained in the declaration is "true."  28 U.S.C. § 1746.  And the Special Master's reading of the statute has support from the Sixth Circuit.  The Sixth Circuit held in *Bonds v. Cox* that a declaration under Section 1746 is permitted to be used as evidence "only if subscribed as true under penalty of perjury and dated."  20 F.3d 697, 702 (6th Cir. 1994) (internal quotations omitted) (emphasis omitted).  The language of Section 1746, as well as the language in *Bonds*, makes clear that an unsworn declaration under 28 U.S.C. § 1746 has four requirements: unsworn declarations can be used as evidence "only if" they are "subscribed as true," sworn under

penalty of perjury, dated, and signed. *Bonds*, 20 F.3d at 702; *see also Counts,* 260 F. App'x at 829, n.1 (rejecting a party's argument that other courts have found Section 1746 not to require such a "rigid approach").

FirstEnergy says the Sixth Circuit held that Section 1746 "require[s] only substantial compliance" and that the O'Neil Declaration substantially fulfilled the requirements laid out in the statute. (Doc. 607-1 at 30, citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475–76 (6th Cir. 2002)). But the authority FirstEnergy cites says no such thing. *See generally Peters,* 285 F.3d at 475–76 (stating nowhere that Section 1746 "require[s] only substantial compliance"). Nonetheless, *Peters* is unpersuasive here. In *Peters*, the plaintiff challenged an unsworn declaration because it was undated, not because it was not declared as true. 285 F.3d at 475. The Sixth Circuit narrowly held that undated declarations can be considered as long as "extrinsic evidence [can] demonstrate the period when the document was signed." *Id.* (internal quotation omitted). In no way did the Sixth Circuit modify the requirement that an unsworn declaration's contents must be subscribed as true. *Id.* And in *Peters*, the defendant remedied the deficiency by filing a second affidavit before the court made its decision, which FirstEnergy did not do. *Id.* at 476. Still more, the Sixth Circuit has expressly rejected FirstEnergy's argument that *Peters* overruled *Bonds* or changed what is required for an unsworn declaration under Section 1746. *Counts*, 260 F. App'x at 829.

Additionally, the "declared as true" requirement is key because, as the Special Master thoughtfully reasoned:

> [A] declarant can state falsehoods while recognizing he or she is under penalty of perjury because the declarant has not declared the statement to be true—but when the declarant declares a statement to be true while concurrently recognizing the consequence—by declaring him or herself to be under penalty of perjury—the recognition of the consequences of lying takes on real meaning as risk attaches.

(Doc. 571 at 12).

The Court agrees with the Special Master that unsworn declarations, under the language of the statute and Sixth Circuit precedent, must be "subscribed as true." *Bonds,* 20 F.3d at 702. Following this logic, the Special Master did not err in rejecting the O'Neil Declaration. The declaration lacked an essential element, and the Special Master properly followed the law and the local rules in disregarding it. *See* S.D. Ohio Civ. R. 7.2(e) (setting out the requirements of evidence used in support of any motion in this district). While FirstEnergy cites out-of-circuit cases where courts accepted declarations that omitted the "true and correct" language, these are simply examples of courts "exercising their discretion." *Counts,* 260 F. App'x at 829 n.1; *Liberty Ford Lincoln Mercury, Inc.*, 2023 WL 4991718 at *2 (finding that courts might reach different results without an abuse of discretion). As such, the Special Master did not abuse his discretion, and FirstEnergy's objection is **OVERRULED.**

## 2. Rule 104(a)

Notwithstanding FirstEnergy's failures under Section 1746, FirstEnergy argues that the Special Master should have considered the O'Neil Declaration under Federal Rule of Evidence 104(a). (Doc. 607-1 at 34). Notably, FirstEnergy never made this argument. (*See* Docs. 612). As such, FirstEnergy potentially has waived this argument. *See NOCO Co., Inc. v. Shenzhen Changxinyang Tech. Co., Ltd.*, No. 1:17-cv-2210, 2019 WL 1723358, at *6 (N.D. Ohio Apr. 18, 2019) (finding, when reviewing objections, that a party waived an argument because they never raised it with the special master); *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 130 (D. N.J. 1998) (holding that a party waives its right to object when they fail to make arguments concerning Rule 104(a) before the trial court).

Still, FirstEnergy argues that courts often consider "affidavits under Rule 104(a) that bear indicia of reliability" even if they are deficient in other ways. (Doc. 607-1 at 34). But unlike the cases

FirstEnergy cites, the O'Neil Declaration does not bear indicia of reliability. For example, Mr. O'Neil is a defendant in this case, not a former coworker who is not a party to the action. *See Tarochione v. Roberts Pipeline, Inc.*, 62 F. Supp.3d 821, 823 (N.D. Ill. 2014). Nor is he a former attorney who unexpectedly failed to appear to testify. *United States v. Straker*, 596 F. Supp.2d 80, 84 (D.C. 2009). Further, as the Special Master noted, FirstEnergy failed to offer any other evidence besides "common sense" and references to ongoing litigation to corroborate Mr. O'Neil's statements. (*See* Doc. 571 at 15; Doc. 607-1 at 64–67); *cf. United States v. Johnson*, No. 2:12-cr-67, 2012 WL 7761544, at \*19 (D. Nev. Dec. 26, 2012) (deciding not to exclude a declaration because the statements contained within it were corroborated by other evidence); *see United States v. Alahmedalabdaloklah*, No. 12-cr-1263, 2017 WL 3172875, at \*2 (D. Ariz. July 26, 2017) ("Although Rule 104(a) of the Federal Rules of Evidence provides that a court is not bound by evidence rules in deciding certain preliminary questions . . . a declaration or affidavit is relevant only to the extent it is reliable[.]").

These facts suggest that the O'Neil Declaration may be unreliable, and as such, Rule 104(a) cannot be used to cure FirstEnergy's failure to provide a proper declaration. FirstEnergy's objection is **OVERRULED.**

### B. The Special Master's *Sua Sponte* Striking of the Declaration

FirstEnergy next argues that Movants waived any objection to the O'Neil Declaration, and the Special Master should not have *sua sponte* addressed the declaration's deficiency. FirstEnergy also contends that the Special Master's decision to strike the O'Neil Declaration *sua sponte*, without giving the company an opportunity to be heard, was an abuse of discretion.

Courts have the power to exclude evidence *sua sponte. Ondo v. City of Cleveland,* 795 F.3d 597, 604 (6th Cir. 2015) (citing *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 2034 (6th Cir. 2003)). This includes unsworn declarations and affidavits, and courts have done so

without offering parties a chance to be heard or to cure their mistakes. *See Enigwe v. Diversity City Media*, No. 2:07-cv-250, 2008 WL 11352583, at *2 (S.D. Ohio June 2, 2008) (*sua sponte* striking an unsworn declaration that did not comply with 28 U.S.C. § 1746); *Jennings v. Nat'l R.R. Passenger Corp.*, No. 97-c-6385, 1998 WL 460270, at *7 (N.D. Ill. July 30, 1998) (stating that because the affidavits were undated and did not say the subject matter was true and correct, "[t]he court would be justified in striking" them); *Mitchel v. Buncich,* No. 2:11-cv-91, 2013 WL 275592, at *4 (N.D. Ind. Jan. 24, 2013) (striking *sua sponte* an undated affidavit without a motion); *Tripati v. Corizon Inc.*, No. 18-cv-66, 2020 WL 673490, at *8 (D. Ariz. Feb. 11, 2020) (striking *sua sponte* a declaration without giving plaintiff an opportunity to fix the alleged deficiency).

And like a court, "[d]uring the performance of his duties, a master is functionally indistinguishable from a trial judge." *Accusoft Corp. v. Palo*, 237 F.3d 31, 58 (1st Cir. 2001). So, like a trial court, the Special Master had the authority to strike evidence *sua sponte*, and this Court reviews his decision for abuse of discretion. *See HDM Flugservice GmbH*, 332 F.3d at 1034 (holding that the decision to *sua sponte* exclude evidence is within a trial court's discretion).

Because the Court agrees that the O'Neil Declaration was deficient, the Court cannot say that the Special Master clearly erred in rejecting it. *Werner v. Young*, 22-5197, 2023 WL 639103, *9 (6th Cir. Jan. 27, 2023) (finding the district court did not abuse its discretion in *sua sponte* striking portions of an affidavit). And FirstEnergy should not have been caught off guard. Throughout their briefing, Movants raised challenged to the O'Neil Declaration. (Doc. 615 at 36, n.5 (summarizing Movants' challenges to the O'Neil Declaration, based on O'Neil's status as a defendant and conclusory statements within his declaration)). Accordingly, FirstEnergy had notice and opportunity to present evidence of the motivations behind the internal investigation. (*See* Docs. 510, 511, 550, 587, 612 (briefing on the motion to compel and oral argument by FirstEnergy)). FirstEnergy chose not to

bolster the record.  Therefore, this objection is **OVERRULED.**

### C.  Denial of FirstEnergy's Request to Amend the O'Neil Declaration

FirstEnergy also objects to the Special Master's denial of its request to amend the O'Neil Declaration and the standard he used in doing so.  (Doc. 607 at 37).  The Court reviews the Special Master's decision for an abuse of discretion.  *See Moore v. United States Dep't of Agric.*, No. 17-5363, 2018 WL 1612299, at *3 (6th Cir. Jan. 31, 2018) (reviewing a court's decision to not allow an amended affidavit after summary judgment was granted for an abuse of discretion).

At the outset, the Court notes that FirstEnergy never filed a motion to amend the O'Neil Declaration.  On November 30, 2023, the Special Master held an emergency status conference at the parties' request after granting the motion to compel.  (*See* Doc. 587 (transcript of the November 30, 2023, status conference)).  During that status conference, FirstEnergy relied upon *Ross v. City of Dublin* to argue that it should have an opportunity to amend the Declaration.  (*Id.* at 9, 12–13).  No. 2:14-cv-2724, 2016 WL 7117389 (S.D. Ohio Dec. 7, 2016).

The Special Master responded:

*** In *Ross*, as FirstEnergy pointed out, Chief Judge Marbley allowed the offending party to file an amended or supplemental replacement declaration to correct what was deemed a technical deficiency.

. . . . No party has suggested to me that *Ross* stands for and my re-reading of *Ross* a moment ago does not indicate any basis that a party is entitled to amend. There's a difference between a permissive you can file an amendment with this Court versus you're entitled to file an amendment with leave of Court. This is a procedural question subject to [abuse] of discretion. . . . In other words, I view FirstEnergy as not having a right to correct its error in this regard.

It's a substantive error. There is no procedural entitlement, however, to correct that. . . . I don't have a motion in front of me to file an amended declaration. In *Ross*, there was a pending motion that was filed that was concurrently pending before the Court before the related summary judgment was decided. So in other words, you had a declaration that was supporting a motion that had not been decided and there was a motion to amend the declaration.

That's not the scenario we had here. Here, there was a declaration filed to support the motion to compel briefing. There was a decision reached in that and only then did FirstEnergy come forward and say, "We would like to correct the deficiency."

11

> So I think *Ross* is distinguishable. *Ross* doesn't create an entitlement here. The local rules call for a motion when you want the Court to act and therefore, when you want to delegate an authority of the Special Master to be imposed, you have to file a motion. There is no motion here.

(Doc. 587 at 27–28).

Nonetheless, even though FirstEnergy never filed a motion to amend the O'Neil Declaration, the Special Master construed FirstEnergy's arguments as an oral motion, which he then denied for a lack of "good cause" shown. (*Id.* at 28–29).

As Movants note, neither side has cited a case setting forth the legal standard for amending declarations after the motions to which they are attached have been decided. (Doc. 615 at 33). FirstEnergy argues that the standard is whether the amendment would have prejudiced Movants and whether the amendment would serve the interests of justice. (Doc. 607-1 at 37, citing *Fox v. Brown Mem'l Home, Inc.*, No. 2:09-cv-915, 2010 WL 4983153, at * 2 (S.D. Ohio Dec. 2, 2010)). For their part, Movants argue that the Special Master used the proper standard of "good cause," as is used for motions for leave. (Doc. 615 at 33).

The Court agrees with Movants that the good cause standard applied by the Special Master is appropriate here.[1] In the past, this Court used a good cause standard in finding that parties should seek leave to file additional evidence in support of motions for protective orders. *See Stillwagon v. City of Delaware*, No. 2:14-cv-807, 2016 WL 6248956, at *3 (S.D. Ohio Oct. 26, 2016) (denying a

---

[1] This Court notes that perhaps FirstEnergy's burden to amend the O'Neil Declaration should be even higher. Here, FirstEnergy sought to amend its deficient declaration only after losing a motion to compel. This situation is analogous to that in which a plaintiff seeks to amend a complaint after losing a motion to dismiss under Rule 12(b)(6) or where a party seeks relief from an adverse decision under Rule 60 or Rule 59. *See, e.g.*, *Leisure Caviar, LLC v. U.S. Fish and Wildlife Serv.*, 616 F.3d 612, 615–16 (6th Cir. 2010) ("When a party seeks to amend a complaint after an adverse judgment, it thus must shoulder a heavier burden. Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60."); *Grant v. Target Corp.*, No. 2:10-cv-823, 2013 WL 5366201 (S.D. Ohio Sept. 24, 2013) (finding a court may only grant a Rule 59(e) motion if there was a "(1) clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice" and refusing to do so where a plaintiff failed to timely provide enough evidence to the court to support his motions to compel and motions for summary judgment). But because FirstEnergy did not satisfy even a "good cause" standard, the Court leaves this determination for another day.

defendant's request to "come forward with more evidence" supporting his inability to be deposed and noting that he never sought leave to do so). In *Stillwagon*, the plaintiff sought to depose a defendant, who filed a motion for a protective order and argued that his medical condition prevented him from being deposed. *Id.* at *2. In support of his motion, the defendant offered only a letter, which did not conform to the requirements of an affidavit or a declaration under Section 1746. *Id.* at *3. Before the Court's decision, the defendant suggested that the Court should allow him to collect additional evidence to support his arguments, which the Court rejected. *Id.* The Court reasoned that the defendant should have filed his evidence sooner and faulted him for not seeking leave. *Id.*

It is clear that precedent and the local rules instruct a party to seek leave when wanting to file belated evidence in support of a motion. *See also Price v. United States*, No. 2:18-cv-949, 2019 WL 13161447, at *2 (S.D. Ohio Aug. 14, 2019) ("[I]f Plaintiff wishes to offer additional evidence in relation to USA's Motion to Dismiss, he would first require leave of Court because briefing on that motion has already closed[.]");S.D. Ohio Civ. R. 7.2(a)(2) (stating that "[n]o additional memoranda beyond those enumerated" can be filed without leave of court for "good cause shown"); S.D. Ohio Civ. R. 7.2(d) (stating that evidence necessary to support a motion must be attached to the primary memorandum of the party relying on that evidence); S.D. Ohio Civ. R. 7.2(e) ("Unless already of record, such evidence shall be attached to the memorandum. . . . All evidence shall be submitted within the time limit set forth [in the local rules].").

In his decision, the Special Master stated that FirstEnergy showed "no good cause. . . other than it was simply not done correctly and no one brought it to [the Special Master's attention] until after an adverse decision was filed." (Doc. 587 at 28). This Court agrees with the Special Master and finds that even if the O'Neil Declaration's deficiency was simply a mistake, the Special Master did not abuse his discretion in denying an amendment after his decision was made. *See Moore*, 2018 WL

13

1612299, at *3 (finding no abuse of discretion where the district court denied plaintiff's motion to submit an amended affidavit after a magistrate judge granted summary judgment, even though plaintiff "relied primarily" on the affidavit in his briefing).

As the Special Master reasoned, FirstEnergy's attorneys were elsewhere capable of crafting a compliant declaration under Section 1746, and the statute's requirements are not "onerous nor complicated." (Doc. 571 at 13). While FirstEnergy leans on this Court's decision in *Ross* to allow such an amendment, *Ross* is simply an example of the Court using its discretion and does not require a FirstEnergy win here. 2016 WL 7117389, at *8. Finally, FirstEnergy cites no cases in which a reviewing court found an abuse of discretion where an amended declaration was denied after the underlying motion was decided.

Therefore, the Special Master did not abuse his discretion, and FirstEnergy's objection is **OVERRULED.**

### D. The Special Master's Analysis of the Record, Privilege, and Work-Product Doctrine

FirstEnergy's next three objections deal with the Special Master's evaluation of evidence and, consequently, his decisions concerning attorney-client privilege and work product doctrine. At the outset, the Court must note the somewhat unusual way that the parties have litigated these issues. The parties agreed to forgo privilege logs for "communications, documents, or work product" exchanged between FirstEnergy and its outside counsel "concerning the litigations set out in Exhibit A that are dated after July 21, 2020 [the date of Larry Householder's arrest]."[2] (Doc. 295 at 2–3, 10; *see also* Doc. 510 at 20 n.5 (discussing the parties' agreement)). Moreover, during the pendency of this

---

[2] FirstEnergy included in its response to the motion to compel a "privilege log prepared by PricewaterhouseCoopers, dated May 1, 2023." (Doc. 511 at 23). But the parties never cite or rely upon this two-page privilege log. The parties also do not explain the relevance of any of the logged documents to the internal investigation or to the motion to compel. And FirstEnergy also notes in its briefing that the parties agreed "that privileged communications and work product concerning H.B. 6-related matters 'dated after July 21, 2020' did not need to be logged." (Doc. 607-1 at 20, n.5). As such, the Court is unable to determine the relevancy of FirstEnergy's Exhibit Four and whether this log encompasses the materials sought by Movants.

Motion, neither party requested *in camera* review of any investigation materials. (*See* Doc. 571 at

16). And finally, as the Special Master explained, the parties often bundled the two investigations

into one, seemingly taking an all-or-nothing approach. (Doc. 571 at 16). As such, in determining

whether materials are privileged or protected by work-product doctrine, the Court necessarily relies

on the record as presented by the parties.

## 1. Other Evidence in the Record

FirstEnergy argues that the Special Master ignored "overwhelming evidence" besides the

O'Neil Declaration and erred in deciding FirstEnergy did not meet its burden for establishing

attorney-client privilege and work product protection. (Doc. 607-1 at 40).

Again, FirstEnergy has the burden here. *See Cooey v. Strickland,* 269 F.R.D. 643, 647–48

(S.D. Ohio 2010). To meet the burden, FirstEnergy must assert the privilege or work-product

protection "with particularity for each document, or category of documents" it seeks to withhold. *In*

*re Haynes*, 577 B.R. 711, 740 (E.D. Tenn. 2017) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*,

250 F.R.D. 251, 266–67 (D. Md. 2008)); *see also* Fed. R. Civ. P. 26(b)(5) (stating that when a party

withholds materials as privileged, they must describe the materials being withheld so "other parties

can assess the claim"). FirstEnergy must then provide evidence "by way of affidavits, depositions,

or equivalent proof" that the materials are privileged or protected. *In re Behr Dayton Thermal*

*Products, LLC*, 298 F.R.D. 369, 72 (S.D. Ohio 2013) (citing *Biegas v. Quickway Carriers, Inc.*, 573

F.3d 365, 381–82 (6th Cir. 2009)); *see Erickson v. Hocking Tech. Coll.*, No. 2:17-cv-360, 2018 WL

9414018, at *3 (S.D. Ohio Mar. 27, 2018) ("Simply asserting that information is privileged is

insufficient to meet the burden." (internal quotation omitted)).

In a footnote, FirstEnergy suggests that the Court should simply accept the Amended O'Neil

Declaration into evidence under Federal Rule of Civil Procedure 53(f)(1). (*Id.* at 40 n.17). The Court

has discretion under this rule to receive evidence "[i]n acting on a master's order." Fed. R. Civ. P. 53(f)(1). But the Court declines to do so here. *See In re Cathode Ray Tube (Crt) Antitrust Litig.*, No. 07-c-5944, 2016 WL 945981, at *2 (N.D. Cal Mar. 14, 2016) ("Although the Court may have the power to consider for the first time evidence never considered by the Special Master, it is a power that should be exercised rarely and cautiously."). To accept the amended O'Neil Declaration now would "defeat [the] purpose" of appointing a Special Master and deprive the Court of his expertise. *Id.* Plus, accepting evidence and documents not considered by the Special Master would prolong and expand litigation, rather than resolve issues expeditiously. *See id.* at *2 (citing *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1131 (Fed. Cir. 2011)); (*See* Doc. 541 at 2 ("[T]he Court finds that appointment of a Special Master will assist the Court in both effectively and expeditiously facilitating the exchange of information and discovery between the parties, including resolving any discovery disputes and preparing this case for dispositive motions and trial.").

Turning to the heart of the objection, FirstEnergy contends that other evidence in the record supports the notion that the materials sought by Movants are protected by attorney-client privilege and work-product doctrine. (Doc. 607-1 at 40–42). But in its objections, FirstEnergy still offers scant evidence to support its arguments. (Doc. 607-1 at 41–42). In its briefs, FirstEnergy highlights documents stating that the company was conducting internal investigations related to "ongoing government investigations," that the Department of Justice was interested in the outcome of those investigations, and that FirstEnergy faced many potential lawsuits. (*Id.* at 42; *see also id.* at 64–67). But little of this evidence was highlighted in FirstEnergy's response to the motion to compel. (*See* Doc. 510; Doc. 607-1 at 66–67); *Laethem Equip. Co. v. Deere & Co.*, No. 05-10113, 2008 WL 4793355, at *2 (E.D. Mich. Nov. 3, 2008) (stating that a court is not required to search the entire record to find evidence to support a party's claims). And FirstEnergy provides no support for its

assertion that the Special Master did not consider all the evidence in the record, other than its belief that he decided the matter incorrectly. *See Laethem Equip. Co.*, 2008 WL 4793355, at *2 (overruling an objection that a magistrate judge failed to consider all the evidence where the objection was seemingly "premised on the defendant's belief that the magistrate judge would have reached a different conclusion had he reviewed" certain evidence cited by the defendant).

But even if FirstEnergy had more emphatically highlighted the other evidence mentioned in its objections, and even if the Special Master had more clearly cited it, the outcome would have been the same, because none of it directly addresses the crux of the issue: FirstEnergy's intentions behind the internal investigations. As the Special Master stated, FirstEnergy had the burden of establishing that the materials sought were protected by attorney-client privilege and work-product doctrine. (Doc. 571 at 14–15). Without the O'Neil Declaration, FirstEnergy provides no persuasive evidence that speaks to the investigation's purposes, such as whether withheld documents contained legal advice or were created in anticipation of litigation.

As such, FirstEnergy's objection is **OVERRULED**, and the Court turns now to the Special Master's analysis of attorney-client privilege and work-product doctrine.

## 2. Attorney-Client Privilege

FirstEnergy objects to the standard used by the Special Master in analyzing whether the investigations were protected by attorney-client privilege. (Doc. 607-1 at 42–43).

The Court reviews *de novo* the Special Master's decision on whether attorney-client privilege exists. *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 293–94 (6th Cir. 2002). "Where a client seeks legal advice from a professional legal advisor, the communications relating to that purpose made in confidence are protected by the attorney-client privilege." *In re OM Sec. Litig.*, 226 F.R.D. 579, 587 (N.D. Ohio 2005) (citing *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th

17

Cir. 1998)). Claims of attorney-client privilege are "narrowly construed," since the privilege "reduces the amount of information discoverable during the course of a lawsuit." *In re Columbia*, 293 F.3d at 294 (internal quotation omitted). Accordingly, attorney-client privilege "applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *Id.* (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986)). Said differently, only disclosures "necessary to obtain informed legal advice" and which "might not have been made absent the privilege" are protected. *Fisher v. United States*, 425 U.S. 391, 403 (1976).

Notably, the burden of establishing attorney-client privilege rests on the party asserting it. *In re Grand Jury Investigation*, 723 F.2d at 450. And the privilege is not unlimited. For example, an attorney's mere participation in business meetings does not establish the privilege. *Alomari v. Ohio Dep't of Pub. Safety*, No. 2:11-cv-613, 2014 WL 12651191, at *3 (S.D. Ohio June 19, 2014) (collecting cases). Still, the "fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege." *Zigler v. Allstate Ins. Co.*, No. 1:06-cv-2112, 2007 WL 1087607, at *1 (N.D. Ohio Apr. 9, 2007) (internal quotation omitted). The relevant test is "whether the predominant purpose of the communication is to render or solicit legal advice." *Cooey*, 269 F.R.D. at 650.

In deciding the internal investigation was not privileged, the Special Master concluded that the internal investigation "was at least prepared in the ordinary course of business pursuant to SEC public requirements unrelated to litigation and for non-litigation human resources/public relations purposes." (Doc. 571 at 15). FirstEnergy asserts that this "ordinary course of business" purpose "bears on work-product, *not* attorney-client privilege." (Doc. 607-1 at 43) (emphasis in original). But FirstEnergy's argument is misguided. In deciding whether the privilege applied, the Special Master was required to ascertain if the "predominant purpose" of the internal investigation was to conduct

18

business or to solicit or render legal advice.  *Cooey*, 269 F.R.D. at 650.

FirstEnergy responds that having a business purpose does not "undercut" a claim of privilege, since legal advice is necessarily given in business organizations and during internal investigations. (Doc. 607-1 at 43–44).  That is true.  *See Alomari*, 2014 WL 12651191, at *3.  But FirstEnergy again misses the ultimate issue.  Whether the internal investigation's purpose was primarily business or human resources-related is crucial in determining whether the privilege exists, because the investigation's predominant purpose must be legal for the privilege to apply.  And ultimately, the burden of proving that legal purpose rests on FirstEnergy.

As the Court discussed above, FirstEnergy failed to provide sufficient evidence to meet its burden.  FirstEnergy provided no direct evidence of the motivations behind the internal investigation other than the deficient O'Neil Declaration, which the Special Master properly rejected.  FirstEnergy's general references to lawsuits it faced and its cooperation with the government are not persuasive enough to show that communications within the internal investigation are privileged.  That is because parties invoking the privilege have an "obligation to identify with particularity the privileged documents" and why these documents are privileged.  *In re Rospatch Sec. Litig.*, Nos. 1:90-cv-805, 806, 807, 1:91-cv-085, 1991 WL 574963, at *8 (W.D. Mich. Mar. 14, 1991).  Communications are not privileged "simply because [they are] made by or to a person who happens to be an attorney. . . The attorney receiving or providing privileged communication[s] must be acting as an attorney and not as a business advisor."  *Id.* (internal citations omitted).  Consequently, pointing to impending lawsuits does not establish that individual communications and documents are privileged because, within those materials, attorneys could be acting as business or human resources advisors and not as legal advisors.  Indeed, FirstEnergy acknowledges that they used the internal investigations for many purposes, including business and employment decisions.  (Doc. 510 at 20, 25–26).  Yet FirstEnergy

does not clarify what materials, if any, contain only confidential communications for the predominant purpose of rendering legal advice, and which materials were primarily made for other reasons.

Instead, FirstEnergy broadly asserts, without providing details, that because the company faced several lawsuits and eventually cooperated with the government, all the investigations' materials must be privileged. (Doc. 510 at 24 (relying on the O'Neil Declaration, "common sense," and the existence of "legal risk" to show that the investigations must be privileged); Doc. 607-1 at 42 (providing other evidence besides the O'Neil Declaration to establish privilege, which included "pending and threatened legal proceedings," but no information on the company's motivations individual communications)). Again, FirstEnergy fails to provide any descriptions of "specific document[s] being withheld or redacted" or "detail sufficient. . . to assess a claim of privilege." *Casale v. Nationwide Child.'s Hosp.*, 2:11-cv-1124, 2013 WL 12203243, at *3 (S.D. Ohio Sept. 13, 2013). Said simply, FirstEnergy did not provide specifics on "when, where, how, to whom, and in what manner" legal advice was communicated during the internal investigations and therefore failed to meet its burden. *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 104 (S.D. N.Y. 2007)*; see also In re Rospatch Sec. Litig.*, 1991 WL 574963, at *5 ("It is the burden of the asserter of the privilege to establish that each document in question involves a communication made in confidence."); *Cooey*, 269 F.R.D. at 649 ("[M]erely conclusory statements may not be enough" to establish whether the privilege applies.).

FirstEnergy also agreed not to keep more extensive privilege logs, which could have helped the Special Master determine the nature of communications created during the internal investigation. (*See* Doc. 295); *see also In re Columbia*, 293 F.3d at 307 (discussing that strategic decisions, like disclosing communications to the government, may have consequences, like a waiver of privilege). Without a log or the opportunity for *in camera* review, the Special Master could not independently

determine whether materials were made with a predominant purpose of soliciting or rendering legal advice. *Raab v. New England Fin.*, No. 2:10-cv-186, 2011 WL 12614881, at *2 (S.D. Ohio Apr. 8, 2011) (finding that parties asserting the privilege must "provide[] sufficient information to establish the factual predicates for the assertion of the privilege or protection") (citing Fed. R. Civ. P. 26(b)(5)); *cf. Zigler*, 2007 WL 1087606, at *2–4 (finding, after *in camera* review, that the requested documents were "properly shielded" by the privilege). The Special Master rightly considered only the record and arguments before him. FirstEnergy failed to meet its burden of proving that the predominant purpose of the internal investigation was legal. Accordingly, this objection is **OVERRULED.**

### 3. Work-Product Doctrine

Turning to work-product doctrine, FirstEnergy similarly argues that the Special Master applied the wrong standard. (Doc. 607-1 at 44). According to FirstEnergy, the Special Master erred in using a "primary or sole purpose" test rejected by the Sixth Circuit in *United States v. Roxworthy*, 457 F.3d 590, 598–99 (6th Cir. 2006). (*Id.* at 46). The Court reviews the Special Master's decisions on work-product doctrine for abuse of discretion because the Sixth Circuit instructs that, unlike attorney-client privilege, such matters fall within the scope of discovery. *Roxworthy,* 457 F.3d at 592, n.1.

Work-product doctrine protects documents prepared "in anticipation of litigation." *Id.* at 594. To show that a document was prepared in anticipation of litigation, a party must establish that: (1) the document was prepared because of a party's subjective anticipation of litigation, "as contrasted with ordinary business purpose[s]"; and (2) the party's subjective anticipation was objectively reasonable. *In re Pros. Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009). Documents produced "to assist with a business decision" do not lose work-product protection "unless the documents would have been created in essentially similar form irrespective of the litigation." *Id.* at 598–99. Said differently, while

a document can be used both in the ordinary course of business and in anticipation of litigation without losing work-product protection, a court's inquiry "centers on whether documents were prepared or obtained because of the prospect of litigation." *McNeil v. Mount Carmel Health Sys.*, No. 2:20-cv-258, 2021 WL 5235103, at *4 (S.D. Ohio Nov. 10, 2021) (citing *Cooey*, 269 F.R.D. at 647). Again, FirstEnergy, as the party asserting work-product protection, bears the burden of proving that each document withheld was created because of litigation. *Id.* (internal quotation omitted).

Contrary to FirstEnergy's arguments, the Special Master applied the correct standard. (Doc. 571 at 6). Under Sixth Circuit precedent, the Special Master was tasked with determining if the materials sought were made "because of" litigation or if they "would have been prepared in substantially the same manner" regardless of litigation. (Doc. 571 at 6–7) (citing cases). And without the O'Neil Declaration, the Special Master found that FirstEnergy had not shown the internal investigation was conducted because of litigation, and not because of employment decisions and business concerns. (*Id.* at 14 ("Thus, Plaintiffs' assessment of the investigation rings true: FirstEnergy has failed to carry its burden to demonstrate it would not have commissioned substantially similar investigations to determine which employees were involved in a massive criminal corruption scheme but for the possibility of litigation." (internal quotation omitted))). Upon review, this Court cannot say the Special Master abused his discretion in finding so.

In its objections, FirstEnergy offers various lawsuits against the company as proof that the materials sought were produced for litigation purposes. (Doc. 607-1 at 45). But FirstEnergy's general references fail to satisfy its burden. Movants claimed that FirstEnergy conducted the internal investigation to satisfy its auditor, PricewaterhouseCoopers, so the company could file its necessary Form 10-Q; to evaluate which executives should be terminated; and to avoid a "declaration of default" by lenders "by striking a deal with the government." (Doc. 607-1 at 56, citing Doc. 529 at 7, 10–12).

And while FirstEnergy argues that these interests overlap with concerns over litigation, the company provided no direct evidence that materials created during the internal investigation were created because of litigation, and not for these other reasons. *In re Pros. Direct Ins.Co.*, 578 F.3d at 439 (finding that a party's general arguments that documents were both for business purposes and for litigation purposes were not enough to satisfy their burden); *see also Allied Irish Banks*, 240 F.R.D. at 107 (finding no work-product protection where a party failed to provide evidence of what it would have done without the threat of litigation).

FirstEnergy again relies on the rejected O'Neil Declaration as evidence "that the investigations would not have been undertaken absent then-pending and anticipated legal proceedings against the Company." (Doc. 607-1 at 48). But putting aside the O'Neil Declaration's deficiency, this too is a conclusory statement that does not help FirstEnergy meet its burden. "Affidavits supporting work-product protection must be specific and detailed to indicate that the documents were prepared in anticipation of litigation . . . . [a]nd application of work-product protection will be rejected where the only basis for the claim is an affidavit containing conclusory statements." *McNeil*, 2021 WL 5235103, at *4 (internal citations and quotations omitted); *see also Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381–82 (6th Cir. 2009) ("Quickway did not come forward with any affidavits or similar proof demonstrating that Dailey's statement was prepared in anticipation of litigation, much less the kind of specific and detailed evidentiary material that would be sufficient to meet this burden." (internal quotation omitted)). FirstEnergy did not provide specific, non-conclusory evidence to establish that litigation was the "driving force behind the preparation" of the disputed materials. *Roxworthy*, 457 F.3d at 595. And again, FirstEnergy did not submit documents to the Special Master for *in camera* review, so the Special Master could not independently determine their purposes.

As such, FirstEnergy has not established that the materials created during the internal

investigation are entitled to work-product protection, and its objection is **OVERRULED**.

### E. Order to Disclose

Next, FirstEnergy argues that the Special Master erred in ordering deposition witnesses to answer "all fact-related questions (past and future) related to the internal investigation." (Doc. 607-1 at 52). Because the Special Master's order is "within the scope of discovery," the Court reviews it for abuse of discretion. *See Ciccio*, 2022 WL 2182301, at *1; *see also Humble v. Mountain State Const. Co.*, 441 F.2d 816, 818–19 (6th Cir. 1971) (reviewing the court's "failure to order the plaintiff" to answer written and oral questions for abuse of discretion).

In his November 29 order, the Special Master instructed witnesses to "answer all fact-related questions," even if they learned of those facts due to the internal investigation. (Doc. 571 at 17). During the November 30 status conference, the Special Master clarified this order:

> [D]iscovery of the facts is permissible. Discovery of the attorneys at this point is not. Discovery of the attorneys' legal conclusions derived from those facts or thought processes to produce those facts is not discoverable. But the fact that a witness learned of a factual allegation or representation or statement of fact from an investigator or as a result of the investigation is fair game for discovery under my order.

(Doc. 587 at 23–24).

"Neither the attorney-client privilege nor the work product doctrine applies to prevent the disclosure of underlying facts, regardless of who obtained those facts." *Graff v. Haverhill North Coke Co.*, No. 1:09-cv-670, 2012 WL 5495514, at *50 (S.D. Ohio Nov. 13, 2012) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981)). Consequently, facts communicated from a lawyer to a witness are not protected. *See Smith v. Gen. Mills, Inc.*, No. 2:04-cv-705, 2006 WL 7276959, at *4 (S.D. Ohio Apr. 13, 2006) (finding a witness must disclose facts, even though the facts were conveyed to her by attorneys). Work-product and privilege concerns arise only if the inquiring party asks questions about attorneys' mental impressions of facts, attorneys' advice, or attorneys' "view as to

the significance or lack thereof of particular facts." *Smith*, 2006 WL 7276959, at *4.

Seemingly, FirstEnergy argues that all facts about the internal investigation are privileged or protected because, at some point, these facts were communicated by lawyers to various individuals. Time and again, courts have rejected this type of argument. While communications between attorneys and clients are privileged, facts are not. *Humphreys, Hutcheson and Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985) (citing *Upjohn Co.*, 449 U.S. at 395). And facts do not become privileged or protected because they were provided to witnesses by attorneys or acquired in anticipation of litigation. *See, e.g.*, *Protective Nat. Ins. Co. of Omaha v. Commonwealth Ins. Co.*, 137 F.R.D. 267, 280 (D. Neb. 1989) ("There is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel."); *United States v. BAE Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2017 WL 1457493, at *5–6 (E.D. Mich. Apr. 25, 2017); *Basulto v. Netflix, Inc.*, No. 22-21796, 2023 WL 3197655, at *2–3 (S.D. Fl. May 2, 2023) ("[F]act-oriented discovery is permitted even if the witness learned about the facts from her attorneys."); *Clear Cast Grp., Inc. v. Ritrama, Inc.*, No. 1:09-cv-169, 2011 WL 13334451, at *6 (N.D. Ohio Sept. 15, 2011). So too here. Facts related to the internal investigation are not shielded simply because they were funneled through attorneys to witnesses.

To the extent FirstEnergy asserts that the Special Master's order allows privileged information to be disclosed, FirstEnergy misreads the order. The Special Master clearly stated that privileged or protected information is not discoverable. For example, the Special Master said that while facts are discoverable, "[d]iscovery of the attorneys. . . is not." (Doc. 587 at 23). The Special Master further clarified that "[d]iscovery of the attorneys' legal conclusions derived from those facts or thought processes to produce those facts is not discoverable." (*Id.* at 23–24). Thus, FirstEnergy's objection is **OVERRULED**.

## F.  Waiver of Privilege and Work-Product Protections

Finally, FirstEnergy objects to the Special Master's characterization that the parties took an "all or nothing approach" to the internal investigation.  (Doc. 607-1 at 59–61).  In his order, the Special Master observed that the parties "repeatedly bundled" the Squire and Jones Day investigations into one, multi-phase effort, seemingly taking the stance that "everything is discoverable or nothing is." (Doc. 571 at 16).  FirstEnergy contends that this Court should reject that approach and instead "order additional logging of privileged documents or sampling of documents for *in camera* review" to determine what materials are privileged or protected.  (Doc. 607-1 at 60–61).

FirstEnergy's request is too little, too late.  It is not this Court's role belatedly to help FirstEnergy cure the consequences of its strategic decisions.  FirstEnergy claims they objected to Movants' "general" request for the internal investigation's materials, but FirstEnergy only did so in a footnote.  (*See* Doc. 510 at 20, n.5); *see, e.g.*, *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 856 (6th Cir. 2005) ("An argument contained only in a footnote does not preserve an issue for our review.").  FirstEnergy also made the decision not to maintain privilege logs for materials "concerning H.B. 6" "dated after July 21, 2020."  (Doc. 510 at 20, n.5).  Consequently, that choice resulted in the Special Master lacking detailed logs to distinguish between the Squire and Jones Day portions of the investigation.  The company also never requested *in camera* review of any materials. (Doc. 607-1 at 61; Doc. 571 at 16).  Because of FirstEnergy's decisions, the Special Master had to rely on the parties' arguments and representations of what the withheld materials contained and why they were created.  (*See* Doc. 571 at 16 (recognizing this unusual approach by the parties)).

And as the Special Master said, throughout the extensive briefing on the motion to compel, the parties seemingly bundled the Squire and Jones Day investigations into one.  For example, in its response to the motion to compel, FirstEnergy discussed the investigations together, without making

significant arguments that each phase was privileged or protected. (*See, e.g.*, Doc. 510 at 18, n.4 ("The internal investigations undertaken by Squire on behalf of the SIC and IRC, and the internal investigation undertaken by Jones Day, are referred to collectively herein as the 'Investigations.'"); *Id.* at 24–26 (discussing the investigations and their purposes together); *Id.* at 35–39 (same)). While FirstEnergy made a belated attempt to separate the two investigations during oral argument, the company failed to provide evidence other than the O'Neil Declaration to support its position. (Doc. 612 at 25, 37, 46; Doc. 571 at 16–17); *see also United States v. Huntington Nat. Bank*, 574 F.3d 329, 332–33 (6th Cir. 2009) ("To raise an argument, a litigant must provide some minimal argumentation in favor of it.").

Even though the parties conflated the investigations, the Special Master also analyzed the investigations separately before granting the motion to compel. (Doc. 571 at 16–17). Either way, the Special Master found that FirstEnergy failed to meet its burden to establish privilege or work-product protection. (*Id.* at 16–17). The Court finds no error in this approach or conclusion.

As previously discussed, without the O'Neil Declaration, FirstEnergy presented no persuasive evidence of the motivations behind each investigation. Even though FirstEnergy objects to the Special Master's "all or nothing" characterization, he still analyzed each investigation individually and concluded that FirstEnergy failed to present sufficient evidence that either investigation was protected. (Doc. 571 at 16–17). Accordingly, the Special Master did not err, and this objection is **OVERRULED.**

As a final note, the parties extensively briefed additional issues regarding waiver of privilege and work-product doctrine. (Doc. 607-1 at 54–61; Doc. 614 at 10–17; Doc. 615 at 43–56). But the Special Master did not reach these questions. (Doc. 571 at 16). The Court agrees that the Special Master did not need to address them, having correctly found that attorney-client privilege and work-

product doctrine do not protect the sought materials. (*Id.*). Likewise, the Court finds it unnecessary to decide those questions now. Therefore, any objections made by FirstEnergy concerning waiver are **OVERRULED.**

## IV. Other Motions

In the aftermath of the Special Master's granting of the Motion to Compel, (Doc. 489), FirstEnergy filed a flurry of motions, including a Motion to Stay the Special Master's November 29, 2023, Order (Docs. 573, 574); a Motion for Reconsideration of the Special Master's November 29 and November 30 Orders (Doc. 592); and a Motion for Leave to File a Reply to FirstEnergy's Objections (Doc. 622). The Special Master denied or recommended denying the Motions. (*See* Docs. 634 (recommending denying FirstEnergy's motion for a stay), 636 (denying FirstEnergy's motion for reconsideration), 635 (denying FirstEnergy's motion for leave to file a reply)). Defendants objected to all of the rulings. (Doc. 643 (certain individual Defendants' objections to the Special Master's Order denying a stay); Doc. 644 (FirstEnergy's objections to the Special Master's denial of the motion to stay); Doc. 645 (FirstEnergy's objections to the Special Master's denial of its motion for reconsideration); Doc. 640 (FirstEnergy's objections to the denial of leave to file a reply)). These matters are largely moot under this Order. Nonetheless, the Court briefly addresses each below.

### A. Order Denying FirstEnergy's Motion to Stay

After the Special Master granted the Motion to Compel, FirstEnergy moved to stay that decision "pending resolution of its objections." (Doc. 574 at 9). Because this Order has overruled those objections, FirstEnergy's Motion to Stay is now **MOOT**.

Yet Defendants[3] raise additional concerns about the Special Master's comments on

---

[3] Individual defendants Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Jason J. Lisowski, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, George M. Smart, Steven E. Strah, K. Jon Taylor, Jerry Sue Thornton, Leslie M. Turner, and James F.

depositions in this case. (*See* Doc. 643 at 2–3; Doc. 644 at 13–14). Specifically, Defendants take issue with the Special Master's statement that Plaintiffs may reserve time for depositions and resume them after the objections concerning the internal investigation materials are resolved. (*See id.*; *see also* Doc. 587 at 31–32 (granting Plaintiff's request to reserve time)). Defendants say this procedure burdens witnesses and effectively modifies the deposition protocol for this case. (Doc. 643 at 2–3; Doc. 644 at 13–14). The record is not clear on whether depositions have occurred since the Special Master's Order granting the Motion to Compel. If no depositions have taken place, this issue is now moot because this Order overrules FirstEnergy's objections regarding the internal investigation materials.

Regardless, Defendants' arguments are not persuasive. The Special Master's statement did not modify the deposition protocol in this case. The deposition protocol allows for "up to eighteen hours for each fact deposition, divided evenly between Plaintiffs and Defendants." (Doc. 355 at 1–2). The protocol also states that witnesses may be deposed only once "[a]bsent agreement of the Parties or order of the Court." (*Id.* at 2). At the time of this deposition protocol, no special master had been appointed. Now, under his Appointment Order, the Special Master is charged with "address[ing] pretrial matters," including establishing discovery schedules, resolving discovery disputes, overseeing docket management, and generally supervising formal discovery. (*See* Doc. 541 at 3–4). Managing depositions is soundly within his duties. (*See id.* at 541 (stating the Special Master has the authority from the Court to carry out these duties)); *see also Accusoft Corp.*, 237 F.3d at 58 ("During the performance of his duties, a master is functionally indistinguishable from a trial judge."). Thus, the Special Master has the authority to manage depositions. Defendant's objections on this

---

Pearson joined in FirstEnergy's objections to the Special Master's Order on the Motion to Stay. (*See* Docs. 643, 644). As such, this Court refers to this collective as "Defendants" for the purposes of this section regarding the Motion to Stay.

point—to the extent that they are not moot—are **OVERRULED**.

### B. Order Denying FirstEnergy's Motion for Reconsideration

Next, this Court has reviewed FirstEnergy's objections to the Special Master's Order denying its Motion for Reconsideration (Doc. 645). In its objections, FirstEnergy relies on its previous and extensive briefing. (Doc. 645 at 2 (citing previous filings)). This Order **MOOTS** the Motion for Reconsideration, and FirstEnergy's objections (Doc. 645) are **OVERRULED**.

### C. Order Denying FirstEnergy's Reply

Finally, FirstEnergy objects to the Special Master's Order denying its motion for leave to file a reply brief to its objections. (Doc. 640). Because of this Order, this issue is **MOOT**. But again, FirstEnergy challenges the Special Master's authority.

As stated above, the Special Master is tasked with overseeing management of the docket in this action, as well as directing and supervising implementation of and compliance with this Court's orders. (Doc. 541 at 4). This Court previously ordered that the parties "will not have the opportunity to file a reply to the response [to objections] unless otherwise ordered by the Court." (Doc. 576 at 2). Said differently, this Order means that no reply briefs shall be filed for objections, unless the Court orders otherwise. Here, the Court did not order a reply brief to FirstEnergy's objections concerning the Motion to Compel. Rather, FirstEnergy sought leave to file such a reply. The Special Master, carrying out his duty to manage the docket and comply with this Court's orders, properly denied FirstEnergy's motion. Any objection to the Special Master's Order denying a reply is therefore **OVERRULED**.

### V.      Conclusion

For the foregoing reasons, FirstEnergy's objections (Doc. 607) to the Special Master's Order granting the Motion are not well-taken and are **OVERRULED**. Furthermore, Defendants'

objections concerning FirstEnergy's motion for a stay, motion for reconsideration, and motion for a reply (Docs. 640, 643, 644, 645) are **OVERRULED**.  The Clerk is **DIRECTED** to terminate FirstEnergy's Motion to Stay (Doc. 573), which is **MOOT** under this Order.

      IT IS SO ORDERED.


Date:  May 6, 2024

_____
ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE


/s/ Kimberly A. Jolson
_____
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT D

**(R. 511-1, Declaration of James F. O'Neil, III)**

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | <u>CLASS ACTION</u> |
| | ) | |
| This Document Relates To: | ) | Judge Algenon L. Marbley |
| | ) | Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS | ) | |
| | ) | |
| MFS Series Trust I, et al., | ) | Case No. 2:20-cv-03785-ALM-KAJ |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| FirstEnergy Corp., et al., | ) ) | |
| Defendant. | ) ) | |
| | ) | |
| Brighthouse Funds Trust II – MFS Value Portfolio, et al., | ) ) ) | Case No. 2:20-cv-03785-ALM-KAJ |
| Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| FirstEnergy Corp., et al., | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF JAMES F. O'NEIL, III**

I, James F. O'Neil, III, hereby declare under penalty of perjury as follows:

1.      I am an independent director serving on FirstEnergy Corp.'s Board of Directors.  I have been a member of the Board since January 17, 2017.

2.      I am currently the Chair of the Board's Compensation Committee and have been since May 2019, and I have been a member of the Board's Audit Committee since May 2022.  I was also a member of the Audit Committee from May 2017 to May 2019.  I previously served as the Chair of the Board's Audit Committee from May 2018 to May 2019, and I was a member of the Board's Operations and Safety Oversight Committee (formerly, the Nuclear Committee) from May 2017 to May 2022.

## I.      Householder Criminal Complaint and the Legal Actions Against FirstEnergy

3.      On July 21, 2020, the United States Department of Justice (DOJ) arrested former Speaker of the Ohio House of Representatives Larry Householder and unsealed a criminal complaint (the "Householder Complaint") alleging that Householder was a member of a criminal enterprise that helped pass Ohio House Bill 6, known as H.B. 6, in exchange for payments from an unnamed company. The Householder Complaint alleged that senior officers of that unnamed company had participated in this criminal enterprise.  This was brought to the attention of directors rapidly because FirstEnergy management, as well as financial analysts and the media, understood that the unnamed company referred to FirstEnergy.

4.      The same day, FirstEnergy received grand jury subpoenas in connection with the DOJ's criminal investigation into Householder and the alleged criminal enterprise concerning H.B. 6.

5.      After the DOJ unsealed the Householder Complaint, Board members and FirstEnergy anticipated that the Company would face government investigations, civil litigation, and regulatory proceedings related to the Company's role in the alleged events described in the

Householder Complaint.  By the next day, July 22, 2020, the price of FirstEnergy's common stock had declined by 34%.  Board members and FirstEnergy anticipated that the drop in FirstEnergy's stock price would trigger the filing of claims under the federal securities laws, as commonly occurs when public companies experience sharp stock declines following negative news.

6.      Numerous legal proceedings were commenced within weeks of the unsealing of the Householder Complaint, including this lawsuit and the lawsuits described below, all of which stemmed from the allegations in the Householder Complaint.  Some examples of these legal proceedings are described below.

7.      On July 26, 2020, stockholders of FirstEnergy filed a shareholder derivative action against FirstEnergy directors and officers in Ohio state court, alleging, among other things, breaches of fiduciary duty.

8.      On July 27, 2020, utilities customers of FirstEnergy filed a class action asserting civil Racketeer Influenced and Corrupt Organizations Act claims against FirstEnergy in federal court.

9.      On July 28, 2020, a stockholder of FirstEnergy filed a class action lawsuit asserting that FirstEnergy and its senior executives violated federal securities fraud laws, which I understand was the first-filed complaint in this action.  On July 28, 2020, I also received a notification that FirstEnergy had instituted a litigation hold for documents related to the allegations in the Householder Complaint.

10.      By August 7, 2020, as FirstEnergy publicly disclosed, eight civil lawsuits were already pending against FirstEnergy in state and federal courts relating to the allegations in the Householder Complaint and the DOJ's investigation into H.B. 6.

11.     On August 10, 2020, FirstEnergy received a formal order of investigation from the U.S. Securities and Exchange Commission (SEC) relating to the allegations in the Householder Complaint.

## II.     The Squire Investigation for the Special Investigation Committee and the Independent Review Committee

12.     In late July 2020, the Board held several special meetings to discuss the Company's response to the DOJ criminal investigation and litigation filed against FirstEnergy.

13.     By July 25, 2020, the Board had decided to retain Squire Patton Boggs LLP to conduct an internal investigation into the allegations in the Householder Complaint.  The Board chose Squire because it did not regularly engage in legal work for FirstEnergy and because Squire had substantial experience conducting internal investigations.  Joseph Walker, the lead partner on the Squire investigation team, was a former criminal prosecutor with the DOJ and, as a partner at Squire, had led numerous internal investigations for large institutions.

14.     Shortly thereafter, on or around July 28, 2020, the Board authorized the formation of a Special Investigation Committee ("SIC").

15.     The Board formed the SIC to provide independent oversight over Squire's internal investigation of the allegations in the Householder Complaint.

16.     The members of the SIC were all independent directors (*i.e.*, directors who were not part of FirstEnergy management).  I was one of the ten independent directors who were members of the SIC.

17.     On or around July 28, 2020, the SIC formally engaged Squire to conduct the internal investigation.  The SIC met frequently with Squire to discuss Squire's investigative findings, legal analyses, and assessments of potential criminal and civil liability.

18.     On or around September 8, 2020, after the SIC had completed its work on the initial phase of the internal investigation, the Board formed the Independent Review Committee ("IRC").

19.     Like the SIC, the IRC was exclusively comprised of independent directors, and I was one of the twelve independent directors that comprised the IRC.  The IRC was formed to provide ongoing independent oversight of counsel's investigative work and ongoing review and assessment of the legal risks associated with the allegations in the Householder Complaint, the DOJ criminal investigation, the SEC investigation, and other pending and anticipated legal proceedings.

20.     The IRC engaged Squire to continue its investigative work and to advise the IRC on the risks described above.

21.     The IRC met frequently with Mr. Walker and other Squire attorneys to discuss Squire's investigative findings, legal analyses, and assessments of potential criminal and civil liability.  Squire continued to advise the IRC until at least June 2021.

### III.     The Jones Day Investigation for FirstEnergy

22.     On or around July 22, 2020, FirstEnergy retained Jones Day to advise the Company on its response to the DOJ criminal investigation and to conduct an internal investigation into the allegations in the Householder Complaint.

23.     Stephen Sozio led the Jones Day team.  Prior to joining Jones Day, Mr. Sozio spent ten years as an investigating prosecutor for the Organized Crime Strike Force Unit of the U.S. Attorney's Office for the Northern District of Ohio.  As a partner at Jones Day, Mr. Sozio had conducted numerous internal investigations in response to federal and state criminal and regulatory investigations.

24.     The Jones Day internal investigation was independent of and separate from the Squire investigation.

25.    FirstEnergy also retained Jones Day to represent the Company in many of the lawsuits related to the allegations in the Householder Complaint and to advise the Company on its response to the SEC investigation.

## IV.    The Reasons for the Investigations

26.    I understand that Plaintiffs in this action, plaintiffs in other related lawsuits against FirstEnergy, and two defendants in this action (Charles Jones, FirstEnergy's former Chief Executive Officer, and Michael Dowling, FirstEnergy's former Senior Vice President of External Affairs) (together, "Movants") have claimed that the internal investigations by FirstEnergy and its Board committees were not undertaken because of the DOJ criminal investigation and the pending and anticipated litigation, but that instead the investigations were undertaken for various business reasons.

27.    This is not correct.  Squire was retained by the SIC and the IRC, and Jones Day was retained by FirstEnergy, to conduct internal investigations in response to the DOJ criminal investigation and the pending and anticipated litigation matters described above, which include this securities class action.  These investigations were not undertaken to appease PwC or because of concerns about raising capital, as I understand Movants suggest.

28.    As the internal investigations unfolded, the information and facts that Squire and Jones Day discovered through their investigative work were used to help inform employment decisions, and those firms also provided legal advice to assist the IRC in making legally sound employment decisions.  But any employment-related issues were ancillary and not the primary reason for engaging these firms or for their investigatory work.

29.    Were it not for the DOJ criminal investigation and pending litigation in late July 2020—and further anticipated litigation and regulatory proceedings, which later materialized—the internal investigations would not have been undertaken.  The internal investigations were

undertaken because the Company was directly responding to the very significant legal risk it suddenly faced and that rapidly expanded over the course of a few days, and then continued to grow over the coming weeks and months. FirstEnergy's independent board committees and management relied heavily on the work and expertise of Squire and Jones Day to navigate and manage these risks.

30.     During the internal investigations, neither Squire nor Jones Day was authorized to waive attorney-client privilege or work product protection. Squire and Jones Day were authorized to respond to inquiries from FirstEnergy's auditor, PricewaterhouseCoopers ("PwC"), but without waiver of attorney-client privilege or work product protection. As an independent auditor, PwC is required to assess the adequacy of the Company's internal controls over financial reporting and the Company's public disclosures on those matters in its financial statements. PwC's evaluation was necessarily intertwined with matters raised in the DOJ criminal investigation related to H.B. 6 and the ensuing litigation. The Board committees and FirstEnergy understood that responses to PwC's inquiries could require confidential disclosure to PwC of information uncovered in the investigations or, if necessary, confidential disclosure of attorney work product from the investigations, without waiving work product protection.

Executed on July 26, 2023.

/s/
James F. O'Neil, III

-7-